**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| DERRICK PETROLEUM SERVICES, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CASE NO. _____ |
| | § | |
| PLS, INC., | § | |
| | § | |
| *Defendant.* | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

COMES NOW, Derrick Petroleum Services ("Plaintiff" or "Derrick"), Plaintiff in the above-styled action, and files this Original Complaint against PLS, Inc. ("Defendant" or "PLS"), and in support would show as follows:

**I.**

**SUMMARY OF THE DISPUTE**

1.      Plaintiff Derrick has brought this suit because its business associate has wrongfully purloined its proprietary database product, sidestepped it to offer similar products to market, and failed to distribute sales revenues evenly as agreed. After enduring nearly five years of a relationship plagued by repeated breaches of contract, threats of misappropriation of Derrick's database product, and other abusive tactics, Plaintiff Derrick is forced, *inter alia* by PLS's most recent and egregious breach of contract, to petition this Court to determine the rights and obligations between it and Defendant PLS and to provide it declaratory, economic, and injunctive relief from PLS's continued wrongs.  Derrick, connected to PLS by a threadbare and temporary Memorandum of Understanding, has watched PLS abuse Derrick's goodwill by

wrongfully withholding revenues which rightly belonged to Derrick, by marketing competing products in gross violation of its contractual duties, and even by threatening to steal and profit from Derrick's own property.   Derrick, having suffered long enough, now seeks the legal declaratory, and injunctive relief necessary from this Court to bring clarity and a resolution to the parties' business relationship.

## II.

## PARTIES

2.      Plaintiff Derrick Petroleum Services is a partnership organized under the laws of the Republic of India.

3.      Defendant PLS, Inc. is a Texas corporation doing business in Harris County, Texas, whose principal office is located at 1 Riverway, Suite 2500, Houston, Texas 77056. Defendant may be served through its registered agent, Ronyld W. Wise, at 1 Riverway, Suite 2500, Houston, Texas 77056.   Plaintiff requests the clerk issue citation and service of process at this time.

## III.

## JURISDICTION AND VENUE

4.      The Court has original subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.  Diversity of citizenship is present because Derrick is a citizen of India and has its principal place of business in India, while Defendant is a citizen of Texas and has its principal place of business in Texas.   Further, the total amount in dispute in this case is greater than $75,000, excluding interest and costs.  The Court additionally has subject matter jurisdiction to render requested declaratory relief under 28 U.S.C. § 2201.

5.     Venue is proper in this district pursuant to the provisions of 28 U.S.C. § 1391(b)(1) because PLS resides within this district.  Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this district.

## IV.

## BACKGROUND FACTS

6.     Plaintiff Derrick, based in Bangalore, India, provides oil and gas industry intelligence databases and reports to companies around the world.  Derrick was founded in 2006 and its Managing Partner is Yashodeep Deodhar.  Deodhar at the time recognized a need in the industry for a single source one-stop platform providing sound analysis of global oil and gas transactions and projects.  Derrick's primary product both during its formative years and still today is the Oil and Gas Mergers and Acquisitions Database (the "Database"), which was earlier known as the E&P Transactions Database.  Derrick created the Database in 2007 and has marketed internationally since 2008.  Throughout this period of time, Derrick has constantly and single-handedly upgraded the Database to higher versions in content and presentation while retaining complete and exclusive editorial control.

7.     In late 2009, although Derrick had found significant success marketing the Database in Europe, it nevertheless felt there were opportunities specifically in the North American market that it wished to target.  Defendant PLS, on the other hand, had been providing news reports and other products in the North American market for years and had significant customer contacts in the region.  As such, PLS was poised to market the Database to both United States and Canadian customers.

8.      Brian Lidsky, a former Derrick consultant who had recently been hired by PLS, recognized an opportunity for the two parties to work together to expand the Database's visibility and customer base in North America.  Lidsky contacted Derrick to explore the possibility of a marketing agreement whereby PLS would market the Database in the United States and Canada in exchange for a share of revenues stemming from sales of the Database in that region.

9.      Derrick showed interest in such an arrangement, and Lidsky introduced Deodhar to Ronyld Wise, PLS's Managing Director, who agreed that such an arrangement was in the best interests of both PLS and Derrick.

