## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **DERRICK PETROLEUM SERVICES,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | **CASE NO. 4:14-cv-01520** |
| | § | |
| **PLS, INC.,** | § | |
| | § | |
| *Defendant*. | § | |

## DEFENDANT PLS, INC.'S ORIGINAL ANSWER, AFFIRMATIVE DEFENSES, AND ORIGINAL COUNTERCLAIM

TO THE HONORABLE LEE H. ROSENTHAL:

Defendant and Counter-Plaintiff PLS, Inc. (hereinafter referred to as "PLS") files its Original Answer and Affirmative Defenses to Plaintiff Derrick Petroleum Services' (hereinafter referred to as "Derrick") Original Complaint for Declaratory and Injunctive Relief ("Original Complaint") and Original Counterclaim and would respectfully show as follows:

## I. ANSWERS TO ALLEGATIONS

Without waiving its affirmative defenses, PLS answers the allegations of Derrick's Original Complaint below by correspondingly numbered paragraphs:

### I. SUMMARY OF THE DISPUTE

1.     PLS denies the allegations made in Paragraph 1 of Derrick's Original Complaint, except PLS admits it entered into a Memorandum of Understanding ("MOU") with Derrick.

## II. PARTIES

2.      PLS is without knowledge or information sufficient to form a belief as to whether Derrick is a partnership or corporation organized under the laws of the Republic of India as described in Paragraph 2 of Derrick's Original Complaint.

3.      PLS admits the allegations set forth in Paragraph 3 of Derrick's Original Complaint.

## III. JURISDICTION AND VENUE

4.      PLS admits the jurisdictional allegations set forth in Paragraph 4 of Derrick's Original Complaint but denies Derrick has a valid claim.

5.      PLS admits the statements regarding venue set forth in Paragraph 5 of Derrick's Original Complaint but denies Derrick has a valid claim.

## IV. BACKGROUND FACTS

6.      PLS admits Derrick is based, at least in part, in Bangalore, India and that Yashodeep Deodhar ("Deodhar") is either its Managing Partner or, as represented in the MOU, its CEO. PLS denies the remainder of the allegations contained in Paragraph 6 of Derrick's Original Complaint.[1]

7.      PLS denies the allegations in the first sentence of Paragraph 7 of Derrick's Original Complaint. PLS admits it has been providing information, marketing and advisory services to the oil and gas industry since 1987. PLS admits that at the time it partnered with Derrick, PLS had significant customer contacts in North America.

---

[1] Derrick's terminology as used throughout its Original Complaint is imprecise and invites confusion. For consistency, PLS will use the following terminology throughout this pleading. Derrick had an M&A database back in 2009, which PLS will refer to as the "2009 Derrick database." PLS also had an M&A database in 2009, which PLS will refer to as the "2009 PLS database." As joint venture partners, the parties jointly contributed to the Joint Venture Global M&A Database, or, as it is referred to herein, the "Global M&A Database." In addition, the term "E&P Transaction Database" also refers to an M&A database, but the term "E&P database products" refers to multiple products, contemplated in the MOU but not necessarily in existence at the time the MOU was executed.

2

8.     PLS admits the first sentence clarifying that Brian Lidsky ("Lidsky") was a commission-only consultant of Derrick for a six week period beginning April 20, 2009. PLS denies the allegations in the second sentence except that PLS admits that Lidsky initially contacted Derrick on June 26, 2009 via an email regarding "how PLS and Derrick might work together" along with several possible arrangements.

9.     PLS admits the allegations set forth in Paragraph 9 of Derrick's Original Complaint except for the reference to "such an arrangement" in Paragraph 8 which is itself misleading as to the nature of the scope of the initial communication between the parties.

10.     PLS admits that in August 2009 discussions were held between Ronyld Wise ("Wise"), Lidsky and Deodhar in Houston. PLS denies that Lidsky drafted the MOU, noting the initial draft dictated primarily by Deodhar and merely typed by Lidsky. PLS admits to the remaining allegations of Paragraph 10 but clarifies that the terms of the final executed MOU were intensely negotiated between July 22, 2009 and September 30, 2009 and the MOU was more than a quick and simple placeholder.

11.     PLS admits the allegations contained in the first sentence of Paragraph 11 of Derrick's Original Complaint. PLS admits that a formal 50/50 Joint Venture Agreement was never executed. PLS admits the MOU remains the operative document binding the parties because of Derrick's refusal to form an LLC as required, notwithstanding the fact that if Derrick had performed as promised, the MOU would have been superseded.

12.     PLS admits the terms and provisions set forth in the MOU speak for themselves. PLS denies that Derrick "assumed *all* responsibilities concerning the Database itself" (emphasis added). PLS denies that Derrick fully and accurately quotes the MOU with respect to the parties' rights and obligations, especially language limiting PLS to North America. PLS agreed to

3

provide a "full license to PLS's brand and corporate name *for use in* marketing *E&P database products*" (plural) (emphasis added). PLS denies that the MOU was limited to the North American market and to the contrary PLS points to the last sentence of the first paragraph of the MOU that states, "The parties understand that further business relationships beyond database products and beyond the North American market are also a goal of this relationship." PLS admits to Derrick's assertion that PLS would be responsible for "Client invoicing, collection & distribution of revenue."

13.     PLS admits the terms and provisions set forth in the MOU speak for themselves. PLS admits the MOU provides as follows:

> Jointly, PLS and Derrick agree to:
>
> 1. Provide E&P Database Services via a co-branded website under respective companies main domains
>
> 2. Share all revenues on PLS, Inc.'s joint E&P database sales, including renewals 50/50
>
> 3. Costs will be bore 100% by the respective parties as they fulfill the respective activities. In other words Derrick will bear 100% of the costs of product development and operations, quality control and PLS will bear 100% of the costs of marketing.
>
> 4. Additional business opportunities will be pursued on the general principle of 50/50.
>
> 5. Grandfather Derrick's existing clients and target clients defined as those clients which have no operations in North America and which Derrick has contacted through October 1, 2009. A list of Derrick's reserved contacts is attached as Appendix A.
>
> 6. Regarding PLS, Inc. sales of proprietary market products generated via a lead supplied by Derrick, Derrick will be entitled to 15% of the sales.
>
> 7. Regarding Derrick's sales of E&P database products outside of North America generated via a lead supplied by PLS, Inc. and not reserved on Appendix A, PLS, Inc. will be entitled to 15% of sales.
>
> 8. The Parties agree to issue all Press Releases, Market Updates and Research Announcements related to the Derrick/PLS, Inc. E&P Databases under a joint Derrick and PLS brand.

