UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DERRICK PETROLEUM SERVICES, | § § | |
|     *Plaintiff*, | § § | |
| v. | § § | CASE NO. 4:14-cv-01520 |
| PLS, INC., | § § | |
|     *Defendant*. | § § | |

## PLAINTIFF'S SUMMARY OF DEPOSITION DESIGNATION OF JASON REIMBOLD

Plaintiff, Derrick Petroleum Services ("Derrick"), hereby submits Plaintiff's Summary of Deposition Designation of Jason Reimbold ("Reimbold") and offers the following summary of Plaintiff's Designation of the Deposition Testimony.

**A. Reimbold Was Designated by PLS to Address the "Pre-Existing" M&A Database PLS Supposedly Had Prior to October 2009.**

Reimbold was designated by PLS to address Topic No. 3 set forth in Derrick's First Amended Notice of Oral Deposition of the Corporate Representative of Defendant PLS, Inc. ("PLS"), a copy of which is attached to this summary as Exhibit 1. The notice sought designation of a witness on the subject of the "older and larger M&A Database" that PLS has alleged to have existed prior to October 2009.

While Reimbold has knowledge regarding the so-called pre-existing database, that knowledge is fairly limited, and is tempered by the fact that he was not employed by PLS at the time the Memorandum of Understanding ("MOU") was finalized and became effective in October of 2009, and given that the nature and extent of his IT responsibilities were further limited as described in more detail below.

**B.     Reimbold's Employment with PLS Embraced Three Separate "Iterations."**

Reimbold is a graduate of the University of Tulsa. He received a B.S. in Finance in 2006. He started employment with PLS in February of 2008. He was hired as Director of Capital Marketing.

His initial responsibilities included the entire product line of PLS. He then became responsible for what he characterized as "A&D Advisory Engagement" (in other words, he was responsible for acquisitions and divestments).

Reimbold stayed with PLS until May of 2009, when he left to join the Rodman Energy Group. This was a boutique investment bank based in New York.

During what he characterized as this "first iteration" of employment, Reimbold spent time reviewing, organizing, and reformatting historical M&A data that had been accumulated by PLS.

Reimbold returned to PLS in June of 2011, and remained there until April 2012. Because PLS had already entered into the MOU with Derrick, it appears that there was much less focus on the historical M&A data during this second iteration of employment than in the earlier 2008-2009 timeframe. In April 2012, Reimbold left to work for M1 Energy Capital, where he again focused on acquisitions and divestments.

**C.     Reimbold Was Apparently Charged With the Mandate of Trying to Monetize the Historical M&A Data.**

When Reimbold joined PLS in 2008, he had a fairly broad array of job responsibilities. As he was being trained, and learning the product lines, he learned that PLS had accumulated certain historical M&A data, "*although it was not in what I would call a marketable fashion . . . .*"[1] Indeed, there was nothing comparable to the version of the M&A Database that was

---
[1] Transcript of Jason Reimbold Deposition Testimony at 11:21-12:3.

subsequently marketed and sold. In fact, the historical data was not being used for commercial purposes, and was not generating any revenue for PLS in 2008 and 2009. Reimbold confirmed that the historical data was not in a commercially usable format and wasn't being sold or marketed.

Whether Reimbold was instructed to try to make some use of the historical data—or whether he took this task up on his own volition is somewhat unclear. Nevertheless, he began using the data for "valuation assessments related to A&D Advisory." Reimbold also had the idea to essentially repackage the information, and to make it more interactive and to create what he called a front-end interface in order to make it easier for PLS to use internally. There was one instance in which a customer asked PLS to do a metrics analysis, which was apparently prepared for Continental Resources using that data and sold for $3,500. Other than this one situation, the historical data was never marketing or sold on a standalone basis, or in a manner akin to how the M&A Database is currently marketed and sold.

Notably, Reimbold is not an IT expert. His experience lies in the area of finance and what he continually referred to as A&D Advisory services. Accordingly, most of the technical work regarding the historical M&A data of PLS was done by an individual named Sean Bao. He is the individual responsible for doing the programming work, to the extent any was necessary. Reimbold was essentially responsible for overall "administration" and for dictating the packaging or formatting of the information in question.

**D.    Reimbold Has No Knowledge Regarding the Creation and Development of the M&A Database or the Status of the MOU.**

Mr. Reimbold was not involved in negotiating the terms of the conditions of the MOU and had no responsibility in administering or interpreting application of that agreement. Moreover, Reimbold has had virtually no involvement in the marketing or sale of the current

3

version of the M&A Database and only very limited, if indirect, dealings with Derrick. In fact, he had no role in the creation, development, or evolution of the M&A Database. Nor was he involved in the transmittal of data, if any, that may have occurred between PLS and Derrick.

By the time Reimbold returned from Rodman Energy Group to begin his second stint at PLS, the MOU had already been entered into with Derrick. By this time, in June of 2011, the MOU had already been in effect since October 3, 2009, or approximately twenty (20) months. Thus, Reimbold was really not involved in any aspect of the relationship between PLS and Derrick other than what he may have heard, and what he may have been told by colleagues of PLS. Along those lines, he came to learn that Derrick was handling the "back-end," or stated differently, was responsible for controlling the content and technical aspects of the M&A Database, while PLS was primarily responsible for sales and marketing. Along those lines, Reimbold had no responsibility relating to the back-end of the M&A Database, or in relation to the sales and marketing efforts that were discharged by PLS.

Assuming the evidence is consistent with the testimony of Reimbold, and established that PLS owned some historical M&A data, Reimbold has no personal knowledge to suggest (a) what data was given to Derrick, and (b) whether and/or to what extent any of the information was ever relied or used by Derrick or integrated into any version of the M&A Database. Although he believes some information was probably provided to and used by Derrick, this is admittedly an assumption on his part and he cannot provide personal knowledge given (a) the gaps in his employment with PLS, and (b) the fact that matters pertaining to the M&A Database lie outside his sphere of influence.

Respectfully submitted,

BAKER & McKENZIE LLP

By:       /s/ Brendan D. Cook
     Brendan D. Cook
     *(attorney-in-charge)*
     Texas Bar No. 04721700
     Federal ID # 5030
     Brandon E. Caire
     Texas Bar No. 24064991
     Federal ID # 1812322
     700 Louisiana, Suite 3000
     Houston, Texas 77002
     Tel: (713) 427-5000 / Fax: (713) 427-5099
     brendan.cook@bakermckenzie.com
     brandon.caire@bakermckenzie.com

ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this document has been served on lead counsel of record on November 3, 2014 by electronic mail, electronic filing, facsimile, hand delivery, and/or U.S. certified mail, return receipt requested:

Eric Lipper
HIRSCH & WESTHEIMER
1415 Louisiana
Houston, Texas 77002
elipper@hirschwest.com
Tel: (713) 220-9181 / Fax: (713) 223-9319

*Attorney for Defendant PLS Inc.*

Brandon E. Caire