**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| DERRICK PETROLEUM SERVICES, | § | |
| | § | |
| *Plaintiff,* | § | |
| v. | § | CASE NO. 4:14-cv-01520 |
| | § | |
| PLS, INC., | § | |
| | § | |
| *Defendant.* | § | |

### PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to the Court's order of October 24, 2014, and in preparation for trial to commence on November 17, 2014, Plaintiff Derrick Petroleum Services submits these its Proposed Findings of Fact and Conclusions of Law and hereby requests that the Court enter an order in accordance with the below findings and conclusions:

### FINDINGS OF FACT

## I.     The Parties

1.      Plaintiff Derrick Petroleum Services ("Derrick") is a partnership organized under the laws of the Republic of India.  Its principal business office is 47/2 Promenade Road, Banglaore - 560 042 India.

2.      Defendant PLS, Inc. ("PLS") is a Texas corporation doing business in Harris County, Texas.  Its principal place of business is 1 Riverway, Suite 2500, Houston, Texas 77056.

3.      Derrick is an oil and gas research company formed in 2006 by Yashodeep Deodhar which provides both consulting services and research products to oil and gas companies and financial advisors around the world.  Derrick's products comprise databases, reports, and news articles on a variety of issues relevant to the oil and gas industry.

## II.    Derrick Created the M&A Database in 2006, Three Years Before the Parties Met.

4.    Derrick's first offering to the market, and to this day its best-selling product, is a database containing data and analysis regarding both historical and current oil and gas mergers, acquisitions, and opportunities, known as the Oil & Gas Mergers & Acquisitions Database (the "M&A Database," the "Derrick Database," or simply the "Database").[1]    The parties acknowledge that the value of the Database in question exceeds $75,000.[2]

5.    The M&A Database contains data on the oil and gas industry compiled from thousands of sources, along with detailed analysis of oil and gas industry transactions presented on a transaction-by-transaction basis.    The M&A Database contains data and analysis on over 15,000 historical transactions from 1999 to the present as well as information on over 3,000 current opportunities—known as "Deals in Play"—in the market.

6.    Derrick created the Database in 2006.    After more than a year of development, Derrick first launched the Database for sale to the public in the fall of 2007.    Derrick soon had success in attracting international clients, including Statoil ASA,[3] who purchased a subscription valued at more than $100,000, as well as additional clients.

7.    Despite its international marketing success, Derrick encountered some difficulties in marketing the Database in North America.    In the spring of 2009, Brian Lidsky was contracted by Derrick to assist as a consultant in marketing the M&A Database in the North American region.    Lidsky quickly launched an email campaign to prospective buyers, touting the Database's unmatched quality.    In representative samples of this email campaign, attached as

---

[1] The Database has also been called the E&P Transactions Database.  Both this term and the term "Global M&A Database" have been used interchangeably by Derrick since it began marketing the Database, although Derrick stopped using the former term once Midstream and Downstream transactions began to be added to the Database in 2012.  *See, e.g.,* Exs. 103, March 2009 Derrick E&P Transactions Database Presentation, and 104, May 2009 Derrick Global M&A Database Presentation.

[2] *See* Ex. 102, PLS Objections and Answers to Plaintiff Derrick Petroleum Services' Interrogatories, Answer to Interrogatory No. 3.

[3] *See* Ex. 87, 2009 Invoice from Statoil ASA.

Plaintiff's Exhibits 9 and 10, Lidsky characterizes the M&A Database as "deep," "excellent," and globally "comprehensive."[4]

8.      PLS has alleged that the Database was exclusively international before Derrick met PLS and that Derrick used PLS's U.S. data to form a complete Global M&A Database. While Derrick no doubt valued PLS's marketing relationships and familiarity with the U.S. markets—indeed, that is the very reason the parties agreed to do business—the Database contained 1,691 U.S. records at the time (as well as 989 Canadian records), accounting for over 25% of Derrick's records in May 2009, before PLS made any contributions, and, as further discussed below, PLS's initial contribution amounted to only 4 new records.  In other words, the Database was far from exclusively international, and many of the U.S. records in the current Database were added before Derrick and PLS ever agreed to work together.

9.      Once Lidsky was hired, he drafted a press release regarding Derrick's activities, including a study of deals on the market, which was issued May 28, 2009.[5]  According to Lidsky's press release at the time, Derrick employed a "team of twenty analysts [which maintained] Upstream Oil and Gas activity databases for a global client base."[6]  Further, Derrick's databases at the time boasted "worldwide coverage, with special emphasis on emerging plays and international transactions."[7]  PLS representative Ronyld Wise, upon reading the press release, was "impressed" by Derrick's work and contacted Derrick to see whether the two parties could work together.[8]

10.     Soon after, Lidsky left his post at Derrick for a position with PLS.  Once there, Lidsky continued to look for ways for PLS and Derrick to work together.  Derrick, still wishing

---

[4] Ex. 9, May 30, 2009 Email from B. Lidsky to J. Stilwell re Oil and Gas Activity.  *See also* Ex. 10, May 30, 2009 Email from B. Lidsky to G. Mazza re Oil and Gas M&A Markets.
[5] Ex. 6, May 28, 2009 Derrick Press Release entitled: "$20 Billion of Oil and Gas Deals Currently on the Market."
[6] *Id.*
[7] *Id.*
[8] *See* Ex. 8, May 29, 2009 Email from R. Wise to N. Seetharama re Derrick Petroleum Services.

to increase its sales in North America, responded to PLS's overtures with trial subscriptions to the Database, noting at the time that its goal was to help grow the Database's business in North America.[9]

11.    After some negotiation, the parties entered into a Memorandum of Understanding (the "MOU"), whereby PLS would market the Database in North America and collect and distribute sales revenues on a 50/50 basis.  While PLS initially alleged that the MOU was drafted by Derrick, it appears to have abandoned this allegation, as Lidsky's own testimony on the subject unwaveringly confirms that he drafted the document.  PLS composed and sent a draft MOU to Derrick on September 2, 2009.[10]  The parties negotiated further for a few weeks and executed a revised MOU on October 3, 2009.[11]  The parties' obligations under the MOU are detailed below in Sections VI and VII of these Findings.

## III.    PLS's Contributions to the M&A Database Were Minimal, Amounting to Approximately 1.5% of Database Content.

12.    When the parties met in 2009, PLS, for its part, informed Derrick that it possessed its own M&A transactions dataset.[12]  While PLS corporate representative Jason Reimbold has confirmed that a nascent PLS database did exist at the time, Reimbold has also made clear that the PLS database was not ready for the market.[13]  The fact that the PLS database did not contain sufficient data or analysis for commercial use is underscored by communications, such as the September 2009 email attached as Plaintiff's Exhibit 23, from PLS to Derrick requesting U.S. data and analysis from the Derrick Database for PLS's own clients.[14]  Had PLS possessed a

---

[9] Ex. 13, July 30, 2009 Email from Y. Deodhar to R. Wise and B. Lidsky re: Trials.
[10] Ex. 3, September 2, 2009 Email from B. Lidsky to Y. Deodhar, R. Wise, and R. Bernardy containing draft MOU.
[11] Ex. 1, MOU.
[12] Ex. 12, June 26, 2009 Email from B. Lidsky to Y. Deodhar mentioning PLS noncommercialized data.
[13] Ex. 95, Summary and Designated Portions of Deposition Transcript of J. Reimbold, at 11:21–12:3.
[14] Ex. 23, September 29, 2009 Email from B. Lidsky to N. Seetharama re: Dynamic Offshore Resources: Client Service from PLS, Inc., requesting Gulf of Mexico data from Derrick.

marketable database of its own in September 2009, it would have been unnecessary to rely upon Derrick's data to answer PLS's customer questions.

13.     Despite the unmarketable nature of PLS's product, PLS has contended the parties created "a new Database combining Derrick's 2009 M&A database with PLS's older and larger M&A database."[15] Per PLS, the Database currently in existence is not the same as the Database Derrick created in 2006 and that existed in 2009.  In some sense, PLS is correct, in that the Database has not remained an identical product in 2006, in 2009, or today.  With Derrick's nearly daily enhancements and updates, one could posit that a new Database is created on an almost daily basis.  However, the more logical position to adopt is that Derrick is not creating a brand-new Database each time it adds a new entry or field value, but that it is simply updating its current product, which was never intended to be a static data silo but a dynamic tool that must remain current in order to retain its value.