10.     In August 2009, discussion were held between Wise, Lidsky, and Deodhar in Houston and, upon Deodhar's return to India in September 2009, Derrick received a temporary Memorandum of Understanding (the "MOU") drafted by Lidsky on PLS's behalf as a placeholder to memorialize Derrick's and PLS's intentions for the time being, until the parties were able to execute a more formal agreement.  As Lidsky himself noted at the time, the parties would need to formalize a firmer agreement and details, but the MOU would be sufficient for the parties to move forward in the interim.

_The Memorandum of Understanding_

11.     The MOU itself (Exhibit 1 to this Complaint) explicitly provides that "the Parties agree to target October 31, 2009," less than a month from the date the parties signed the MOU, "to formalize a written Joint Venture Agreement."  A formalized Joint Venture Agreement was never executed, however, leaving the MOU—a temporary document which was never contemplated to govern the parties' relationship for more than a matter of weeks—as the sole agreement between the parties.

12.     The MOU broadly (and somewhat vaguely) delineates the parties' respective roles in the development and marketing of the Database.  As one would expect in an agreement of this nature, Derrick assumed all responsibilities concerning the Database itself, including "existing M&A database platforms, … database updates and integrity, … [and] client services and training where appropriate."  (Ex. 1)  On the other hand, PLS promised to provide "a full license to PLS' brand and corporate name, … Marketing," and, since it would be responsible for sales of the Database in North America, North American "Client invoicing, collection, and distribution of revenue" to the parties.  (Ex. 1)

13.     In addition to describing the role of each party, the MOU recounts a list of agreements between Derrick and PLS, including:

a.   the promise to "co-brand" efforts to market the M&A Database, including the parties' websites and "all Press Releases, Market Updates, and Research Announcements";

b.   the promise to "share all revenues…50/50" and for each party to bear its own expenses, with PLS shouldering responsibility for "100% of costs of marketing" in North America and Derrick bearing responsibility for "100% of costs for product development and operations, quality control"; and

c.   the promise "to work together exclusively on these efforts" efforts during the MOU's term and not to "circumvent the other party for similar product offerings."

14.     With regard to its term, the MOU states: "The intent is for a long term relationship.  The initial term is for 5 years."  Per the MOU, then, the parties, although both envisioned a long-term relationship, only agreed to work together for a term of five years.

15.     The MOU also provides an early termination mechanism, called an "Exit Mechanism," that outlines various penalties for each party in the event of that party's early exit.

The MOU provides that should PLS exit before the end of the MOU's term, it "shall forfeit revenues from existing and targeted clients of the service and provide Derrick Petroleum with all documentation regarding marketing activities" and additionally it "will not sell similar products to the same clients … for a minimum of two years."

16.     Although it is the sole agreement governing the parties' relationship, the MOU is not the formal, comprehensive documents that the parties envisioned, and its imprecise language must be supplemented with the parties' course of conduct over the past 4 years as well as common commercial standards and expectations.

17.     To take one example, although the MOU forbids each party from circumventing the other for "similar product offerings," it does not define the term "similar product offerings." PLS has, however, through its prior course of performance under the MOU, defined this term narrowly, as it has independently launched a product known as "DocFinder," which was similar in certain ways to an add-on feature in the Database called Document Search Tool,[1] but was dissimilar to the primary portion of the Database containing oil and gas transactions data. Accordingly, given PLS's course of performance, Derrick considers the term "similar product" to be defined to exclude products such as DocFinder, and to include only products which offer some type of oil and gas transactions datasets.

18.     Additionally, the MOU envisioned the future establishment of a joint venture through the execution of a more formal Joint Venture Agreement.  However, that agreement was never signed.   Given the failure of the parties to "follow through" on the Joint Venture

---

[1] It bears noting that, prior to PLS's launch of DocFinder, Derrick itself had developed and shared with PLS an analogous product known as "DocSearch" which it intended to market jointly with the Database.  Upon learning of PLS's offering of DocFinder, Derrick attempted in good faith to harmonize the two products, but PLS has insisted upon marketing DocFinder separately.