4

14.     PLS admits in part and denies in part the allegations set forth in Paragraph 14 of Derrick's Original Complaint. PLS admits Derrick's assertion that the MOU states: "The intent is for a long term relationship. The initial term is for 5 years." PLS denies Derrick's allegation that "per the MOU, then, the parties although both envisioned a long-term relationship, only agreed to work together for a term of five years" because such allegation fails to take into account the entirety of the agreement, the express promise to create an LLC once the revenue threshold was reached, and the conditions that satisfied a long term relationship.

15.     PLS admits the terms and provisions set forth in the MOU speak for themselves. PLS denies that Derrick's characterization of the "Exit Mechanism" is accurate or complete. PLS admits the MOU contains a section entitled "Exit Mechanism" which states as follows:

> In the event of exit by Derrick for whatever reason, Derrick shall provide PLS, Inc. a full copy of the Database and associated software and other such required items deemed necessary for PLS, Inc. to continue to provide M&A or other Joint Venture products. In the event of exit by PLS for whatever reason, PLS shall forfeit revenues from existing and targeted clients of the service and provide Derrick Petroleum with all documentation regarding marketing activities. The Party that exists will not sell similar products to the same clients that were subscribers for the JV products for a minimum of two years.

16.     PLS admits that the MOU is the sole written agreement governing the parties' relationship. PLS denies the remaining allegations in Paragraph 16 of Derrick's Original Complaint, subject to the correct application of the law governing contract interpretation.

17.     PLS admits that the MOU contains a clause that states "The parties agree to work together exclusively on these efforts during the term of this JV and will not circumvent the other party for similar product offerings, unless agreed to in writing." PLS admits that the MOU itself does not define the term "similar product offerings." PLS denies Derrick's allegations that PLS

has defined the term "similar product offerings" narrowly by and through its conduct. PLS denies the remainder of the allegations in Paragraph 17, together with the footnote, both of which mischaracterize the events described.

18.     PLS denies Derrick's characterization that the MOU "envisioned the *future* establishment of a joint venture" (emphasis added). The executed MOU states the parties "agree to work together in good faith as joint venture partners," which established a present-tense joint venture in the original MOU. PLS admits that a more formal agreement was never signed. PLS denies the remainder of the allegations in Paragraph 18 of Derrick's Original Complaint.

19.     PLS denies the allegations set forth in Paragraph 19 of Derrick's Original Complaint.

20.     PLS admits that it markets a product called OpFinder, but denies that OpFinder competes directly with the 50/50 Joint Venture Joint Venture Global M&A Database. PLS admits that OpFinder provides international information on oil and gas exploration and production investment opportunities but denies that this definition is "nearly identical" to that of the Joint Venture Global M&A Database.

21.      For a variety of reasons, PLS denies the allegations set forth in Paragraph 21 of Derrick's Original Complaint.

22.     PLS denies the allegations set forth in Paragraph 22 of Derrick's Original Complaint.

23.     PLS denies the allegations set forth in Paragraph 23 of Derrick's Original Complaint.

24.     PLS denies the allegations set forth in Paragraph 24 of Derrick's Original Complaint.

25.     PLS denies the allegations set forth in Paragraph 25 of Derrick's Original Complaint.

26.     PLS denies the allegations set forth in Paragraph 26 of Derrick's Original Complaint.

27.     PLS denies the allegations set forth in Paragraph 27 of Derrick's Original Complaint.

28.     PLS denies the allegations set forth in Paragraph 28 of Derrick's Original Complaint.

29.     PLS denies the allegations set forth in Paragraph 29 of Derrick's Original Complaint.

30.     PLS admits it owns 50% of the Joint Venture Global M&A Database. PLS denies the remaining allegations set forth in Paragraph 30 of Derrick's Original Complaint.

31.     PLS denies the allegations set forth in Paragraph 31 of Derrick's Original Complaint.

32.     PLS denies the allegations set forth in Paragraph 32 of Derrick's Original Complaint.

33.     PLS admits it owns 50% of the Joint Venture Global M&A Database. PLS denies the remaining allegations set forth in Paragraph 30 of Derrick's Original Complaint.

## V. DAMAGES FOR BREACH OF CONTRACT

34.     PLS incorporates its contentions as set forth above, and the affirmative defenses set forth in Section II of this pleading.

35.     PLS admits the allegations set forth in Paragraph 35 of Derrick's Original Petition.

36.     PLS denies the allegations set forth in Paragraph 36 of Derrick's Original Complaint.

37.     PLS denies the allegations set forth in Paragraph 37 of Derrick's Original Complaint.

38.     PLS denies the allegations set forth in Paragraph 38 of Derrick's Original Complaint.

39.     PLS denies the allegations set forth in Paragraph 39 of Derrick's Original Complaint.

40.     PLS denies the allegations set forth in Paragraph 40 of Derrick's Original Complaint.

41.     PLS admits that Derrick is asking for the relief requested, but denies that Derrick is entitled to that relief, and denies the remaining allegations set forth in Paragraph 41 of Derrick's Original Complaint.

## VI. REQUESTS FOR DECLARATORY RELIEF

42.     PLS incorporates its contentions as set forth above, and the affirmative defenses set forth in Section II of this pleading.

43.     PLS admits that an actual controversy does exist, but not because of its claims of ownership. Therefore, denied as alleged.

44.     PLS admits that it claims an ownership interest in the Joint Venture Global M&A Database, but denies the characterization of the parties' claims as stated in Paragraph 44 of Derrick's Original Complaint.

45.     PLS denies the allegations contained in Paragraph 45 of Derrick's Original Complaint, and denies that Derrick is entitled to the relief sought.

46.     PLS admits a more formal, written Joint Venture Agreement was never signed by the parties but asserts that the conditions requiring the formation of a Joint Venture as outlined in the MOU were satisfied. PLS denies the remaining allegations set forth in Paragraph 46 of Derrick's Original Complaint.

47.     PLS denies that Derrick is entitled to the relief sought in Paragraph 47 of its Original Complaint and PLS denies the Parties are not in a joint venture.

48.     PLS denies the allegations contained in Paragraph 48 of Derrick's Original Complaint.

49.     PLS denies the allegations contained in Paragraph 49 of Derrick's Original Complaint.

50.     PLS denies the allegations contained in Paragraph 50 of Derrick's Original Complaint, and denies Derrick is entitled to the relief sought.

51.     PLS denies the allegations in Paragraph 51 of Derrick's Original Complaint because the MOU by its own terms contemplates the creation of an LLC, the conditions precedent for which have been met, with no such expiration date.

52.     PLS admits the allegations contained in Paragraph 52 of Derrick's Original Complaint

53.     PLS denies Derrick is entitled to the relief sought in Paragraph 53 of its Original Complaint.

54.     PLS denies Derrick is entitled to the relief sought in Paragraph 54 of its Original Complaint.

55.     PLS denies the allegations contained in Paragraph 55 of Derrick's Original Complaint, and denies Derrick is entitled to the relief sought.