14.     The evidence in this case establishes that, of the records PLS initially provided to Derrick, only four were added to Derrick's Database, which at the time contained 5,893 records.[16] Accordingly, the mere addition of 4 records (even in 2009 amounting to less than 0.07% of the Derrick Database at the time) did not effect the creation of an entirely new Database, but was more akin to ongoing updates to the database Derrick created in 2006 and continues to maintain and develop. Further, as the analysis conducted by Ms. Nancy Miracle shows, the unique software identifiers of the Database remained unchanged from its 2006 inception all the way until the Database was moved to the Intuit Quickbase platform in mid-2010.[17]  Accordingly, there is no new Database, and the Database which Derrick created in 2006

[15] 1st Am. Countercl. (Doc. # 10) at ¶ 10.
[16] Ex. 92, Supplemental Expert Report of Nancy Miracle on Similarity and Data Content ("Miracle Supp. Rep.") at pp. 21–22.
[17] Ex. 92, Miracle Supp. Rep. at p. 17 and Ex. 2 to Miracle Supp. Rep.

and which exists today, although they certainly represent different editions, are the same product.

15.    PLS also contends that it has made substantial contributions to the Database. However, an analysis of the content of the Database reveals that PLS's entire contribution both initially in 2009 and afterward amounts to approximately 1.5% of the Database's content.

16.    Per its own corporate representative Brian Lidsky, PLS's alleged content contributions have been documented in two ways. First, Lidsky claims that it gave Derrick access to the unmarketable PLS database described above. Additionally, Lidsky claims that PLS continued to provide content via emails sent to Derrick on an ongoing basis after the fall of 2009. Neither of these contributions resulted in any substantial change to the Database.

17.    Regarding PLS's alleged contribution of data from its own PLS database, while it is possible that PLS may have granted Derrick representative Naveen Seetharama access to the PLS database at some point in the fall of 2009, there is no evidence that either Seetharama or any other Derrick representative ever accessed the PLS database,[18] and more importantly, it is apparent that the vast majority of the content in the PLS database was not added to the Derrick Database as the Derrick Database contains data only reaching back as far as 1999, while the PLS database is alleged to have contained data beginning in 1980.

18.    The only documentation supporting any initial data contribution by PLS is a spreadsheet which was sent from Lidsky to Seetharama on October 19, 2009, and which contains a list of entries in each database,[19] including 153 entries which could be found in the PLS database but were supposedly missing from the Derrick Database.[20] Of these 153 entries, 70 actually appear in pre-existing versions of the Derrick database and expert analysis reveals, as

---

[18] Ex. 98, Deposition Transcript of Naveen Seetharama ("Seetharama Dep."), at 54:24–55:4.
[19] Ex. 32, November 15, 2009 Email from N. Seetharama to Pavithra, forwarding B. Lidsky list of deals allegedly in each database.
[20] Ex. 92, Miracle Supp. Rep., p. 21.

noted above, that only 4 entries were added to the Derrick Database, rendering PLS's initial contribution a minimal 0.02% of today's Database.[21]

19.    With regard to PLS's ongoing emails, analysis similarly reveals that very little content from the emails was added to the Database. As a threshold matter, although PLS contends that it has provided a list of emails which contain contributions by PLS to the Database,[22] a closer examination reveals this list to comprise not only PLS suggestions but essentially any communications from PLS to Derrick's PLSDeals email address, regardless of their import. While the list is incorrectly entitled "PLS Data Contribution and Quality Control," many items on the list relate to neither Contributions or Quality Control, but instead, *inter alia*, request that Derrick provide information to PLS. For example, an email from PLS employee Denise Condina dated October 2, 2012, and entitled "Need Source" is included on the third page of the list.[23] A review of this email reveals it not to be a PLS contribution but instead a request for a source document from Derrick, in which Ms. Condina refers to an already existing Database entry and asks: "Is there a source document for this deal?"[24] So not all the items on this list reflect PLS contributions or quality control.

20.    Further, as Ms. Miracle has observed, the vast majority of PLS's emails relate to content which was not proprietary to PLS, but for which PLS was merely passing on information sourced from other companies.[25] PLS can hardly claim this content belonged to PLS simply by virtue of the fact that it forwarded information authored by another party.

21.    A more thorough and comprehensive review of PLS's emails conducted by

---

[21] Ex. 92, Miracle Supp. Rep., pp. 21–22. As noted above, PLS's initial contribution represented 0.07% of the Database as it existed in 2009; however, as Derrick has added more records, the relative amount of PLS's initial contribution has shrunk accordingly.
[22] Ex. 72, Chart: PLS Data Contribution and Quality Control Outbound Emails.
[23] Ex. 72, Chart: PLS Data Contribution and Quality Control Outbound Emails, at p. 3, l. 18.
[24] Ex. 105, October 2, 2012 Email from D. Condina to PLSDeals inbox re: Need Source.
[25] Ex. 92, Miracle Supp. Rep. at p. 10.

Derrick and statistically verified by Ms. Nancy Miracle indicates that, in the end, PLS email contributions account for about 1% of the announced transactions Database records and about 4% of Database records for transactions currently on the market, or "Deals in Play."[26] Considered together, then, PLS's content contribution amounts to about 1.5% of the data in the Global Deals and Deals in Play sections of the Database.[27] Accordingly, there is no evidence that any significant amount of data from PLS was ever added to the Derrick Database.[28]

22.    In addition to content, PLS's contributions in terms of Database analysis were similarly insignificant.  Although PLS through its corporate representative Lidsky contends  that it taught Derrick how to value the M&A Database, in truth, Lidsky was just re-entering the oil and gas database analytics space in 2009 after having worked in another area for nearly ten years.  Accordingly, Lidsky's experience in evaluating transactions for an M&A Database was significantly dated, and relied upon valuation concepts that were essentially worthless to Derrick, especially in light of the momentous changes in the industry that took place in the intervening decade.  At the same time that Lidsky left the business, Deodhar entered it, serving oil and gas clients as a consultant for McKinsey & Company from 2001 to 2005, and having regular interaction with oil and gas transaction analysis at that time.

23.    To cite one example, in September 2009, Lidsky forwarded Derrick a valuation document that was authored by Herold's in 2000.[29]  As Seetharama explained, "[t]he whole idea [of valuation] has changed" since 2000, and, with the emergence of shale plays, "people just

---

[26] Ex. 92, Miracle Supp. Rep., pp. 23–29.

[27] *Id.* at p. 31.  The Database is composed primarily of Global Deals, which currently include approximately 15,900 announced transactions; the Database's "Deals in Play" section is smaller, consisting of approximately 3,000 transactions currently on the market.  Accordingly, after combining PLS's 4% contribution to Deals in Play with its 1% contribution to Global Deals, the Court arrives at a blended 1.48% contribution to the Database.

[28] Ex. 92, Miracle Supp. Rep., p. 13, observing that only 4 records from PLS's database extract could be found among the 16,000 records in the Derrick Database.

[29] Ex. 17, September 17, 2009 Email from B. Lidsky to N. Seetharama attaching 2000 Herold Methodology.

can't follow this even in 2009. Forget now."[30] Lidsky's experience, having been put on the shelf for nearly ten years, was more dated and less relevant than the experience Derrick had gained in Deodhar's five years with McKinsey & Company and Derrick's three years immediately prior to 2009. Accordingly, Lidsky and PLS often butted heads with Derrick over analysis issues. PLS's contributions in analysis have often been rejected by Derrick, and the parties' disagreements over analysis issues, which are well-documented and beyond dispute, underscore this fact.[31] In the end, as discussed further below, Derrick controlled which analysis it would employ in the Database.