Agreement and the absence of any sharing of profits and losses as required by law in a joint venture, it is clear that the parties' relationship has remained an arms' length contractual relationship rather than one in the nature of a joint venture or partnership.  Despite this fact, it is evident from the language of the MOU itself that the parties explicitly agreed to work together "in good faith."

_PLS Grossly and Egregiously Breaches Various Agreements Made in the MOU._

19.     Since the parties' signing of the MOU, PLS has breached the MOU on multiple occasions.

20.     Most seriously, as of May 17, 2014, PLS has begun to market another similar product called OpFinder to customers in North America and internationally.  OpFinder competes directly with the Database, offering listing and analysis of both current and past oil and gas transactions.  According to its own website, OpFinder is defined as providing "worldwide information services for oil and gas exploration and production investment opportunities." This definition is nearly identical to that of the Database.

21.     The components of each product mirror each other.  For example, the types of transactions covered by OpFinder are "Exploration," "Undeveloped Discoveries," "Producing Fields," and "Licensing Rounds."   To compare, the Database includes the categories "Exploration blocks previously awarded," "Discoveries not yet under development," "Fields under development," "Producing fields," "Corporate M&A," and "New Exploration Awards." OpFinder further covers "Active Opportunities" which are essentially identical to the "Deals in Play" section of the Database and "Completed Opportunities" which are covered similarly in the Database.   While OpFinder offers "Attached Documents," the Database offers "Source

Documents." Examples of specific deals mentioned on the home page of OpFinder and also found in the Database.

22.     Given these striking similarities, PLS' recent marketing efforts of OpFinder represent an extremely serious and direct breach of the parties' agreement not to circumvent each other for similar products, as PLS is now actively marketing a nearly identical product.

23.     In addition, PLS has consistently refused to offer the Database as a co-branded product as required by the MOU.  In the early stages of the parties' relationship, PLS marketed the Database as the "PLS M&A Database," with no mention of Derrick's name whatsoever. Recently, in response to repeated objections by Derrick, PLS has begun to at least mention Derrick's name, albeit in a subordinate manner (at times using the phrase "in conjunction with Derrick Petroleum Services" in fine print on marketing documents and its website).  Derrick, for its part, has consistently and unequivocally voiced its strong objection to PLS's refusal to co-brand.

24.     In PLS's view, any attempt to co-brand the Database was absurd—despite its earlier promise in the MOU to do so, PLS no longer had any interest in co-branding.  Derrick has struggled to stop PLS from selling the Database to customers as if it were solely a PLS product.

25.     Finally, PLS, who has responsibility for distribution of revenues under the MOU, has also broken its promise to share revenues evenly.  In one instance, PLS unilaterally determined and informed Derrick that it would pay Derrick less than its 50% share that particular month.  In support of this gross violation of the agreement to share revenues evenly, PLS falsely claimed that it had incurred some expenses that it believed Derrick should be responsible for.

26.     At times, PLS has even admitted that it does not intend to honor the parties' agreement to share revenues evenly (despite the clear language of the MOU), claiming at one

point that Derrick is not entitled to 50% of revenues due to its failure to add certain deal information to the Database.

27.     In recent months, PLS has refused to share copies of customer contracts, leaving Derrick in the dark concerning revenues.  Given PLS's past history of failing to make payment in full and its direct threats of deducting amounts from Derrick's share of revenues, Derrick has reason to suspect that PLS has been improperly deducting its own costs before sharing revenues. The amount of total revenues, and , hence, the extent of PLS's deductions, can only be determine by conducting an audit of the withheld customer contracts.

_PLS Improperly Asserts an Ownership Interest in the Database._

28.     In addition to PLS's various breaches of the MOU, PLS has taken inconsistent positions as to when it believes the parties' relationship will end.  At times, PLS has pointed to the vague statement in the MOU predicting a "long term relationship" as evidence that the MOU's term is not limited to five years.  On other occasions, including as recently at May 22, 2014, however, PLS has made clear that it intends for the parties' commercial relationship to end in its entirety by October 2014 and for each party to market database products in North America separately at that time.  PLS's vacillation concerning the MOU's end date is likely borne of its desire to continue to receive the reliable revenue stream generated by its Database sales.