56.     PLS denies Derrick is entitled to the relief sought in Paragraph 56 of its Original Complaint.

## VII. REQUESTS FOR PERMANENT INJUNCTIVE RELIEF

57.     PLS incorporates its contentions as set forth above, and the affirmative defenses set forth in Section II of this pleading.

58.     PLS denies Derrick is entitled to the relief sought in Paragraph 58 of its Original Complaint.

59.     PLS denies the allegations contained in Paragraph 59 of Derrick's Original Complaint, and denies Derrick is entitled to the relief sought.

60.     PLS denies the allegations contained in Paragraph 60 and footnote 2 of Derrick's Original Complaint, and denies Derrick is entitled to the relief sought.

61.     PLS denies the allegations contained in Paragraph 61 of Derrick's Original Complaint, and denies Derrick is entitled to the relief sought. PLS agrees that Derrick had a lack of history in the North American marketplace.

62.     PLS denies the allegations contained in Paragraph 62 of Derrick's Original Complaint.

63.     PLS denies the allegations contained in Paragraph 63 of Derrick's Original Complaint.

64.     PLS denies Derrick is entitled to the relief sought in Paragraph 64 of its Original Complaint.

65.     PLS denies that it has triggered the "Exit Mechanism" provision of the MOU, or that Derrick is entitled to any of its marketing materials or related documents. PLS denies Derrick is entitled to the relief sought in Paragraph 65 of its Original Complaint.

66.     PLS denies the allegations contained in Paragraph 66 of Derrick's Original Complaint.

67.     PLS denies Derrick's characterization of the harm and/or damages to Derrick and denies the remainder of allegations asserted by Derrick in Paragraph 67 of its Original Complaint.

68.     PLS denies Derrick is entitled to the relief sought in Paragraph 65 of its Original Complaint, and denies the allegations contained therein.

69.     PLS denies Derrick is entitled to the relief sought in Paragraph 69 of its Original Complaint.

70.     PLS denies Derrick is entitled to the relief sought in Paragraph 70 of its Original Complaint.

## VIII. APPLICATION FOR PRELIMINARY INJUNCTION

71.     PLS denies the allegations contained in Paragraph 71 and footnote 3 of Derrick's Original Complaint, and denies Derrick is entitled to the relief sought.

72.     PLS denies the allegations contained in Paragraph 72 of Derrick's Original Complaint, and denies Derrick is entitled to the relief sought.

73.     PLS denies the allegations contained in Paragraph 73 of Derrick's Original Complaint.

74.     PLS denies the allegations and legal contentions contained in Paragraph 74 of Derrick's Original Complaint.

75.     PLS denies issuance of an injunction as sought by Derrick in is in the public's best interest, and denies the remainder of the allegations in Paragraph 75 of Derrick's Original Complaint.

76.     PLS denies Derrick is entitled to the relief sought in Paragraph 76 of its Original Complaint.

## IX. PRAYER

77.     PLS denies that Derrick is entitled to the relief sought in its Prayer.

## II. <u>AFFIRMATIVE DEFENSES</u>

1.     PLS affirmatively pleads that Derrick cannot obtain the requested equitable relief in any form, particularly in the form of a temporary or permanent injunction, because Derrick has unclean hands throughout in its dealings with PLS.

2.     PLS affirmatively pleads that Derrick's claims are barred in whole or in part by anticipatory repudiation and prior material breach.

3.     PLS affirmatively pleads that Derrick's claims are barred in whole or in part by estoppel.

4.     PLS affirmatively pleads that Derrick's claims are barred in whole or in part by laches.

5.     PLS affirmatively pleads that Derrick's claims are barred in whole or in part by payment.

6.     PLS affirmatively pleads that Derrick's claims are barred in whole or in part by waiver or failure to mitigate damages.

7.     PLS affirmatively pleads that Derrick's claims are barred in whole or in part by offset.

8.     PLS affirmatively pleads that Derrick's claims are barred in whole or in part by the doctrine of election of remedies.

### III. ORIGINAL COUNTERCLAIM

1.        Pursuant to Fed. R. Civ. P. 13(a), PLS brings this Original Counterclaim against Derrick.

### I. SUMMARY OF THE DISPUTE

2.        The bitter irony of this dispute is that the 50/50 Joint Venture created by the Parties has been financially successful and would be for years to come were Derrick not insistent on ruining a good thing. The matter before the Court involves the repeated and insistent broken promises Derrick made in the very same Memorandum of Understanding (hereinafter "MOU") from which Derrick selectively misquotes it its own Original Complaint. Despite promising that it would "work together" with PLS "in good faith as joint venture partners," Derrick has ignored, and still ignores, whole provisions of the MOU that Derrick conveniently fails to mention in its lawsuit, choosing instead to overlook specific requirements of the MOU when doing so serves its purposes, wholly without regard for the rights of its Joint Venture partner.

3.        Derrick has broken the simplest promise of the MOU which was to move to an LLC once $2 million in annual revenues were met. In addition, Derrick has pirated promotional materials from the Joint Venture to further its own selfish, openly competing interests; failed to share revenues with PLS as promised in the MOU; foisted operating expenses onto PLS that were exclusively Derrick's to bear; and failed to act in good faith to further the interests of the Joint Venture and in doing so threatened the seamless, continued service to the prepaying clients who have purchased the Joint Venture Global M&A Database sold through PLS.

4.        Contrary to Derrick's pleadings, PLS's OpFinder is not competitive with the Joint Venture Global M&A Database and Derrick knows that. On the contrary, Derrick's new 1Derrick product is competitive with PLS's long-standing core products. The MOU, moreover,

is not a threadbare document and was, instead, negotiated by sophisticated parties for well over a month.

5.       The business claim pled by Derrick that it has "suffered long enough" is preposterous. PLS has made Derrick money and Yashodeep Deodhar ("Deodhar"), its chief executive, very wealthy. From 2009 to the present, Derrick has received cash and asset appreciation in excess of $10 million dollars for its 50% share. The Joint Venture Global M&A Database used by clients today bears little resemblance to the 2009 Derrick database used by a handful of clients before PLS's contributions. Moreover, Derrick's additional representations about OpFinder are insupportable. With hands as dirty as Derrick's, equitable relief for Derrick's benefit is out of the question. PLS, rather, is entitled to be made whole for Derrick's breaches of promise and breaches of duty that PLS is more than happy to bring to the court's attention.