24. PLS has also alleged that it made some contributions to the structure and appearance of the database. While PLS appears to have made suggestions regarding the geographical categories for U.S. transactions as well as other Database features that Derrick did eventually incorporate, these suggestions related merely to the "presentation layer" of the Database, to how customers view the Database, and not to Database content or analysis itself. Such surface-level changes to the "presentation layer" of the Database, however, do not modify the Database's actual content in any significant way and do not constitute fundamental database changes.[32]

25. PLS's contributions of data to the M&A Database amount to approximately 1.5% of the data in the Database, and the analysis present in the Database was authored by Derrick, who held the final say on content and analysis issues. Accordingly, Derrick, the Database's creator and its proprietor from 2006 through the present, is the true owner of the M&A Database, and any ownership claim by PLS is at best minimal, amounting to about 1.5% of the Database.

---

[30] Ex. 98, Seetharama Dep. at 185:16–186:21.
[31] *See, e.g.,* Ex. 66, June 20, 2013 Email from R. Wise to Y. Deodhar re: Tullow Meeting — Tomorrow @ 9am (claiming, "we have pricing veto rights … just like you do over Lidsky, me and David Harris ideas on the backend.).
[32] Ex. 92, Miracle Supp. Rep. pp. 6–7.

## IV. Derrick Has Always Retained Sole Possession and Control Over the M&A Database.

26.     Even if PLS's contributions had been material, these contributions would not bestow upon it an ownership interest in the Database, as Derrick as its sole owner has always controlled the content and structure of the Database, and has held the final decision on whether to include or exclude content from the Database throughout the parties' dealings.  Accordingly, in order for a suggestion made by PLS to become a part of the Database, Derrick would have to agree with and approve this suggestion.  As communications between the parties indicate, Derrick often disagreed with PLS suggestions,[33] and PLS suggestions at times failed to pass Derrick quality control standards, leading Derrick to reject them.

27.     The parties' MOU, which is addressed further below grants to Derrick, as the owner, the authority to update the Database and maintain its integrity, as well as the authority to incorporate product enhancements into the Database.  Specifically, the MOU states that Derrick shall provide "Existing M&A database platforms, software and content including ongoing data from its sources," along with "Product Enhancements including…branding, additional features, integration of PLS transaction data," and "Ongoing Operations including: a. Database updates and integrity [and] b. Maintenance of user accounts."[34]

28.     PLS has admitted on multiple occasions that the MOU grants veto power to Derrick over PLS's content suggestions, and that Derrick controls the Database's operational side.  Even in 2013, Wise conceded to Derrick that Derrick was "the boss of M&A's back end" and that Deodhar and other Derrick personnel had "veto power over [PLS consultant] David Harris, Lidsky and myself," characterizing the complete control Derrick held over the Database

---

[33] *See, e.g.,* Ex. 58, March 24, 2013 Email from D. Harris to Y. Deodhar re: M&A Database Protocols.
[34] Ex. 1, MOU at p. 1.

as "another stupid limitation of this product joint venture."[35]  Internal PLS emails confirm this view, with PLS employee Jonathan Palmer noting, "Yashodeep controls all aspects of the product management and development now, and effectively has control."[36]

29.    Both Wise and Lidsky admitted at trial that while PLS could make suggestions on Database content, in the end the decision of whether or not to include that content in the Database rests solely with Derrick.

## V.    Internal PLS Communications Recognize Derrick's Ownership of the Database and Even Plot the Creation of a "Mirror Image" Database.

30.    Given the insignificance of PLS's contributions, the fact that Derrick had created the Database three years before meeting PLS, and the fact that Derrick completely controlled the content, structure, and appearance of the Database at all times, it is not surprising that a number of internal PLS emails discuss the weaknesses of PLS's own "case for ownership."

31.    As a first example, in a June 2013 email discussing the possibility of a new agreement with Derrick, PLS employee Jonathan Palmer conceded that "**the 2009 agreement was … unclear**" on ownership and that, as a result, PLS still needed to "**[s]ecure the structure that gives [PLS] rights of ownership that are clear and enforceable**."[37]  Palmer reiterated that even as late as 2013, the parties were merely "heading towards a joint equitable ownership of rights in the product"  and that "getting a clear title to rights to this thing with the correct clauses in [was] the main goal" for PLS at the time.[38]  Lidsky, in response, agreed, describing the state of new deal negotiations thusly: "Goal #1 was 50% ownership.  I think we have that and can paper

---

[35] *See, e.g.,* Ex. 66, June 20, 2013 Email from R. Wise to Y. Deodhar re FW: Tullow Meeting -- Tomorrow @ 9am.
[36] Ex. 64, June 11, 2013 Email from B. Lidsky to R. Wise re: Yashodeep/feedback.
[37] Ex. 64, June 11, 2013 Email from B. Lidsky to R. Wise re: Yashodeep/feedback.
[38] *Id.*

it to lawyers satisfaction."[39]  Wise also agreed with Palmer's view, noting in a separate email to Lidsky on July 31, 2013, that Deodhar "**should have known to put ownership in the 3 pg document but he didn't** …"[40]

32.     Later in July 2013, Lidsky shared his view of certain terms in the parties' MOU with Wise, noting on at least one occasion that the language of the parties' agreement is "[n]ot good" for PLS on the issue of ownership.  As Lidsky explained, under the terms of the MOU, PLS would only receive a copy of the Database in the event of a Derrick exit.[41]  Lidsky then explains that "**this might be interpreted that we cannot get a copy**" in the event of the MOU's natural expiration, an eventuality that even Lidsky of course viewed as "problematic" to PLS's ownership claims.  Accordingly, Lidsky noted to Wise that whether PLS would actually be entitled to a Database copy at the end of the MOU is "**not clear in the MOU.**"[42]

33.     Even as recently as March 2014, Wise internally confirmed that PLS did not jointly build the Database, complaining that "**IF WE HAD A SYSTEM or built one it would be better**."[43]

34.     Given these doubts, when PLS eventually realized that the end of the MOU might signify the end of its access to the Database, it panicked.   As Wise has since noted, "**What will PLS be like without an M&A database?**"[44]  Consequently, PLS commenced an effort to create its own "mirror database" using content pilfered from the Derrick Database.  Taking care to keep its machinations secret from Derrick (as Wise admitted at the time, "**I don't want Yashodeep

---

[39] *Id.*
[40] Ex. 69, July 31, 2013 Email from R. Wise to B. Lidsky re: Tax Consequences of Busn Disputes.
[41] Ex. 68, July 31, 2013 Email from R. Wise to B. Lidsky, noting "It says in the event of DPS exit, they will provide a copy … to allow PLS to continue."
[42] *Id.*
[43] Ex. 79, March 7, 2014 Email from R. Wise to A. Rizvi and B. Lidsky re: Life and Deals.
[44] *Id.*

**stumbling over"** PLS's plans),[45] PLS began to anonymously seek out engineers familiar with the Intuit platform which hosted the Database that it might recruit to help build a copycat database. In its efforts to maintain absolute secrecy from Derrick, PLS even considered using consultant Habib Yunus as a stalking horse or creating a fake gmail account from which to solicit an engineer.[46] PLS's attempts to create its own copycat database highlight its concerns over Database ownership and its ability to continue marketing the Database without Derrick's participation after the end of the MOU.

35. When confronted about PLS's plans to build a copycat database, Wise admited that this mirror image copy of the Database is complete and ready to put to market, and that PLS's intention in creating a copycat database is to replace the Database with the copycat and continue to service customers without Derrick by using the mirror image database. Lidsky referred to the copycat database as PLS's "insurance policy," a backup plan to utilize in case its ownership gambit did not succeed.[47] If PLS truly believed itself to be the owner of the Database, it would have seen no need to take out this insurance policy, let alone do so in such a cloak-and-dagger manner, taking pains to keep Derrick in the dark.