29.     PLS seems to have realized that there is at least a good chance that the parties will go their separate ways in October 2014, and it has begun to lay the groundwork for a scheme to allow it to continue to market the Database—and to continue to receive the steady stream of income that Database subscriptions provide—long into the future.

30.     In order to secure this continuing income stream, PLS has recently begun to claim that it owns 50% the Database.  PLS has asserted these claims despite the fact that Derrick created and marketed the Database for years before it had even met PLS.  PLS's Database ownership claims have taken various forms, but, typically, PLS has asserted that it owns 50% of the Database while Derrick owns the other 50%.

31.     When asked for a basis for its specious ownership claims PLS has inexplicably claimed that Derrick conveyed a 50% interest in the Database to PLS under the terms of the MOU.  However, not only is there no language indicating such a conveyance in the MOU, there is also no consideration for such a conveyance in the MOU.

32.     Alternatively, PLS has claimed that data and analysis that it has provided to Derrick over the course of the parties' dealings have entitled it to a 50% ownership interest in the Database.  Although PLS has over the years offered some token contributions in the way of data and analysis—contributions no different in nature than those sometimes made by Database customers—the Database has always remained the property of Derrick, who created it before the parties ever met and has sole responsibility under the MOU for updating and maintaining the Database.  To be clear, Derrick has at all times (i.e., before signing the MOU with PLS and after signing the MOU) implemented all data updates, defined all analysis protocols, and created all software application for data presentation.  Further, whatever *de minimus* contributions PLS has offered have been more than compensated for by its generous 50% share of revenues.

33.     PLS, armed with its new contention that it owns 50% of the Database, now threatens to essentially shut Derrick out of the North American market by misappropriating the Database from Derrick in the fall of 2014, characterizing it as PLS's own database, and continuing to market it to current Database customers.

## V.

## DAMAGES FOR BREACH OF CONTRACT

34.     Derrick realleges and incorporates the allegations set forth above.

35.     Derrick and PLS, by executing the MOU, entered into a valid, enforceable contract on October 3, 2009.

36.     Derrick has performed its obligations under the MOU, providing, updating, and maintaining the Database from 2009 to the present, and providing client training as needed.

37.     Despite Derrick's performance, PLS has breached the terms of the MOU, by:

a.      offering OpFinder, an identical product, independently and without Derrick's cooperation;

b.      refusing to co-brand the Database in conjunction with its marketing efforts; and

c.      threatening to refuse to share revenues evenly and refusing to share customer contract information so as to allow Derrick to determine actual revenues.

38.     PLS's breaches of the MOU have harmed Derrick in a variety of ways, as more comprehensively described above.  Accordingly, Derrick seeks damages in the form of unpaid revenues, damages to Derrick's brand caused by PLS's refusal to co-brand the Database in its marketing efforts, and damages in the form of lost profits and lost business opportunities to Derrick caused by PLS's offering of OpFinder.

39.     In addition to the above breaches, PLS, by its attempts to circumvent Derrick, its failure to properly account to Derrick its share of revenues, and its specious claims of Database ownership, has breached of its duty of good faith and fair dealing, as agreed to in the MOU itself.

40.     Further, PLS's sustained and repeated breaches of the MOU have effected termination of the MOU and have triggered the MOU's Exit Mechanism, which explicitly

provides for certain penalties to PLS in connection with its breach.  Among these penalties, PLS is required to "forfeit all revenues from existing and targeted clients of the service."  Derrick seeks these damages in addition to the above-described damages.

41.     Finally, Derrick seeks certain declaratory and injunctive relief stemming from PLS's breach of the MOU, as further detailed below.  Although Derrick seeks the injunctive relief requested below, the provision of financial damages for PLS's breach of contract is not inconsistent with injunctive relief, because even where money damages are available to compensate for some harm, other less tangible injuries cannot be so easily valued or compensated, so that the availability of  money damages that  do  not  fully  compensate  Derrick  do  not  preclude a preliminary injunction.  *See, e.g., Glenwood Bridge v. City of Minneapolis*, 940 F.2d 367, 371–72 (8th Cir. 1991).