## II. BACKGROUND FACTS

### How the parties met

6.       How these parties met each other and how the MOU came to be is the place to start. PLS, an acronym for Petroleum Listing Service, is a Houston-based company founded in 1987 as a leading and well known oil and gas information, marketing and advisory firm that facilitates transactions for buyers, sellers and capital providers in the energy industry. Before PLS had ever heard of Derrick, PLS had earned the respect of a broad base of clients in the energy sector for more than 20 years and was at the time developing a commercial Joint Venture Global M&A Database in Houston. This 2009 PLS database actually contains the industry's oldest data set of oil and gas transactions, metrics and comparables going back to 1980, and though PLS has used the database internally the firm had never released the product commercially.

7.      Unbeknownst to PLS, in April of 2009, Deodhar, owner and CEO of Derrick, reached out to Brian Lidsky ("Lidsky"). who was, at the time, a U.S.-based M&A expert and analyst. Deodhar reached out to Lidsky via LinkedIn, asking if Lidsky could help Derrick market its international M&A database (referred to as "Derrick 2009 database") which dealt with transactions valued in excess of $100 million and had been on the market for over two years with limited success and few subscribers.

8.      On May 28, 2009, Lidsky, acting on Derrick's behalf, authored and issued a press release on a special M&A topic and the news story caught PLS's attention. Believing there might be natural synergies with Derrick worth exploring, PLS reached out to the contact information on the press release and was surprised to find itself in touch with Lidsky, a professional known to PLS for over 15 years and who PLS learned was at that time helping Derrick as a commission-only consultant. The next week, Lidsky visited PLS's office and was impressed with PLS's products, growth opportunities and the M&A Database PLS had in 2009, which was larger than Derrick's 2009 database. Wise and Lidsky agreed they should contact Derrick's owner, Deodhar, suggesting that the three should work together to combine PLS's mostly North American M&A database, brand, marketing resources, reputation, information platform, captive client base, and historical news archives with Derrick's mostly international 2009 M&A database, lower labor costs and Lidsky's unique M&A database experience to create a new and improved Global M&A Database they could sell to PLS's large paying client base (>1,500 companies) and the industry as a whole. To facilitate the opportunity, PLS offered to begin paying Lidsky immediately because Derrick did not appear to have the funds to pay Lidsky, or an interest in paying him. Moreover, PLS had other projects Lidsky could help on.

9.      On July 15, 2009, as part of the ongoing PLS and Derrick discussions, Derrick set PLS up with trial access to Derrick's 2009 database and at the same time PLS showed Derrick its own 2009 database. On July 22, 2009, Derrick proposed a 50/50 Joint Venture whereby PLS and Derrick would pool their efforts and offer a co-branded Global M&A Database which PLS nixed, in part, because PLS did not, under any circumstances want a co-branded product. Among PLS's concerns were that a co-branded product would confuse PLS's clients and create unnecessary marketing risks. Also of concern to PLS were clients' preferences for a single vendor, and Derrick's limited brand recognition, together with India's reputation for data and outsourcing, all of which were detrimental to selling the proposed product. It is important to note that PLS saw the seamless opportunity to sell the new Global M&A Database quickly to its client base, but accentuating Derrick's profile had the potential to confuse potential subscribers and introduce uncertainty to the sales process. After sixty days and no fewer than two meetings in person in Houston in August and September of 2009, Derrick and PLS entered into the MOU that is attached as Exhibit 1 to Derrick's Original Complaint. The MOU includes notable concessions by Derrick on co-branding, software, database structure, revenue sharing, international rights and non-compete issues absent from Derrick's original July 22, 2009 email proposal. Contrary to Derrick representations, the MOU is not at all a threadbare document and was in fact intensely and intently negotiated for over sixty days.

### What the parties agreed to

10.      Pursuant to the MOU, Derrick and PLS agreed "to work together in good faith as joint venture partners to develop and market E&P database products for the North American Market." *Docket Entry No. 1-1, p. 1.* The parties also agreed that "further business relationships

16

beyond database products and beyond the North American market" were a "goal of the relationship." *Id.* In the MOU, Derrick expressly agreed to provide:

      a.   "Existing M&A database platforms, software and content including ongoing data from its sources."

      b.   "Product Enhancements including, but not exclusive of, branding, additional features, integration of PLS transaction data, regional segregation."

      c.   "Ongoing Operations including:

          i.  Database updates and integrity
        ii.  Maintenance of user accounts"

      d.   "Client Services and training where appropriate via phone/internet." *Id.*

11.     In the MOU, the parties jointly agreed to provide E&P Database Services via co-branded websites (notably, but not a cobranded product); share all revenues on the joint database sales, including renewals 50/50; bear 100% of their respective costs for product development and operations, quality control (Derrick's activities) and marketing (PLS's activities); pursue additional business opportunities 50/50; grandfather Derrick's existing and target clients as of October 1, 2009. *Id. at p. 2.*

12.     At the time the MOU was executed, naturally neither PLS nor Derrick knew whether the Joint Venture would succeed or fail, and that is why the MOU includes a "penalty-free" walk-away clause in the event the Joint Venture earned less than $150,000 in the first twelve months. The initial walk-away clause came and went without controversy as sales were on the upswing and surpassed the $150,000 threshold. Conversely, if the Joint Venture was successful, and reaped revenues of $2 million annually, the parties expressly agreed to form an LLC for the purpose of furthering the business of the Joint Venture. That is why under the heading "TERM," the MOU states, "The intent is for a long term relationship. The initial term is for 5 years." That term provision is, in many respects, not wholly unlike the *habendum* clause in

17

an oil and gas mineral lease and is even worded similarly in some respects. The purpose for the initial five-year window was to give the Joint Venture time to succeed. If in five years the business had not met the $2 million annual revenue threshold, then by the terms of the MOU the Joint Venture would come to an end or the Parties could make other plans or extend the Joint Venture, if they chose.

13.     The MOU also included a separate "Exit Mechanism" whereby each party could exit for "whatever reason" provided that it comply with certain terms. Upon Derrick's exit, Derrick was to provide PLS a "full copy of the Database and associated software and other such required items deemed necessary for [PLS] to continue to provide M&A or other Joint Venture products." *Id.* And most importantly, that the Party that exits "will not sell similar products to the same clients that were subscribers for the JV products for a minimum of two years."

14.     The parties also agreed to work together "exclusively on these efforts during the term of this JV" and "not circumvent the other party for similar product offerings, unless agreed to in writing." *Id. at p. 3.* It is PLS's position that the phrase "not circumvent the other party for similar product offerings" means not to compete with one another. The phrasing of the MOU in this regard may be inelegant but it is not unclear.

15.     Ronyld Wise, founder of PLS, signed the MOU on September 30, 2009, and Deodhar signed on October 3, 2009. *Id.* The MOU creates a binding, enforceable Joint Venture that satisfies the requirements of partnership formation under the Texas Business Organizations Code.[2] Although no one would argue that the MOU is the most exhaustive contract ever written, it is enforceable nonetheless and simple in structure and concept. Moreover, the concept of creating a 50/50 joint venture is embedded throughout the MOU and is not a term of recent coinage in this relationship.