36. PLS's ownership claims have almost constantly evolved, taking several forms at various points. In January 2013, PLS split ownership by transaction date: Wise claimed then that while PLS and Derrick jointly owned content from 2000 forward, only PLS owned any pre-2000 content.[48] This position, of course, is logically inconsistent with PLS's theory that both parties conveyed their data to a partnership via the MOU, and is further evidence that the parties made

---

[45] Ex. 71, August 1, 2013 Email from R. Wise to F. Saldana and B. Lidsky re: In pursuit of Mr. Goodbar.
[46] *Id.*
[47] Of course, given that PLS does not own the Database, it similarly would not own any data transferred from the Database.
[48] Ex. 53, January 17, 2013 Email from R. Wise to Y. Deodhar re: PLS and Derrick Joint Ownership of the Global M&A Database ("We both own content from 2000 forward … PLS is the only one who owns the old M&A deals before 2000.").

no such conveyance.  In the same email, Wise goes so far as to claim, "I could argue that Derrick doesn't own the data base because PLS brought more to the table but I won't do that."[49]  Later, in July 2013, PLS altered its contention, claiming then that ownership was split by transaction geography rather than transaction date:

> PLS position is that we own the North American data bases and that you own the international data sets and that you are an outsource vendor for PLS for your North American data sets, that we are a reseller of your international data sets and we jointly share revenue on combined global data sales.[50]

Wise made this claim despite the undisputed fact that Derrick's 2009 Database contained 1,691 U.S. entries before Derrick had even met PLS.

37.     At other points in time, PLS has vacillated between claiming that it has earned an ownership interest due to its content contributions to the Database,[51] claiming its ownership interest was tied to the creation of an LLC, and claiming as it does in its Answers to Derrick's Interrogatories that Derrick conveyed ownership of the Database to a partnership pursuant to the parties' MOU.[52]  Such ever-changing and inconsistent claims underscore the tenuous nature and the lack of support in the record for a PLS ownership interest.

## VI. The Memorandum of Understanding, Which is Limited in Scope, Contains a 5-Year Term.

38.     While the substance of the parties' many communications are no doubt enlightening as to their course of conduct, as noted above, the sole legal document outlining the

---

[49] *Id.*

[50] Ex. 69, July 25, 2013 Email from R. Wise to Y. Deodhar re: Tax Consequences of Busn Disputes.

[51] *See, e.g.,* Ex. 53, January 17, 2013 Email from R. Wise to Y. Deodhar re: PLS and Derrick Joint Ownership of the Global M&A Database ("PLS, like Derrick Petroleum Services owns its own copy to the Global M&A Database by virtue of … our contributions of ideas and content …").

[52] Ex. 102, PLS Objections and Answers to Derrick Petroleum Services Interrogatories, Answer to Interrogatory No. 5.

parties' relationship is a memorandum of understanding drafted by PLS representative Brian Lidsky in the fall of 2009 (the "MOU").

39.     The MOU was intended to be a temporary document and by its terms envisioned the creation and execution of a more formal and ostensibly more complete Joint Venture Agreement by October 31, 2009.[53]  However, no formal Joint Venture Agreement was ever executed, leaving the MOU as the sole document governing the parties' relationship.  As Wise noted in early 2012, "**THE ORIGINAL JV document is poorly written and Im embarrassed that I signed it without arguing for better writing**."[54]

40.     Pursuant to the MOU, PLS and Derrick agreed to "Share all Revenues on PLS, Inc.'s joint E&P database sales, including renewals 50/50"[55] but also agreed that "Costs [would] be borne 100% by respective parties as they fulfill[ed] the respective activities.  In other words Derrick [would] bear 100% of the costs for product development and operations, quality control and PLS [would] bear 100% of the costs of marketing."  These provisions both outline the discrete nature of the parties' financial responsibilities and restate in summary fashion what each party's role in the  relationship will be.  Derrick's role was "product development and operations, quality control" while PLS's role was "marketing."  In performing these roles, the parties agreed that, while revenues from PLS sales would be shared equally, all costs incurred by each party would be that party's alone to bear and would not be shared.

41.     And initial PLS draft of the MOU sent in early September 2009 purported to give the parties' relationship a global scope; however, Derrick would not agree to a global

---

[53] Ex. 1, MOU at p. 3.
[54] Ex. 41, May 6, 2012 Email from R. Wise to Y. Deodhar, D. Harris, M. Hirve re: Resolving all outstanding issues.
[55] Although the MOU tasks PLS with "distribution of revenue," PLS has failed to remit to Derrick its 50% revenue share for Database sales in the month of September 2012, underscoring PLS's view that the parties' relationship has effectively ended and that the MOU is no longer valid.

relationship, and insisted that the scope of the MOU be limited to North America.[56] The draft MOU was revised in accordance with Derrick's position before the parties signed it, with the parties deleting the language expanding the MOU to cover international markets.[57] Accordingly, the MOU, as executed, is limited to "the North American market," and, hence, is not a global or universal agreement with regard to Database sales. Accordingly, Derrick maintained full control over both marketing and Database operations outside North America.

42.     The MOU also includes a section entitled "TERM" on page 2, in which the parties agreed that they intended to enter into a long-term relationship and established an initial 5-year term for the relationship. While PLS in its submissions to this Court has attempted to draw a connection between the parties' agreement to form a LLC and the MOU's term, there is no provision in the MOU which would extend the 5-year term even in the event an LLC were to be created.

43.     Over the course of the parties' relationship, PLS has indicated to Derrick on multiple occasions that it views the MOU as expiring in September 2014[58] and also that it does not intend to renew the parties' relationship at the expiration of the 5-year term.[59]

44.     Further underscoring that the parties' relationship has effectively ended is the deep acrimony between the parties. A litany of emails and other communications reveal tension, making it obvious that the parties' relationship would not survive the initial term of the MOU. Even in the MOU's early years, Wise confided internally that he did not trust Deodhar and did

---

[56] See Ex. 5, Sept. 29, 2009 Email from Y. Deodhar to R. Wise re RE: Derrick / PLS MOU (stating "If in the future, PLS does develop a worldwide marketing network, we would be very happy to extend the JV for international markets (provided the US results are good).").
[57] See id., October 1, 2009 Email from Y. Deodhar to R. Wise and B. Lidsky re RE: RE: Derrick / PLS MOU, attaching Derrick revisions to draft MOU.
[58] PLS's assertions that the MOU expires in September rather than October of 2014 appear to be mistaken, as the document was not effective until October 2014, which is when both parties had executed the MOU.
[59] See, e.g., Ex. 44, September 13, 2012 Email from R. Wise to Y. Deodhar re RE: Joint Ventures and Competing Partners ("I will just save these ideas for OUR NEW PRODUCT that we will launch in Sept 2014 when our five year JV ends.").

not believe that the parties' relationship would survive.[60]  By January 2013, Wise was convinced that the relationship was doomed, saying, "**A JV will not work.  They just don't work.  There is too much conflict and they are inherently weak**."[61]  As time wore on, PLS's intention to go its own way further crystallized, and by July 2013 it had made such intentions clear to Derrick. As of that date, Wise threatened:

> "You'll be taking on sales directly against PLS … with our own product Yashodeep … at the end of our JV … PLS plans on selling the heck out of the M&A data base through September 2014 at which time we will take our copy of the data base. You can have yours.  And we will tell our clients.  Hey, pick a vendor."[62]

As noted above, PLS's position that the MOU has ended has been confirmed by its actions of late in refusing the comply with its obligation to distribute to Derrick 50% of revenues from September Database sales.  By word and deed, PLS has indicated that it considers the parties' relationship extinct.

45.     As PLS has noted, on page 3 of the MOU, under the heading "OTHER," may be found the following language: "The parties agree that a separate LLC for the purpose of the JV will be created once product revenues reach a minimum of $2 million annually."  This provision does not appear to relate to the MOU's term, however, as it is found in a different section from the "TERM" section and even on a different page of the MOU.  Further, this provision contains no language regarding the extension of the MOU's term if the parties entered into an LLC or any other indication as to whether the LLC would have a different term than the MOU generally.

---

[60] Ex. 42, August 7, 2012 Email from R. Wise to B. Lidsky re: Newco - next steps.
[61] Ex. 51, January 11, 2013 Email from R. Wise to B. Lidsky, D. Harris re: New Feature - Research Assistant.
[62] Ex. 69, July 31, 2013 Email from R. Wise to B. Lidsky re: Tax Consequences of Busn Disputes, including earlier messages to Y. Deodhar.