## VI.

## REQUESTS FOR DECLARATORY RELIEF

42.     Derrick realleges and incorporates the allegations set forth above.

*Database Ownership*

43.     PLS's claims of ownership over the Database have created an actual controversy between the parties with respect to the ownership of the Database.

44.     While Derrick claims that it created, updated, maintained, and has owned the Database before and throughout the term of the parties' relationship, PLS, relying upon various theories as noted above, contends that it owns some interest in the Database.

45.     Accordingly, Derrick seeks a declaration from this Court that it is the sole owner of the Database, having created the Database before meeting PLS and having maintained sole control over the content of the Database at all times.

_Existence of a Joint Venture_

46.     As noted above, while the parties mentioned the future execution of a Joint Venture Agreement, this agreement was never signed.  Further, the parties' relationship as outlined in the MOU lacks many of the requirements for the creation of a joint venture under Texas law.

47.     Accordingly, Derrick requests a declaration from this Court determining that the parties have not entered into a joint venture, and that each party owes the other no residual duties at the conclusion of their business arrangement.

_Termination of the MOU_

48.     As shown above, PLS's various breaches of the MOU have operated to effectively terminate the MOU by excusing any further performance by Derrick thereunder.

49.     PLS breached the MOU by:

      a.     offering OpFinder, an identical product, independently and without consulting Derrick;

      b.     refusing to co-brand the Database in conjunction with its marketing efforts; and

      c.     threatening to refuse to share revenues evenly and refusing to share customer contract information so as to allow Derrick to determine actual revenues.

50.     Accordingly, Derrick seeks a declaration from this Court that PLS, due to its repeated breaches of the MOU, has effected the termination of the MOU, that such termination

occurred on or before May 17, 2014, and that pursuant to such termination, Derrick owes no further duties or obligations to PLS under the MOU.

*Expiration of the MOU.*

51.     Alternatively, if the Court determines that the MOU has not been terminated due to PLS's various breaches, as noted above, the MOU is set to expire by its terms on October 3, 2014.

52.     The parties have expressed differing views concerning, what, if any, obligations they may have toward each other after this date (due, in part, to the MOU's "long term relationship" language), casting a cloud of uncertainty over the parties' rights and obligations toward one another.  These controversies concerning the parties rights and obligations under the MOU require resolution by this Court.

53.     Accordingly, Derrick seeks an alternative declaration that, upon termination of the MOU by its terms on October 3, 2014, the parties' relationship will end completely, and the parties will have no rights or obligations toward one another after that point.

*Derrick's Right to Market the Database in North America.*

54.     Regardless of whether the MOU was terminated or will expire, due to the parties' disagreement as to their rights and obligations under the "long term relationship" language of the MOU, a further declaration from this Court is necessary to clarify Derrick's rights to market the Database to customers in the North American market, including to previous and existing customers of the Database.

55.     Such relief is required by the fact that, under the terms of the MOU, Derrick is prohibited from circumventing PLS in order to market the Database.  It is Derricks' contention that PLS's own breach of the noncircumvention provisions of the MOU, however, has rendered the MOU moot, and Derrick is therefore not restricted from marketing the Database in North America.  Alternatively, when the MOU expires in October 3, 2014, as PLS and Derrick will owe each other no further duties or obligations, Derrick will then be free to market the Database in North America without restriction.

56.     Accordingly, Derrick seeks a declaration that it has a legal right—either as of May 17, 2014 or as of October 3, 2014, depending upon the Court's view of the date of the MOU's termination—to offer the Database in the North American market, including to previous and existing Database customers.

## VII.

## REQUESTS FOR PERMANENT INJUNCTIVE RELIEF

57.     Derrick realleges and incorporates the allegations set forth above.


*Permanent Injunction Prohibiting PLS's Use of the Database Without Derrick's Permission and Prohibiting the Marketing of Similar Products such as OpFinder to the Same Clients for Two Years*

58.     In addition to the legal and declaratory relief requested above, injunctive relief is required in three respects to ensure that Derrick avoid irreparable harm.

59.     First, Derrick seeks both a prohibitory injunction ordering PLS to refrain from marketing the Database without Derrick's permission.  As shown above, the Database is owned entirely by Derrick, who created and has maintained control over its content from the beginning. However, PLS has threated to continue to market its own copy of the Database even without

Derrick's permission.  If PLS is allowed to essentially steal the Database from Derrick and continue to market it, Derrick will be deprived of incalculable business opportunities in the North American market.