---

[2] Tex. Bus. Orgs. Code Sec. 152.051-.052.

16.     Finally, the parties agreed to a target date of October 1, 2009 for the launch of the Joint Venture Global M&A Database and a target date of October 31, 2009, to formalize a more detailed Joint Venture Agreement. *Id.* October 31, 2009, came and went, and no formal Joint Venture Agreement was executed, leaving the MOU as the operative document shaping the parties' rights, duties and obligations to each other, along with the protections otherwise provided by law.

17.     To shed light on the truth regarding the allegation that "Derrick has constantly and single-handedly upgraded the database," PLS would point out that even before the MOU was executed, Derrick began eagerly working with PLS by sending its lead M&A analyst to Houston to work side-by-side with PLS and Lidsky: (1) to take directions on the design, (2) establish new protocols for U.S. and Canada, (3) incorporate and cross reference PLS's proprietary data and (4) restructure the database to create a commercial Joint Venture Global M&A Database suitable for North American and global clients. Prior to this effort, the 2009 Derrick database was not commercially successful.

### *Who built what*

18.     The Joint Venture Global M&A Database is a proprietary web-based relational database that tracks and evaluates energy transactions in the upstream, midstream, downstream and oilfield services sectors. It was designed to provide professionals involved in the oil/gas industry and financial industries intelligence on what has been sold, who sold/who bought assets in the energy sector, and detailed proprietary analysis providing for market valuation metrics on a granular asset level. The Joint Venture Global M&A Database featured comprehensive coverage of activity, and not just those deals above a certain dollar threshold. Accordingly, it needed to include and would come to include separate portals for United States Upstream Deals,

Canadian Upstream Deals, Global Upstream Deals, Midstream Deals, Downstream Deals and Oilfield Services (OFS) Deals. On each individual transaction, the Joint Venture Global M&A Database includes available information on over 150 unique data points on a systematic and consistent basis. The Joint Venture Global M&A Database is unique in the marketplace because of its comprehensiveness, granularity, quality and transparency of analysis via inclusion of original source documents, speed of updates, superior client support, ease of use and continuous innovation.

19.     Contrary to Derrick's allegations in its lawsuit, and as the evidence will make abundantly clear, PLS provided significant contributions in the beginning and throughout the duration of the relationship in furtherance of the Joint Venture. In doing so, PLS incurred significant expenses that Derrick should have borne under the MOU.

20.     To contend now that the present state of the Joint Venture Global M&A Database is the same one Derrick brought to the Joint Venture in 2009 and that Derrick is free to leave the Joint Venture, free and clear, with the fruits of PLS's contribution on board is to exhibit a profound disregard for the plain meaning of the MOU and the law governing fiduciary responsibilities of joint venture partners, let alone what it means to act in good faith.

21.     The parties would not be in litigation had Derrick honored its promises and abided by the law governing relationships such as this one. Since the execution of the MOU, Derrick has breached the MOU and its fiduciary duties to PLS time and again, as discussed herein.

### The present state of things

22.     Since day one, and over the course of the Joint Venture, PLS has fulfilled its obligations concerning "marketing including, but exclusive of… introduction, launch of M&A

database service to new clients." In fulfilling its duties, PLS marketed by various means and media to a worldwide audience. These marketing efforts resulted in sales of the Joint Venture Global M&A Database to global clients. It is important for the court to recognize that the oil and gas industry is global in nature with virtually all large oil companies having operations in North America. Throughout the entire term of the Joint Venture, PLS has shared all revenues generated from sales of the Joint Venture Global M&A Database with Derrick 50/50 as appropriate. With PLS's marketing and product efforts, the Joint Venture Global M&A Database has now achieved a preeminent leadership position worldwide. Only since the Joint Venture Global M&A Database achieved this preeminent status has Derrick attempted to demand that PLS co-brand everything and attempt to take back international sales opportunities from PLS and demand that PLS no longer sell outside North America. Such demands are contrary to the MOU and additional promises made by Derrick in 2011 after PLS spent hundreds of thousands of dollars and more developing international and global markets. Meanwhile, as PLS knows now, Derrick is now selling the Joint Venture Global M&A Database behind PLS's back without sharing revenues or accounting for what it is doing.

### *The required LLC*

23.     To begin with, when revenues hit the $2 million annual threshold in 2013, Derrick refused, and continues to refuse, to form the agreed-upon LLC for the purpose of conducting the business of the Joint Venture business, electing instead, as is now apparent, to rely upon the five-year initial term provision to let the Joint Venture dissolve so that Derrick can walk away—or at least try to—with the current Joint Venture Global M&A Database in hand, including the many enhancements contributed by PLS over the past five years. The right to create an LLC is a present-tense possessory right belonging to PLS—now. That right cannot be brushed aside or

ignored because Derrick does not like the agreement that it signed. The condition precedent for forming an LLC was satisfied a year ago, but Derrick simply chooses to act as though it never happened and as though Derrick never promised anything about an LLC.

24.     In response to PLS's entreaties to form the promised LLC, Deodhar claimed Derrick cannot be a part of an LLC because of adverse tax implications to himself. Whatever those consequences might be, they are not an excuse for Derrick's nonperformance of a contractual obligation. Those tax burdens, moreover, were either foreseeable to Derrick at the time Deodhar signed the MOU and thus evidence of a promise made *ab initio* that Derrick never intended to keep, or of recent vintage and Deodhar's alone to bear. To say the least, Derrick cannot avoid a contractual obligation because one of its shareholders or executives has a problem with the tax man.

25.     PLS agreed to provisions in the MOU to protect it from the very misbehavior Derrick has exhibited, not the least of which is Derrick's refusal to recognize the $2 million "tripwire" for LLC formation to carry on the business. Derrick's inexcusable refusal to form an LLC for the purpose of conducting the future business has jeopardized--and is, in fact, presently jeopardizing--the ability of the Joint Venture to conduct its day-to-day affairs and directly undermines what PLS has worked so hard and contributed so much to build.

### *The truth about OpFinder*

26.     When attempting to steal something, it is apparently sometimes beneficial to create a diversion or distraction, and so goes Derrick's allegations about OpFinder. PLS's OpFinder product is not competitive to Joint Venture Global M&A Database. It is simply a relatively minor, recent bolt-on acquisition of international listings (and their unique archives) that is a natural extension of PLS's core multiple listings service that drives PLS's brand and a

service that has been offered for over 25 years. In fact, OpFinder actually offers the Joint Venture additional sales opportunities for the Joint Venture Global M&A Database and Derrick is aware of that.