46.     Nevertheless, Derrick has participated in extensive negotiations aimed at formalizing the parties' relationship on numerous occasions.  Derrick first offered to enter an LLC in a Newco proposal it forwarded to PLS in March 2012, but PLS refused to accept the proposal.[63]  Derrick additionally offered to enter into the Indian equivalent of an LLC in December 2012.[64]  PLS put forward its own Newco proposal a year later in March 2013.[65]  The parties additionally negotiated and discussed a Joint Sales and Operating Agreement,[66] an amendment to the current Memorandum of Understanding that the parties discussed in early 2014, and a Sales and Operating Agreement.[67]  However, due to differences in the parties' expectations regarding the structure, operations, scope, governance, and assets involved, the parties failed to reach an agreement to formalize their business relationship.

47.     In any case, the parties' failure to create an LLC stems not from any interference by Derrick, but instead from the parties' failure to agree upon the specifics surrounding the structure and location of a LLC—essential terms which are absent from the MOU's language. Even PLS's own Jonathan Palmer has conceded that PLS doesn't have the "gunpowder" to back up its threats regarding the LLC provision.[68]

## VII.   The MOU Does Not Explicitly Address Database Ownership, But Does Imply that Derrick is the Owner of the Database.

48.     The MOU does not directly address ownership of the Database nor does it clearly provide for a transfer of ownership either in the Database or any other property.  While the MOU does state that Derrick shall provide, *inter alia*, "existing M&A database platforms, software and

---

[63] Ex. 40, March 24, 2012 Email from Y. Deodhar to R. Wise and B. Lidsky re: Newco - Next Steps.
[64] Ex. 49, December 14, 2012 Email from Y. Deodhar to R. Wise re: PLS Derrick and DI.
[65] Ex. 60, March 29, 2013 Email from B. Lidsky to Y. Deodhar and R. Wise re: PLS Derrick Newco or LLC.
[66] Ex. 62, May 15, 2013 Email from B. Lidsky to Y. Deodhar re: Confidential: JSOA and Non-Compete Agreements, attaching proposed Joint Sales and Operating Agreement and separate Non-Compete Agreement.
[67] Ex. 67, July 19, 2013 Draft Sales and Operating Agreement.
[68] Ex. 64, June 11, 2013 Email from R. Wise to B. Lidsky re: Yashodeep/feedback … ("Give up the LLC—we don't have the gunpowder to back up our threats today.").

content including ongoing data from its sources," when considered in the context of Derrick's other responsibilities, this provision concerns Derrick's obligations rather than effecting any transfer of property.[69] Although the word "provide" might in other cases effect a conveyance of property, it is clear from the context of the MOU that the term "provide" as used in the MOU is intended to describe the parties' respective roles under the MOU, and not to convey a property interest. The MOU goes on to list other things Derrick is required to "provide," which include "Product Enhancements," "Ongoing Operations," and "Client Services." Just as none of these other items envision a transfer of property, neither does Derrick's agreement to provide its "Existing M&A database platforms, software and content" effect a transfer of Derrick's intellectual property.

49.     Even aside from the meaning of the term "provide," this provision of the MOU makes no mention of conveying a 50% interest in the Database. Regardless of how one might interpret the above language, there is no language appearing anywhere in the MOU concerning the transfer of a one-half interest in the Database. The only references appearing in the MOU which do relate to a one-half or 50/50 interest concern the sharing of revenues from North American Database sales and the forward-looking statement that Derrick and PLS plan to apply a 50/50 general principle to *additional business opportunities*.[70] These provisions by their own terms do not apply to the Database ownership, but to revenues from sales and to potential future opportunities. Aside from these two provisions, neither of which relate to Database ownership, there is no mention in the MOU of a 50/50 division of ownership.

50.     The MOU also contains an Exit Mechanism which provides penalties in the event either party prematurely exits the relationship. As the MOU provides: "In the event of exit by

---

[69] Ex. 1, MOU at p. 1.
[70] Ex. 1, MOU at pp. 2–3.

Derrick for whatever reason, Derrick shall provide PLS, Inc. a full copy of the Database and associated software and other such required items deemed necessary for PLS, Inc. to continue to provide M&A and other Joint Venture products."[71]  Accordingly, if Derrick were to exit the relationship prematurely, it would be obligated as its penalty to transfer a copy of the Database to PLS.  This provision, of course, would have been wholly unnecessary surplusage had PLS already been the owner of the Database, and further confirm that Derrick is the owner of the Database.

## VIII.   Summary of Findings of Fact

51. In summary, the Court finds:

   a.   Derrick created the Database in 2006, and the Database marketed today is essentially the same Database that existed in 2009 when the parties met.

   b.   PLS's contributions to the Database have amounted to approximately 1.5% of the Database's content.

   c.   Derrick has exercised complete and sole control over the Database throughout the parties' relationship.

   d.   The MOU provides for a 5-year term, and the LLC provision includes no language purporting to extend that term.

   e.   PLS did not desire to extend its relationship with Derrick but instead indicated that it intended to compete with Derrick at the close of the MOU's 5-year term.

   f.   The MOU expired by its terms on October 3, 2014.

52.     In the event that any of these Findings of Fact are more properly considered to be Conclusions of Law, they shall be deemed Conclusions of Law.

---

[71] *See* Ex. 1, MOU at p. 2.

**CONCLUSIONS OF LAW**

I.  **Legal Standard for a Declaratory Judgment**

53.  This Court holds the judicial power to render requested declaratory relief pursuant to the Federal Declaratory Judgment Act, codified 28 U.S.C. § 2201–02.  The Act provides that:

> In a case of actual controversy within its jurisdiction, … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.[72]

54.  Given the allegations in the parties' pleadings, the Court finds that an actual controversy exists between the parties concerning the following questions:

  a.  Who is the owner the Global M&A Database?

  b.  Has the MOU entered into by the parties terminated, or has the LLC provision of the MOU operated to extend the MOU's term?

Further, the parties have each contended that the determination of these matters in controversy will resolve critical underlying disagreements between the parties and facilitate the potential resolution of other matters in dispute, resulting in a just and more expeditious and economical determination of the parties' entire controversy.  Accordingly, the Court has the ability under the DJA to resolve the actual controversy concerning these issues of law by rendition and entry of declaratory judgment.

55.  With regard to subject-matter jurisdiction, while the DJA does not enlarge this Court's subject matter jurisdiction, the parties have agreed, and the Court hereby concludes, that it holds jurisdiction in this case under 28 U.S.C. § 1332.  As the Court has found above, Plaintiff

---

[72] 28 U.S.C. § 2201.

Derrick Petroleum Services is a citizen of the Republic of India while Defendant PLS, Inc. is a citizen of Harris County, Texas, and the value of the Database whose ownership is in dispute is greater than $75,000. *See City of Moore, Oklahoma v. Atchison, Topeka, & Santa Fe Ry. Co.*, 699 F.2d 507, 509 (10th Cir. 1983) (holding that "[i]n a declaratory judgment action, the amount in controversy is measured by the value of the object of the litigation. Dismissal is appropriate only if it appears to a 'legal certainty' that the jurisdictional amount is not met."), *citing Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 347 (1977).

56.     Federal court have generally held that the burden of proof in a declaratory judgment action is not shifted by the mere fact that the parties have sought declaratory judgment rather than proceeding in a more conventional sense, and the burden remains with the party who would ordinarily bear it with regard to each underlying issue. *See, e.g., American Eagle Ins. Co. v. Thompson*, 85 F.3d 327, 331–332 (8th Cir. 1996) ("We see no reason to deviate from Arkansas burden of proof principles simply because this action was brought by the insurer under the federal Declaratory Judgment Act."); *Preferred Acci. Ins. Co. v. Grasso*, 186 F.2d 987, 991 (2d Cir. 1951) ("Does the fact that this is the insurer's action for a declaratory judgment change the principle? It would seem rather anomalous that so important a matter should depend on the chance of who first sues and the outstanding authority in the field argues against such a result.") Accordingly, the burdens of proof have been addressed separately below for each issue in dispute.