60.    Additionally, Derrick requests that this Court enjoin PLS from marketing similar products such as OpFinder to existing or target clients for two years.  Specifically for OpFinder, Derrick requests that this court require PLS to halt all sales and marketing activities, to refrain from acquiring any more customer contracts or licenses, to refrain from acquiring any renewals of existing customer contracts or licenses, and to halt the provision of OpFinder services.[2] Derrick seeks this relief pursuant to the terms of the MOU itself, which provides that, in the event that PLS exits prior to the expiration of the MOU by its terms, PLS will "provide Derrick Petroleum with all documentation regarding marketing activities" and will "not sell similar products to the same client … for a minimum of two years."  (Ex. 1)  As noted above, PLS's sustained breaches of the MOU have effected the MOU's termination and triggered this Exit Mechanism.

61.    If the Court refuses to enjoin the above actions and PLS continues to market Derrick's Database, Derrick will suffer irreparable injury in the form of lost potential clients, the value of which is highly dependent upon various factors including the likelihood those clients renew Database subscriptions and the effect of word-of-mouth advertising from those clients to other potential clients.  Derrick is relatively new to the North American marketplace, and its lack of significant business history in North America places it in a relatively precarious position in the market, a position which in fact was the very reason it agreed to work with PLS in the first place.

---

[2] Derrick is willing to consider the provision of Database services to OpFinder clients for the remaining duration of their OpFinder contract so that these clients are not inconvenienced because of PLS's actions.

Should PLS be allowed to continue to market to customers in violation of the MOU's terms, the effect upon Derrick's position in the marketplace will be impossible to repair or value.

62.     Moreover, the injury that Derrick faces in being potentially shut out of the North American market far outweighs the injury that would be sustained by PLS if the Court enters injunctive relief.  Concerning the Database, PLS will still be free to build its own database, but will simply not be able to take advantage of Derrick's efforts.  Concerning similar products, PLS will only be restricted for the short period of two years and will only be unable to call upon the same clients.  And, even during the two-year period, PLS will still be able to call upon different clients to offer similar products.

63.     Finally, an injunction forbidding PLS from marketing the Database without Derrick's permission and from marketing similar products for two years will not adversely affect public policy or the public interest.  The public interest would be best served by the issuance of injunctive relief because the PLS's intended misappropriation of Derrick's property would be destructive to the sound and productive business practices that fuel a healthy economy.

64.     Accordingly, Derrick requests an injunction from this court prohibiting PLS from marketing the Database without Derrick's permission and from contacting the current and targeted Database clients for two years for marketing similar products.

*Permanent Injunction Requiring the Disclosure of All Documentation Regarding Customer Contracts and Marketing Activities*

65.     Derrick also seeks a mandatory injunction requiring PLS to provide Derrick with all documentation regarding marketing activities thus far.  Derrick's request for mandatory relief is also grounded in the MOU itself, which again provides that, in the event that PLS exits prior to

the expiration of the MOU by its terms, PLS will "provide Derrick Petroleum with all documentation regarding marketing activities" and will "not sell similar products to the same client ... for a minimum of two years."  (Ex. 1)

66.     The deprivation of marketing know-how that PLS is contractually required to provide in the event it exits will similarly injure Derrick irreparably and leave Derrick without an adequate legal remedy.  PLS's marketing documents represent the value it contributed to the parties' relationship.  The MOU's provision requiring PLS to share "all documentation regarding marketing activities" was included to ensure that, in the event PLS breached the Contract, Derrick, having given PLS half the revenues from the sales of the Database, would at least be able to preserve the value of that consideration in some way by retaining access to PLS's marketing documents for the Database.  Without access to these documents, Derrick, who entrusted PLS for marketing, will have no knowledge of the marketing plan for the Database, including, *inter alia*, what marketing strategies were employed for the Database, which customers PLS has already contacted or plans to contact, and which sectors of the industry PLS sought to focus on in marketing the Database.  No damages can adequately compensate for this lack of knowledge.