27.     It is easy to see that Derrick's allegations about OpFinder are no more than a ruse to obfuscate its own bad behavior. Specifically, sometime in the middle of 2012, in Singapore, Derrick launched a new product called 1Derrick over PLS's objections. 1Derrick is a free online news delivery product that violates the terms of the MOU with regard to "similar product offerings." Most importantly, 1Derrick is a database, news delivery and social media platform that offers free news, data, listings of deals for sale and even transaction metrics and comparables. A review of the website (www.1Derrick.com) shows various channels and subchannels such as Global Deals, FarmIns and Farmouts; Dealmaking; Mergers & Acquisitions; Licensing Rounds; Fiscal Terms and Exploration, Energy Finance and Oilfield Services. A quick review of the 1Derrick site on June 29, 2014 shows over 7,500 news abstracts posted since 2012, all available for free. In addition, a small sampling of the data dump seems to show as many as one-third or more of the abstracts (est 2,500-3,000) include almost exact extracts or quick rewrites taken from the Joint Venture Global M&A Database and laid out neatly for free on the web. Even worse, the site includes no mention of the PLS brand, the Joint Venture or any co-branded web offering of the Joint Venture Global M&A Database. In fact, even if 1Derrick could be argued to be promotional on behalf of Derrick and PLS, any revenues from cross-selling of the Joint Venture Global M&A Database through 1Derric go directly to Derrick, with no required sharing to PLS. 1Derrick, for the foregoing reasons, must be stopped.[3]

---

[3] See, e.g., Exhibit 2.

*More wrongdoing by Derrick*

28.     Further, upon information and belief, during the term of the Joint Venture, Derrick created a map feature which was installed early on in the Joint Venture's Global M&A Database. When this original map inside the Joint Venture Global M&A Database proved awkward to use, Derrick assured PLS that he could fix the map. During its repair work on the map, Derrick apparently stumbled upon a new idea for mapping that was proprietary and, in fact, showed PLS a mockup. Unfortunately, Derrick has never put a map back in the Joint Venture Global M&A Database but has instead put the map in 1Derrick. Derrick has failed to provide PLS, its Joint Venture partner, with any benefits associated with the map feature.

29.     Since day one, and over the course of the Joint Venture, PLS has fulfilled its obligations concerning "marketing including, but exclusive of… introduction, launch of M&A database service to new clients." In fulfilling its duties, PLS marketed by various means and media to a worldwide audience. These marketing efforts resulted in sales of the Joint Venture Global M&A Database to global clients. It is important for the court to recognize that the oil and gas industry is global in nature with virtually all large oil companies having operations in North America. Throughout the entire term of the Joint Venture, PLS has shared all revenues generated from sales of the Joint Venture Global M&A Database with Derrick 50/50. With PLS marketing and product efforts, the Joint Venture Global M&A Database has now achieved a preeminent leadership position worldwide. Only after the Joint Venture Global M&A Database achieved this preeminent status has Derrick now attempted to force on to PLS a demand that PLS "no longer" has the right to sell internationally. Derrick, on the other hand, has sold the Joint Venture Global M&A Database behind PLS's back and not shared the revenues.

30.    In late 2013, Derrick, for its own account and without permission from or notification to PLS, used and distributed marketing materials that were close replicas to those developed by PLS to market the Joint Venture Global M&A Database. Derrick intentionally replaced the PLS logo and Derrick logos with its own new Derrick logo on the nearly carbon copy brochure. Derrick then used the pirated brochure to market and sell the Joint Venture Global M&A Database for Derrick's own account.[4] *See below for the Derrick pirated advertisement on the right, PLS/Derrick Joint Venture advertisement on the left.*



31.    Against the backdrop of this trade dress piracy, Derrick's conduct and motives become clear. Moreover, any sales or other benefits gained by Derrick from its unauthorized use of the PLS brochures have not been shared with PLS as required by the terms of the MOU.

### DocFinder

32.    In the summer of 2009, when Derrick first visited PLS's offices in Houston, PLS showed Derrick a new generation one product called docFinder that PLS had been working on

---

[4] See, e.g., Exhibit 1.

since 2007. The unique tool could be used by PLS's clients to quickly search, seek and find individual power point slides in seconds out of a library of hundreds of thousand slides based on the user's selection criteria.  Derrick saw the product and returned to India where he built a version of docFinder for the Joint Venture Global M&A Database using a third party programming firm. While concerned about the secrecy surrounding this development and outsourcing of the programming, PLS was happy to see the "knock off" added as a module to the Joint Venture Global M&A Database. Unfortunately, Derrick then placed "docSearch" on the web for free and started aggregating slides and content and marketing the product in competition with PLS's 2007 docFinder tool. When PLS expressed dismay at Derrick's competing efforts, Derrick shrugged and said that he had come up with the idea for docSearch first and that PLS's docFinder was a copy of Derrick's docSearch.

33.     Later on, PLS invited Derrick to participate in the development of a third generation, stand-alone docFinder product that actually sourced "images" from hundreds of thousands of slides as opposed to just text-based search.  Despite the prior problem, PLS was willing to offer Derrick the opportunity to participate in the third generation image-based search tool because PLS was concerned about underwriting the labor costs necessary to create the new 2011 search product.  Derrick declined to work with PLS on the new tool claiming the oil industry did not need it, wouldn't pay for it, and that his docSearch text-based product was adequate.

34.     In the summer of 2011, PLS again asked Derrick to participate, but Deodhar declined because Derrick was too busy with other efforts. After PLS successfully built docFinder into a $2 million business, and a tool that helps cross sell the Joint Venture Global M&A Database, Derrick started complaining that docFinder was still a knock off of Derrick's

docSearch, contrary to fact and PLS's efforts. Finally, Derrick removed the free copy of docSearch from the web but shortly thereafter unilaterally took docSearch out of the Joint Venture Global M&A Database, thereby compromising the modules and the client experience. There still exists a dispute between the parties as to who owns docSearch and PLS is concerned Derrick is holding back the docSearch module until, as Derrick contends, the Joint Venture expires in October 2014.

### III. CAUSES OF ACTION

**Breach of Contract**

35.      Derrick and PLS entered into a valid and enforceable contract, the MOU, on or about October 3, 2009.

36.      PLS has performed its obligations under that contract, providing marketing and contacts for the Joint Venture Global M&A Database to grow and prosper into the successful world-wide energy tool that it is.

37.      Despite PLS's performance, Derrick has breached the terms of the MOU by unilaterally stopping the creation of the Joint Venture LLC; marketing a competitive product, 1Derrick, and without obtaining consent from PLS, copying the Joint Venture Global M&A Database marketing materials, for 1Derrick's and Derrick's own financial benefit, to the express exclusion of PLS and the Joint Venture; failing to provide updated information on the Joint Venture Global M&A Database; and pursuing sales without PLS's knowledge or consent and without providing PLS with PLS's portion of the revenues.