## II.     The Parties Did Not Form a Joint Venture or a Partnership Under Texas Law.

*The Parties Did Not Form a Partnership Under Texas Law.*

57.     While the issue of whether or not the parties have entered into a partnership is not dispositive of the question of Database ownership, given the facts presented, the Court concludes

that, whatever the parties' intentions may have been in signing the 2009 MOU, they did not form a partnership under Texas law.

58.     As an initial matter, the burden of proof in establishing the existence of a partnership falls upon the party claiming that a partnership exists—in this case, upon Defendant PLS, Inc.  *See Box v. Dallas Mexican Consulate Gen.*, No. 3:08-cv-1010-O, 2014 U.S. Dist. LEXIS 33242, at *21 (N.D. Tex. Mar. 14, 2014) (mem. op.) ("The party seeking to prove the existence of the joint venture bears the burden of proving the matter"); *Valero Energy Corp. v. Teco Pipeline Co.*, 2 S.W.3d 576, 585 (Tex. App.—Houston [14th Dist.] 1999, no pet.) ("The burden of proof is on the party seeking to establish the partnership.").  PLS has failed to meet its burden in this case.

59.     The nature and creation of partnerships in Texas is governed by Chapter 152 of the Texas Business Organizations Code, and has been further clarified by the Texas Supreme Court in *Ingram v. Deere*.[73]   As Section 152.051 makes clear:

> an association of two or more persons to carry on a business for profit as owners creates a partnership, regardless of whether (1) the persons intend to create a partnership; or (2) the association is called a "partnership," "joint venture," of other name.

TEX. BUS. ORGS. CODE § 152.051 (Vernon 2012).  Per the plain meaning of Section 152.051, then, whether the parties intend to create a partnership or whether the parties refer to their arrangement as a partnership is far from determinative of the question of whether a partnership actually exists.  Instead, the Court must look primarily to whether the parties intended to "carry

---

[73] 288 S.W.3d 886 (Tex. 2009).

on a business for profit **as owners**."

60.     Additionally, both the Code and *Ingram* provide five factors for the Court to weigh in determining whether a partnership has been created between the parties.   The factors listed are:

(1) receipt or right to receive a share of profits of the business;

(2) expression of an intent to be partners in the business;

(3) participation or right to participate in control of the business;

(4) sharing or agreeing to share: (A) losses of the business; or (B) liability for claims by third parties against the business; and

(5) contributing or agreeing to contribute money or property to the business."

*Ingram*, 288 S.W.3d at 895, *quoting* TEX. BUS. ORGS. CODE § 152.052(a).  As the Texas Supreme Court held in *Ingram*, "[e]ven conclusive evidence of only one factor normally will be insufficient to establish the existence of a partnership."  *Ingram*, 288 S.W.3d at 898.  Only one of these five factors is present in this case.

61.     First, as noted above, the MOU contains an agreement to share revenues on a 50/50 basis, but contains a counterpart agreement that each side would bear its own costs.  In *Ingram*, the Texas Supreme Court faced a similar situation to that before the Court today, in which the proponent of a partnership had argued that his right to earn a portion of revenues qualified as profit sharing.  As the *Ingram* court explained, "[t]he ordinary meaning of 'profits' is 'the excess of revenues over expenditures in a business transaction'" and therefore "**the receipt of gross revenue is not profit sharing**."  *Id.* at 899.  Accordingly, the parties did not agree to

share profits.

62.     As Derrick has acknowledged, the parties did announce an intention to be "joint venture partners" in the MOU.  Additionally, there are multiple communications from Derrick which refer to the parties' relationship as a "JV" or "joint venture," and which refer to PLS as a "partner."  Accordingly, the second factor, an expression of intent, is present in this case. However, as both the *Ingram* court has warned, "TRPA evaluates the parties' expression of intent to be partners as one factor, … and it does not by its terms give the parties' intent or expression of intent any greater weight than the other factors."  *Id.*  Moreover, as noted above, the TRPA explicitly provides that a partnership either will be or will not be created "**regardless of whether … the persons intend to create a partnership**." TEX. BUS. ORGS. CODE § 152.051 (Vernon 2012).  Accordingly, while this factor is present in the parties' relationship, it is entitled to no more weight in the Court's analysis than any other factor and is not determinative of a partnership's existence.

63.     With regard to the right to participate in control of the business, the *Ingram* court has defined the right to control a business as "the right to make executive decisions," echoing an earlier opinion which defined control of a business as "authority over its operations."  288 S.W.3d at 901, *citing Brown v. Cole*, 291 S.W.2d 704, 710 (Tex. 1956).  In the MOU, the parties agreed to assign responsibility for "ongoing operations" exclusively to Derrick.[74]  Only Derrick had any discretionary control over the business.  While PLS did have the responsibility to provide marketing and data support, these areas do not involve executive decisions.  Even if PLS entered into a subscription with a customer, Derrick controlled whether and on what terms that customer had any access to the Database, and PLS was wholly reliant upon Derrick to provide

---

[74] Ex. 1, MOU at p. 1 ("Derrick shall provide … Ongoing Operations …").

Database access both to itself and to the customers. And while PLS was also tasked with collecting and distributing revenues, the terms under which revenues would be distributed were strictly defined in the MOU, leaving PLS no legal right to "control" their distribution. As noted above, PLS has time and again bemoaned Derrick's exclusive control over the Database, further evidencing a lack of mutual control and supporting the conclusion that the third TRPA factor has not been met.

64. The fourth factor, whether the parties agree to share losses or third-party liability, is easily addressed. Not only did the parties fail to agree to share losses, **the parties specifically agreed not to share losses**, assigning each party to bear its own costs. As the MOU states, "Costs will be borne 100% by respective parties as they fulfill the respective activities."[75] Additionally, nowhere in the MOU nor in the parties' five-year course of conduct have the parties ever agreed to share third-party liability. Accordingly, the fourth factor has not been met.

65. The final factor in the TRPA's analysis is whether each party contributed money or property to the business. This factor has not been met. First, it is undisputed that neither party has contributed money to the business. No joint account was ever opened by the parties in which to deposit funds, and the parties invested no funds into the business, but solely **received** funds from the business in the form of the monthly distributions of revenues. Similarly, the parties did not contribute property to the business, each keeping title to their own property. As PLS has argued, it did not contribute its brand to the business. On Derrick's side, as the Court has found above and concludes below, Derrick has maintained complete ownership of the Database at all times and has not conveyed the Database to the business. All property remained the property of

---

[75] Ex. 1, MOU at p. 2.

each party throughout the business.[76]  The "Exit Mechanism" clause of the MOU is enlightening on this subject.  As the clause provides, upon an exit by one party, that party would forfeit its property to the other party.  Had the parties already contributed such property, there would have been no need for such a clause, as the property would have already been in the partnership.  To consider the property to reside within a partnership, one must read the Exit Mechansim as pure surplusage, which would of course run afoul of Texas contract interpretation principles.  *Coker v. Coker*, 650 S.W.2d 391, 393-94 (Tex. 1983) ("Courts must favor an interpretation that affords some consequence to each part of the instrument so that none of the provisions will be rendered meaningless.").  Accordingly, the fifth factor is likewise not present.

*66.*     In the final analysis only one factor—an expression of intent to work together as "joint venture partners"—is present, while four factors are missing.  As noted above and in *Ingram*, "[e]ven conclusive evidence of only one factor normally will be insufficient to establish the existence of a partnership."  *Ingram*, 288 S.W.3d at 898.  As a result, the parties, despite their apparent intent to do so in 2009, have not created a partnership.

*The Parties Did Not Form a Joint Venture Under Texas Law.*

67.     Although the parties did not create a partnership under Texas law, the question remains as to whether they nevertheless did form a joint venture.  While *Ingram* does not distinguish between partnerships and joint ventures in its analysis, it does note that a joint venture can only be considered a partnership to the extent that possesses the attributes of a partnership, which, as noted above, would require an intent—absent in this case—to act as

---

[76] While one may contend that the parties' provision of time and reputation to the business is a form of contribution of property, the *Ingram* court has held otherwise, stating, "Employees may contribute to business endeavors by lending their time and reputation, but that is not a contribution to the venture indicative of a partnership interest." 288 S.W.3d at 903.  There is no evidence that the parties intended to contribute their time and reputation as partners rather than as part of a simple but ongoing commercial transaction.  To hold otherwise would be to convert every marketing relationship into a partnership.

owners.  *Id.* at 894, n. 2.