67.     Further, the harm that will befall Derrick if the parties' promises are not enforced greatly outweighs that which will befall PLS if the Court enforces the provisions of the MOU. While PLS will merely be held to is promise, if PLS is allowed to escape the MOU's provisions, Derrick will be deprived of the security afforded by the Exit Mechanism.

68.     Finally, the issuance of injunctive relief will not adversely affect public policy or the public interest, as public policy favors the enforcement of contractual promises like those present in the Exit Mechanism.

69.     Accordingly, Derrick requests an inunction from this Court requiring PLS to provide all documentation regarding customer contracts and marketing activities to Derrick.

70.     Alternatively, if the Court determines that the MOU has not been terminated due to PLS's breaches, but will expire by its terms on October 3, 2014, Derrick nevertheless seeks a mandatory injunction requiring PLs to provide Derrick with all customer contracts effective as of October 3, 2014, so that Derrick may properly service these customer for the remaining duration of their contracts and so that these customers' interests are not harmed in any manner.

## VIII.

## APPLICATION FOR PRELIMINARY INJUNCTION

71.     Fed. R. Civ. P. 65 authorizes courts to grant preliminary injunctive relief when appropriate.  A court should issue a preliminary injunction if the movant shows: (1) likelihood of success on the merits; (2) likelihood of suffering irreparable harm in the absence of preliminary relief; (3) balance of the equities tips in the movant's favor; and (4) injunction is in the public's best interest.  *Winter v. NRDC, Inc.*, 555 U.S. 7, 19, 129 S. Ct. 365, 374 (2008) (setting forth elements for preliminary injunction); *Paulsson Geophysical Services, Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008) (granting preliminary injunction in favor of intellectual property owner); *Ford Motor Co. v. DeMontrond Lincoln Mercury Co.*, 2009 U.S. Dist. LEXIS 89571, at *3 (S.D. Tex. Sept. 28, 2009) (granting preliminary injunction to remain in effect until final order from court).  The decision to issue a preliminary injunction is in the court's discretion.  *Baker Hughes Inc. v. Nalco Co.*, 676 F. Supp. 2d 547, 552 (S.D. Tex. 2009) (court has discretion to issue preliminary injunction for patent infringement). In this case, Derrick seeks from the Court a preliminary injunction prohibiting PLS from marketing OpFinder to clients in violation of the MOU, requiring PLS to cease all sales and marketing activities concerning OpFinder, to

refrain from acquiring any more customer contracts and licenses, to refrain from signing any renewals of existing customer contracts and licenses, and to cease provision of OpFinder services.[3]  Derrick can and will establish all four preliminary injunction factors for its breach of contract claim, thereby entitling it to preliminary injunctive relief.

72.      As detailed above, PLS's course of action in acquiring and marketing OpFinder, a product nearly identical to the Database, amounts to an egregious breach of its agreement in the MOU "not [to] circumvent [Derrick] for similar product offerings."  Given the clear language of the MOU in this regard, in addition to the facts shown above which establish that OpFinder is not merely similar but is nearly identical to the Database, the likelihood that Derrick will succeed on the merits of its breach of contract claim in this regard is high.

73.      Further, if it is allowed to continue its current course of action, PLS's marketing of OpFinder to the same customer base for whom the Database is targeted will cause irreparable injury to the Database's market share—and, as a result, to Derrick's business—for which there exists no adequate remedy at law.  If PLS continues to market OpFinder as an alternative to the Database, Derrick will suffer a loss of business opportunities, damage to its goodwill, loss of its competitive advantage, loss of existing and potential customers, and confusion in the marketplace, which will ultimately result in the loss of Derrick's market share. PLS's illegal acts will also result in harm to Derrick's reputation, including but not limited to, its reputation as being an innovator in oil and gas intelligence database systems.  These injuries, if allowed to occur, are irreparable and cannot be compensated after-the-fact by the assessment of damages.

---

[3] Derrick is again willing to consider the provision of Database subscriptions to OpFinder clients for the remaining duration of their OpFinder contracts so that these clients are not inconvenienced because of PLS's actions.

Indeed, given Derrick's relatively tenuous foothold in the North American marketplace, PLS's illegal actions may very well result in Derrick being unable to conduct business in the region.