38.      Such breaches by Derrick have harmed PLS resulting in lost profits, lost business opportunities, and damage to PLS's reputation and good will in the community.

**Breach of Fiduciary Duty**

39.     The relationship between joint venturers, such as Derrick and PLS, is fiduciary in character and imposes on all participants the obligation of loyalty to their joint concern and of the utmost faith, fairness, and honesty in their dealings with each other within the scope of the enterprise or with respect to property related to or employed in the enterprise.[5] The duties of loyalty and care that partners owe one another cannot be ignored or contracted away, least of all in an agreement in which "the parties agree to work together exclusively on these efforts during the term of the JV [Joint Venture] and will not circumvent the other for similar product offerings, unless agreed to in writing."[6]

40.     Even if the MOU did not contain the provision quoted above, the fiduciary duties Derrick owes PLS include:

(1)     accounting to and holding for the partnership property, profit, or benefit derived by the partner: (A) in the conduct and winding up of the partnership business; or (B) from use by the partner of partnership property;

(2)     refraining from dealing with the partnership on behalf of a person who has an interest adverse to the partnership; and

(3)     refraining from competing or dealing with the partnership in a manner adverse to the partnership.[7]

41.     Indeed, the partners must discharge their duties in good faith, and in a manner the partner reasonably believes to be in the best interest of the partnership.[8] The fiduciary duty applies to every aspect of the joint venture until its completion, termination, or abandonment,

---

[5] *General Universal Systems, Inc. v. Lee*, 379 F.3d 131 (5th Cir. 2004); *Miller-Rogaska, Inc. v. Bank One, Texas, N.A.*, 931 S.W.2d 655 (Tex.App.—Dallas 1996); *Austin v. Truly*, 744 S.W.2d 934 (Tex. 1988).
[6] Tex. Bus. Orgs. Code Sec. 152.204(a) & 152.206(a)(2).
[7] *Id. at* 152.205.
[8] *Id. at 152.204(b).*

and as long as a joint venture continues.[9] In the absence of the creation of the required LLC, the joint venture continues even today, as do Derrick's continued duties.

42.     Derrick has breached its fiduciary duties to PLS by unilaterally stopping the creation of the Joint Venture LLC; marketing a competitive product, 1Derrick, and without obtaining consent from PLS, copying the Joint Venture Global M&A Database marketing materials, for 1Derrick's and Derrick's own financial benefit, to the express exclusion of PLS and the Joint Venture; failing to provide updated information on the Joint Venture Global M&A Database; and pursuing sales without PLS's knowledge or consent and without providing PLS with PLS's portion of the revenues.

43.     Such breaches by Derrick have harmed PLS, resulting in lost profits, excessive costs foisted onto PLS throughout the Joint Venture, lost business opportunities, and damage to PLS's reputation and good will in the community. In addition, PLS requests that this Court order Derrick to make an accounting to determine the amount PLS is owed.

### False Designation of Origin and Trade Dress Infringement in Violation of Section 43(A) of the Lanham Act

44.     Derrick's piracy of marketing and advertising materials is in direct violation of Section 43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a), which provides that:

> (1) Any person who, on or in connection with any goods or services, … uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which
>
> (a) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or

---

[9] *International Trust Corp. v. Honorable Patrick Pirtle*, 1997 WL 20870, *9 (Tex.App.—Amarillo 1997) (citing *Maykus v. First City Realty & Financial Corp.*, 518 S.W.2d 887 (Tex.App.—Dallas 1974).

her goods, services, or commercial activities by
another person, or

(b) in commercial advertising or promotion,
misrepresents the nature, characteristics, qualities,
or geographic origin of his or her or another
person's goods, services, or commercial activities,

shall be liable in a civil action by any person who
believes that he or she is or is likely to be damaged by
such act.

45.     Derrick's advertising materials for its sales of the Joint Venture Global M&A
Database from November of 2013 are nearly carbon copies of the marketing materials PLS has
used to market the Joint Venture Global M&A Database. Derrick has used a "false designation of
origin" that is likely to cause confusion, mistake or deception as to the affiliation or connection
of Derrick with PLS and/or as to the sponsorship or approval by PLS, in violation of Section
43(a) of the Lanham Act, 15 U.S.C.A. § 1125(a). Derrick's acts as alleged herein misrepresent
the nature, characteristics, or qualities of its goods, services, or commercial activities.

46.     Derrick's acts constitute the use in commerce of false designations of origin and
false and/or misleading descriptions or representations, tending to describe and/or represent, in a
false or misleading fashion, Derrick's products as those of PLS in violation of Section 43(a) of
the Lanham Act, 15 U.S.C.A. § 1125(a). Derrick's wrongful acts will continue unless enjoined
by this Court. Derrick's acts have caused and will continue to cause irreparable injury to PLS.
PLS has no adequate remedy at law and is thus damaged in an amount not determinable.

**Tortious Interference with Existing Contracts**

47.     The elements of tortious interference with an existing contract are: (1) an existing
contract subject to interference, (2) a willful and intentional act of interference with the contract

(3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss.[10] PLS has numerous existing contracts subject to interference, all of which Derrick is or should be aware, because it receives revenues from the contracts between PLS and those customers. PLS will suffer actual damages from lost revenues and profits as a result of PLS's tortious interference.

### Misappropriation of Trade Secrets

48.     The elements of misappropriation of a trade secret or confidential information under Texas law are: (1) existence of a trade secret; (2) breach of a confidential relationship or improper discovery of a trade secret; (3) use of the trade secret without authorization; and (4) resulting damages.[11] The conduct and/or omissions described herein demonstrate Derrick's intent to misappropriate the intellectual property and trade secrets of PLS. As a joint venturer, Derrick was allowed access to PLS's current clients, potential customers, and pricing information. Items such as customer lists, pricing information and client information have consistently been considered trade secrets by Texas courts.[12] Derrick has made it clear its intent is to enter the North American market with competing products, despite the fact that it admits it had no North American customer base before its venture with PLS. There is no way Derrick could successfully market "knock-off" PLS products, 1Derrick, or any other related product for that matter, in North America without availing itself of the trade secrets it learned through its Joint Venture with PLS. PLS has clearly not authorized this use by Derrick, and would suffer significant damages and loss of revenue as a result.

---

[10] *Funes v. Villatoro,* 352 S.W.3d 200, 213 (Tex.App.—Houston [14th Dist.] 2011, pet. denied).
[11] *Twister B.V. v. Newton Research Partners, LP,* 364 S.W.3d 428, 437 (Tex.App.-Dallas 2012, no pet.)
[12] *Gallagher Healthcare Ins. Services v. Vogelsang*, 312 S.W.3d 640, 652 (Tex.App.–Houston [1st Dist.] 2009, pet. denied).