68.    Indeed, while *Ingram* controls as to the creation of a partnership, Texas courts even in the wake of *Ingram* have continued to distinguish between joint ventures and partnerships, holding that a joint venture (as opposed to a partnership) only exists "where there is (1) a community of interest; (2) an agreement to share profits; (3) an agreement to share losses; and (4) a mutual right of control … **A joint venture is not established if any one of the four elements is missing**."  *Varosa Energy, Ltd. v. Tripplehorn*, No. 01-12-00287-CV, 2014 WL 1004250 (Tex. App.—Houston [1st Dist.] March 13, 2014, no pet. h.).  As an agreement to share profits and an agreement to share losses are both missing from the MOU, under this parallel line of Texas jurisprudence, a joint venture was not created by the MOU.

### III.    Derrick is the Owner of the M&A Database.

69.    Regardless of whether or not the arrangement the parties entered into by signing the MOU could be considered a partnership, however, there is no evidence on the record nor support in law that would lead one to conclude that the Database is owned by any entity other than Derrick.

*PLS's Minimal Contributions Do Not Entitle It to Ownership of 50% of the Database.*

70.    As the Court found above, Derrick created the Database in 2006.  Three years later, Derrick and PLS agreed to go into business marketing the Database in North America.  In fact, PLS first met Derrick **in response to a Derrick advertisement for the Database**.  The parties did not form a new Database in 2009 by combining existing databases, but at best Derrick added four PLS data records, comprising less than .07% of its own Database, and with PLS's assistance created a new U.S.-friendly presentation layer in order to better market the Database in the U.S.

71.     While PLS no doubt made some contributions to the Database product, such contributions, which amount to approximately 1.5% of the Database's content, are of a nature one would expect an agent selling a product would suggest in order to improve sales numbers. Since PLS was to be marketing the Database in North America, it suggested the creation of both U.S. and Canadian presentation layers, to which Derrick agreed. PLS was certainly well compensated for its work in this regard as it led to an increase in sales, of which PLS received a sizeable 50% share. Such minimal content contributions of 1.5% cannot possibly bestow upon PLS a 50% ownership interest in the Database.

72.     Further, PLS's *de minimus* contributions were typically not in the form of proprietary intellectual property. PLS usually contributed publicly-known transaction information and made suggestions on analysis and on presentation, but Derrick was the party, as the author of the Database, who put these "ideas" into a proprietary form. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (holding, in the context of copyright protection, that "[t]o be an author, one must supply more than mere direction or ideas: one must translate an idea 'into a fixed, tangible expression entitled to copyright protection.'"); *Computer Mgmt. Assistance Co. v. Info. Mgmt. Consultants & Assocs., Inc.*, 220 F.3d 396, 400 (5th Cir. 2000) ("In other words, copyright protection does not extend to ideas, per se, but to the particular expression of those ideas."). As other federal courts have held, "**general assistance and contributions to the fund of knowledge of the author did not make [him] a creator of any original work, nor even the co-author**." *SOS, Inc. v. Payday, Inc.*, 886 F.2d 1081, 1086-87 (9th Cir. 1989), *citing Whelan & Assocs. v. Jaslow Dental Laboratory*, 609 F. Supp. 1307, 1318–19 (E.D. Pa. 1985), *aff'd*, 797 F.2d 1222 (3rd Cir. 1986), *cert. denied*, 479 U.S. 1031 (1987).

*Derrick Did Not Convey the Database to a PLS-Derrick Partnership.*

73.    In the end, however, the extent of PLS's contribution to the Database—be it meager or otherwise—matters little, as PLS does not currently claim that it gradually acquired a portion of the Database by means of its content and presentation layer contributions.  Instead, PLS claims it acquired a full 50% interest in the Database instantly through the parties' alleged partnership on the day the MOU was signed, and its ownership derives from the language of the MOU itself rather than from any theory based upon contribution.

74.    Provided that (as the Court has concluded above) the Database Derrick created in 2006 is the same Database that is being marketed today, Derrick, having created the Database in 2006, was the original owner of the Database.  Accordingly, Derrick is entitled to the presumption that it still owns the Database in the absence of proof that it has conveyed its interest in the Database to a partnership, as "[p]roperty acquired in the name of one or more partners is presumed to be the partner's property."  TEX. BUS. ORGS. CODE § 152.102(c) (Vernon 2012).  PLS has failed to overcome this presumption as it has not shown that Derrick effected a conveyance of ownership in the Database to either PLS or to an alleged partnership between the two parties.

75.    There are no records evidencing any intellectual property transfer.  With regard to transfers of ownership in intellectual property, such transfers must typically be clearly delineated.  *See* 17 U.S.C. § 204(a) ("A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.").  As Wise admitted, Dedohar did not include ownership in the MOU.

76.     Additionally, Derrick still maintains sole possession and control over the Database.  As the sole party in possession and control, Derrick is again presumed to be the owner of the Database, and PLS has advanced no evidence to overcome this presumption.  *In re Rollings*, 451 Fed. Appx. 340 (5th Cir. 2011) ("Under Texas law, '[o]ne in possession (or control) of property is presumed to be the owner of it.'"), *quoting Smith v. Briggs,* 168 S.W.2d 528, 531 (Tex. Civ. App.—San Antonio 1943, writ ref'd w.o.m.); *see also Hickey v. Couchman*, 797 S.W.2d 103, 110 (Tex. App.—Corpus Christi 1990, writ denied) ("Possession of personal property raises a presumption of ownership."), *citing Implement Dealers Mutual Ins. Co. v. Castleberry,* 368 S.W.2d 249, 254 (Tex. Civ. App.–Beamont 1963, writ ref'd n.r.e.) ("Possession alone raises a presumption of ownership to real and personal property").

77.     The mere fact that the parties used the Database for the purposes of the partnership (assuming one existed) is similarly not evidence that the Database belonged to the partnership, as "[p]roperty acquired in the name of one or more partners is presumed to be the partner's property, *regardless of whether the property is used for partnership purposes*."  TEX. BUS. ORGS. CODE § 152.102(c) (Vernon 2012).  *See also Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 2013 Tex. App. LEXIS 10487 at *10 (Tex. App.—Dallas Aug. 20, 2013, *overturned on other grounds*) ("The mere fact property is used for partnership purposes is not evidence it is partnership property … To the contrary, such property is presumed to be the property of the partner that purchased the property with its own funds.").  Although Derrick did not purchase the Database from another party but created it with its own resources beginning three years before PLS entered the scene, the result is the analogous: the use of the Database in furtherance of the parties' business goals does not render the Database partnership property.

78.     While PLS contends that the use of the term "provide" in the MOU effected a

transfer in ownership, the commonly accepted meanings of the word "provide" has been defined to include "supply," "furnish," or "make available." *See HCBeck, Ltd. v. Rice*, 284 S.W.3d 349, 363 (Tex. 2009), *citing* WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1556 (1996). None of these three meanings denote a conveyance of an ownership interest in intellectual property. Even if Derrick supplied, furnished, or otherwise made its Database available to a partnership, it did not convey or transfer its ownership interest in the Database. Additionally, the meaning of the term "provide" can be determined by reference to the other items on the list that follows the word. In this context, as noted above, it becomes clear that the term "provide" was meant to outline the parties' respective ongoing roles under the MOU; tellingly, not a single one of the other three items Derrick agreed to "provide" were even items of property.