74.     Additionally, although PLS may contend that an injunction would cause it to be harmed by not being able to effectively run its business, OpFinder is only one facet of PLS's business, and a nascent one at that.  Even in the presence of an injunction prohibiting it from marketing OpFinder, PLS will not be prejudiced from marketing the vast array of products it currently offers.  Further, even with regard to its marketing of OpFinder and any hardship imposed by an injunction prohibiting the same, such a hardship is one "imposed by law, not by any peculiar circumstances of this case."  *See MGM Well Servs. v. Mega Lift Sys., LLC*, 505 F. Supp. 2d 359, 379 (S.D. Tex. 2007).  PLS made a binding contractual promise not to market products such as OpFinder, so whatever hardship is suffers from keeping this promise is imposed by the operation of law.  On the other hand, the harm that will befall Derrick should an injunction not issue, as fully described above, is far more severe and is not sanctioned by the effect of any promise or law.  The balance of harms thus clearly favors the issuance of a preliminary injunction.

75.     Finally, the issuance of a preliminary injunction in this case is in the public's best interest for two reasons.  First, it is in the public interest in a commercial society to hold parties to the binding promises that they have made. *See King Aero. Commer. Corp., Inc. v. Al-Anwa Aviation, Inc.*, No. 3:08-CV-0999-L, 2008 U.S. Dist. LEXIS 81677, 22 (N.D. Tex. Oct. 15, 2008) ("Enforcing a contract promotes rather than disserves the public interest.").  Additionally, given the marketplace confusion that could occur by PLS offering not one but two database platforms, including confusion as to which platform is Derrick's, an injunction must issue.  *See Freddie Fuddruckers, Inc. v. Ridgeline, Inc.*, 589 F. Supp. 72, 78 (N.D. Tex. 1984) ("It is in

the public interest to avoid consumer confusion and the public interest would be served by the issuance of a preliminary injunction.").

76.     For these reasons, Derrick seeks a preliminary injunction from this Court to prohibit PLS from continuing to breach the MOU.

## IX.

## PRAYER

WHEREFORE, Plaintiff Derrick respectfully requests that Defendant PLS be cited to appear and answer herein and prays that Derrick have judgment against Defendant including:

a.      a preliminary injunction, as requested above, prohibiting PLS from marketing OpFinder;

b.      economic damages for breach of contract;

c.      a declaration from this Court that Derrick is the sole owner of the Database;

d.      a declaration from this Court that PLS has been adequately compensated for its contributions to the Database by its 50% share in revenues since October 2009;

e.      a declaration from this Court determining that the parties have not entered into a joint venture or a partnership, and that each party owes the other no residual duties at the conclusion of the term of the MOU;

f.      a declaration from this Court that the MOU was terminated as of May 17, 2014, due to the PLS's various breaches, including especially the acquisition and marketing of OpFinder;

g.      alternatively, a declaration from this Court that the MOU will expire by its terms on October 3, 2014, and that, following that date, Derrick will owe no further duties or obligations to PLS;

h.    a declaration form this Court that Derrick has a legal right to offer the Database in the North American market, including to previous and existing Database customers after the termination or expiry of the MOU;

i.    an injunction prohibiting PLS from using the Database after October 3, 2014 (or after May 17, 2014, should the Court determine that the MOU has been terminated as of May 17, 2014);

j.    an injunction prohibiting PLS from marketing similar products to existing and targeted Database clients for two years;

k.    an injunction requiring PLS provide to Derrick all documentation regarding marketing activities concerning the Database;

l.    costs of court;

m.    reasonable attorney's fees; and

n.    any other relief to which Plaintiff may show itself justly entitled.

Respectfully submitted,

BAKER & McKENZIE LLP

By:       /s/  Brendan D. Cook
Brendan D. Cook
Texas Bar No. 04721700
Federal ID # 5030
Brandon E. Caire
Texas Bar No. 24064991
Federal ID # 1812322
700 Louisiana, Suite 3000
Houston, Texas  77002
Tel: (713) 427-5000
Fax: (713) 427-5099
brendan.cook@bakermckenzie.com
brandon.caire@bakermckenzie.com

ATTORNEYS FOR PLAINTIFF