## IV. APPLICATION FOR PRELIMINARY INJUNCTION

1.     Pursuant to Fed. R. Civ. P. 65, PLS asks this Court to grant a preliminary injunction enjoining Derrick from taking the Joint Venture Global M&A Database, depriving PLS and the Joint Venture from use of the Joint Venture Global M&A Database, and resulting in insurmountable losses to PLS, specifically including injunctive relief as prayed for below.

2.     To obtain such an injunction, PLS must show: (1) a likelihood of success on the merits; (2) irreparable harm if the injunction is not granted; (3) the threatened injury outweighs any harm that the injunction might cause Derrick; and (4) that the injunction will be in the best interest of the public.[13] Because PLS can and will show that all of these factors are met, PLS is entitled to this injunctive relief.

3.     As set forth in its counterclaims, PLS's likelihood of success on the merits is high. Despite an explicit agreement to move to an LLC when revenues reached the agreed-upon threshold of $2 million, Derrick has refused, and continues to refuse, to move to an LLC. This is a fundamental breach of the MOU. If Derrick absconds with the Joint Venture Global M&A Database containing all the enhancements provided to it by PLS over the years, PLS will be stuck without the benefit of the bargain it made with Derrick and serious practical impairment, if not inability, to honor its contracts with customers. All that PLS has built and worked for is jeopardized by Derrick's unilateral refusal to honor its written promises and its threatened departure with the fruits of PLS's hard work, time and energies that helped create what is now the Joint Venture Global M&A Database.

4.     In addition, Derrick has blatantly breached the MOU's provision regarding circumventing PLS for similar product offerings. First, Derrick marketed 1Derrick since the middle of 2012, and copied the Joint Venture Global M&A Database's marketing materials

---

[13] *See Winter v. NRDC, Inc.*, 555 U.S. 7, 19 (2008).

created by PLS, for Derrick's own benefit. Second, Derrick has used a map feature for 1Derrick's website which was intended for the Joint Venture Global M&A Database. Third, Derrick has failed to provide revenues to PLS for any of the sales associated with 1Derrick, the copied advertising materials and the misappropriated map. Further, Derrick has failed, repeatedly, to provide updated information on the Joint Venture Global M&A Database in direct violation of the MOU terms governing "Ongoing Operations."

5.      Lastly, Derrick has pursued sales without PLS's knowledge and without providing PLS with the portion of the revenues due to PLS from such sales.

6.      In addition to PLS's high likelihood of success on the merits, if Derrick is not enjoined from absconding with the Joint Venture Global M&A Database and other property created by the Joint Venture, there will be irreparable harm to PLS, the Joint Venture and the Joint Venture Global M&A Database, for which there will be no adequate remedy at law. In such an instance, PLS will experience loss of business opportunities, damage to its goodwill, loss of its competitive advantage, loss of existing and potential customers, and confusion in the marketplace, which will result in a reduction in PLS's market share. Derrick's continued acts will harm PLS's reputation in that a database that is not updated as necessary will not meet the high standards in the ever-changing energy industry. Indeed, if Derrick is not enjoined, PLS will lose the efforts it has expended in the past 20 plus years establishing itself in the information corridor of the energy arena. Such injuries are irreparable and cannot be compensated by monetary damages.

7.      Any harm to Derrick is of Derrick's own doing through its inveterate disregard of its obligations under contract and under law, and in no event is any ostensible detriment to

Derrick equal to or greater than the prospective damage to PLS for the reasons set forth in the preceding paragraph.

8.      Lastly, a preliminary injunction here serves the public's best interest because turning a blind eye to brigandage and thievery undermines the sanctity of contract and the expectations of parties to contract creating fiduciary relationships.

## V. PRAYER

For the reasons set forth herein, Defendant and Cross-Plaintiff PLS respectfully prays that Derrick take nothing by way of its claims, and that PLS have a judgment against Derrick for the following:

1.  An injunction from the court:

    a.  Ordering Derrick to continue hosting the Joint Venture Global M&A Database on servers located in the United States and hosted by companies incorporated in the United States;

    b.  Ordering Derrick to make the source code, executable code, object code and all other related documentation for the Joint Venture Global M&A Database available to PLS;

    c.  Ordering Derrick to preserve any and all product enhancements, innovations and data sets provided by PLS for the benefit of the Joint Venture Global M&A Database;

    d.  Ordering Derrick to provide a list of any and all product enhancements, innovations and data sets that exist for the Joint Venture Global M&A Database, whether under development, or in beta or testing mode;

    e.  Ordering Derrick to continue to provide client access to the Joint Venture Global M&A Database for any and all Joint Venture customers for the pendency of the lawsuit;

    f.  Ordering Derrick to continue providing services and maintaining the Joint Venture Global M&A Database in good working order as set forth in the Memorandum of Understanding for the pendency of the lawsuit;

    g.  Ordering Derrick to reinsert the Joint Venture product docSearch back into the Joint Venture Global M&A Database;

h. Ordering Derrick provide a full accounting of all sales it has made of the Joint Venture Global M&A Database or 1Derrick;

i. Enjoining Derrick from publishing or distributing 1Derrick or other similar product offerings, or making 1Derrick or other similar product offerings available on or through its website;

j. Enjoining Derrick from using marketing or advertising materials which are similar or identical to those used by PLS and/or the Joint Venture;

k. Enjoining Derrick from infringing and misappropriating the intellectual property of PLS and/or the Joint Venture;

l. Enjoining Derrick from developing, marketing, or otherwise offering for sale or for free products that compete with the Joint Venture Global M&A Database or docFinder;

2. Awarding compensatory damages to PLS as follows:

a. Economic damages for breach of contract and the losses attributable to Derrick's breach, and for Derrick's breach of fiduciary duty, including but not limited to the recovery PLS's losses for expenditures made for Derrick's benefit, recovery of its 50% interest in revenues earned but not shared by Derrick

b. Costs of court;

c. Reasonable attorneys' fees and

d. Any other relief to which PLS may show itself justly entitled.

Respectfully submitted,

MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.

By: ___/s/ Phillip D. Sharp_____
Phillip D. Sharp
Texas State Bar No.18118680
Federal ID No. 13588
sharp@mdwjlaw.com
Julie Wilson
Texas State Bar No. 24070062
Federal ID No. 1139374
wilson@mdjwlaw.com
808 Travis, Suite 2000
Houston, Texas 77002
Telephone: (713) 632-1700
Facsimile: (713) 222-0101

35

ATTORNEYS FOR PLS, INC.

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing document was filed and served electronically, via the ECF system, on the 1st day of July, 2014.

Brendan D. Cook
Baker & McKenzie, LLP
700 Louisiana, Suite 3000
Houston, Texas 77002
Fax: (713) 427-5099

*/s/ Julie R. Wilson*
Julie R. Wilson

6658-0002
1145852

36