79. Finally, even if PLS and Derrick are in a partnership and even if Derrick had conveyed the Database to the partnership, PLS would still not own 50% of the Database. Upon dissolution of a partnership, each partner is entitled to settlement of all partnership accounts on winding up the business. TEX. BUS. ORGS. CODE § 152.707(a) (Vernon 2012). These accounts, in turn, are composed of (a) the amount of a partner's original and additional contributions of cash to the partnership, (b) the agreed value of any other property that the partner originally or additionally contributed to the partnership, and (c) allocations of partnership profits to the partner, then (d) subtracting the amount of distributions and allocations of partnership losses. TEX. BUS. ORGS. CODE § 152.101 (Vernon 2012). As the parties unquestionably did not agree to share profits or losses, and as neither party contributed cash to the partnership, each party's account at dissolution consists of "the agreed value of any other property that the partner originally or additionally contributed to the partnership." *Id.* In other words, PLS is entitled to receive exactly what it contributed to the partnership, which, with respect to the Database,

amounts to 1.5% of the content of the Database. Even if one were to accept PLS's argument that (1) a partnership was created and (2) Derrick conveyed its ownership interest in the Database entirely to the partnership, PLS would still be limited under Texas law to recover only 1.5% of the value of the Database based upon its contribution. PLS is not entitled to the 50% ownership share that it seeks in this case.

## IV.  The MOU Expired By Its Own Terms on October 3, 2014.

80.    As the Court found above, the MOU includes the following language—and no other language—under the section entitled "TERM": "The intent is for a long term relationship. The initial term is for 5 years."  Pursuant to Texas principles of contract interpretation, in interpreting a contract, the Court must be guided by the plain meaning of the words used by the parties.  *See Continental Casualty Co. v. N. Am. Capacity Ins. Co.*, 683 F.3d 79, 89 (5th Cir. 2012), *quoting Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Crocker*, 246 S.W.3d 603, 606 (Tex. 2008) (To interpret a contract, "[w]ords are given their 'plain meaning,' and courts must not insert 'additional provisions into the contract.'").  While the plain meaning of the term "long term relationship" may be subject to some debate, the plain meaning of the words "5 years" years is pellucid.  Whatever the parties' general forward-looking intentions, they only agreed to be bound by the MOU for an initial term of 5 years.  The legal effect of the "TERM" section of the MOU, then, is to establish an agreed initial term of 5 years.  Since the MOU was executed on October 3, 2009, its term of 5 years expired on October 3, 2014.

81.    While PLS contends that the MOU created a partnership, there is no evidence that the parties intended any partnership to outlive the term of the MOU.  Partnerships certainly may be limited in duration under Texas law, as the TRPA itself makes special provision for partnerships of specified durations.  *See, e.g.,* TEX. BUS. ORGS. CODE §§ 152.503(b)(2),

152.152.709(a) (Vernon 2012).  Whether or not a partnership was created by the MOU, the relationship expired October 3, 2014.

## V.  The LLC Provision in the Agreement Has No Effect Upon the MOU's Term, and, In Any Event, is Unenforceable.

82.     PLS has also contended that the 5 year term in the MOU was intended to be extended by the parties' agreement to form an LLC if revenues reach $2 million annually.  As an initial matter, there is no evidence that the two provisions are linked in the way that PLS contends.  On the contrary, the LLC provision does not appear in the "TERM" section of the MOU, and, in fact, doesn't even appear on the same page of the MOU as the "TERM" section.  As a result, interpreting the LLC provision to somehow relate to the "TERM" section in the absence of language indicating such a relationship would defy the plain meaning and structure of the agreement in contravention of Texas law.  *See Continental Casualty Co.*, 683 F.3d at 89.  As there is no indication from the agreement that the provisions were meant to be connected,  the Court must consider them to be separate provisions.

83.     Secondly, much like the existence of a partnership, the existence of an LLC[77] similarly does not automatically compel either the conclusion that (1) the LLC's term would be any longer than the five years agreed to in the "TERM" section of the MOU or that (2) Derrick agreed to transfer ownership of the Database to an LLC.

84.     While PLS rightly notes that the LLC provision itself does not expressly limit an LLC to the term of the MOU, the LLC provision similarly includes no language stating that an LLC would be permanent in nature nor any language indicating the survival of an LLC after the expiration of the MOU.  As a result, the 5 year term of the MOU, ostensibly intended to relate to the entire agreement, is still conclusive concerning the temporal length of the parties'

---

[77] The Court also notes that neither party contends that an LLC has been created in this case.

relationship.  LLCs, much like partnerships, can be created for a specified duration, and to interpret the LLC provision as surviving the termination of the MOU would again defy the plain meaning of the parties' agreed language.  *See Continental Casualty Co.*, 683 F.3d at 89.

85.     In any event, the Court must conclude that the LLC provision in the MOU is unenforceable as it lacks essential terms sufficient to establish that the parties had no meeting of minds with regard to the features of an LLC.  In order for a contract to be enforceable, the parties must have agreed on the essential terms. *AMX Corp. v. Pilote Films*, 2007 U.S. Dist. LEXIS 40684 at *47 (N.D. Tex. June 5, 2007), citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992) ("Where an essential term is open for future negotiation, there is no binding contract.").  An "essential term" is one that is a vitally important agreement in the bargain. *AMX Corp. v. Pilote Films*, 2007 U.S. Dist. LEXIS 40684 at *47 (N.D. Tex. June 5, 2007), citing *Neeley v. Bankers Trust Co.*, 757 F.2d 621, 628 (5th Cir. 1985).  The contract must be sufficiently definite in its terms so that a court can determine the legal obligations of the parties. *Washburn v. Sims*, 2009 Tex. App. LEXIS 2091 at *19-20 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).  Here, the parties left open such essential terms as (1) the jurisdiction in which to place the LLC, (2) the envisioned assets of the LLC, (3) the term of the LLC, (4) the governance structure of the LLC, (5) the parties' respective interests in the LLC, and even (6) the name and membership composition of the LLC.

86.     The Court has previously recounted the parties' repeated failures to reach an agreement on a more formal business structure, which include the failure to reach agreement on these very same essential terms.  Due to differing expectations on an LLC's governance, scope, operations, and assets, the parties were unable to create an LLC.  These failed negotiations themselves are perhaps the strongest evidence that the parties shared no meeting of minds on

these items. In short, the parties' inability to agree on the structure of an LLC is precisely the reason why a vague proposal to form an LLC, with no agreement as to any of the details of that LLC, is not an enforceable agreement. As PLS's own Jonathan Palmer acknowledged, PLS simply does not have the "gunpowder" to back up its contention that the LLC provision is enforceable.

87. The Court therefore concludes that the provision of the MOU requiring the parties to create "a separate LLC for the purposes of the JV … once product revenues reach a minimum of $2 million annually" to be unenforceable under Texas law as it lacks essential terms necessary to its enforcement.

## VI.    Summary of Legal Conclusions

88. In summary, the Court concludes:

    a.   By signing the MOU, the parties did not form a partnership under Texas law.

    b.   Regardless of whether a partnership does or does not exist, Derrick is the sole owner of the Global M&A Database.

    c.   The parties' MOU was limited to a term of five years and expired on October 3, 2014.

    d.   The LLC provision appearing in the MOU does not extend the MOU's five-year term and, in any event, is unenforceable under Texas law.

89. In the event that any of these Conclusions of Law are more properly considered to be Findings of Fact, they shall be deemed Findings of Fact.

Respectfully submitted,

**BAKER & MCKENZIE LLP**

By:  /s/Brendan D. Cook
        Brendan D. Cook
        (lead attorney)
        Fed. ID No. 5030
        State Bar No. 04721700
        Brendan.Cook@bakermckenzie.com
        Brandon E. Caire
        Fed. ID No. 1812322
        State Bar No. 24064991
        Brandon.Caire@bakermckenzie.com
        700 Louisiana, Suite 3000
        Houston, Texas 77002
        Tel.:   713-427-5000
        Fax:   713-427-5099

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on lead counsel of record on this November 7, 2014 by electronic mail, electronic filing, facsimile, hand delivery, and/or U.S. certified mail, return receipt requested:

Eric Lipper
HIRSCH & WESTHEIMER
1415 Louisiana
Houston, Texas 77002
elipper@hirschwest.com
Tel: (713) 220-9181 / Fax: (713) 223-9319

*Attorney for Defendant PLS Inc.*

_____
Brandon E. Caire