UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DERRICK PETROLEUM SERVICES,<br>    *PLAINTIFF*, | § § § | |
| V. | § § | CIVIL ACTION NO. 4:14-CV-01520<br>JURY DEMANDED |
| PLS, INC.<br>    *DEFENDANT*. | § § § | |

## DEFENDANT AND COUNTER-PLAINTIFF PLS, INC.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant and Counter-Plaintiff PLS, Inc. ("PLS") respectfully submits the following proposed findings of fact and conclusions of law.

## FINDINGS OF FACT

**The Parties**

1. Plaintiff and Counter-Defendant, Derrick Petroleum Services ("Derrick") is a partnership organized under the laws of the Republic of India and has its principal place of business in India. Derrick is a citizen of India.

2. At the time the events in this lawsuit originated Derrick was a new company and its principal – Yashodeep Dehodhar – was a virtual unknown in North America with respect to Oil and Gas M&A research and analysis.

3. Defendant and Counter-Plaintiff, PLS is a Texas Corporation and its principal office is in the State of Texas. PLS is a citizen of the State of Texas. PLS is owned by a Houston resident named Ronyld Wise. Mr. Wise founded PLS in 1987 and developed it into the market leader in Oil and Gas industry research, transaction, and advisory services.

4. The total amount in dispute between PLS and Derrick is greater than $75,000.00, excluding interest and costs.

**PLS's Business**

1. PLS is a Houston-based company, founded in 1987. It is a leading source of oil and gas information, including a multiple listing service of oil and gas properties for sale, marketing and advisory services for buyers, sellers, and

2.  capital providers in the energy industry, a provider of premium databases, and nineteen (19) plus industry publications.

2.  One of the industry leaders in the M&A database field was a company called John S. Herold. If a person worked at John S. Herold, both PLS and Derrick agree that such former employee would be knowledgeable in the database environment. At least two witnesses in this case, Brian Lidsky and David Harris have worked at John S. Herold.

3.  A database has value for two primary reasons: (a) the data and its presentation is acceptable; and (b) a market is created for the database. If a database has no market it is nothing more than a worthless compilation.

4.  As part of its long-standing business, PLS developed its own M&A database containing a data set of oil and gas transactions and metrics. One of the projects on the shelf for PLS was to further convert its M&A database into a commercially viable product and start competing with John S. Herold.

5.  In 2009, Derrick had an entry level database comprised primarily of international data. It appeared to the knowledgeable people in this industry that Derrick was destined for failure with its new database effort because it had only sold subscriptions to three customers in its entire history. And Derrick knew that its sales efforts had to improve so it hired a salesman/consultant – Brian Lidsky – to help them market their database.

6.  As noted above Lidsky had formerly been with John S. Herold, so he knew the business and the industry well. Despite his expertise, Lidsky was not able to sell the existing Derrick database to anyone. To use a baseball analogy – Derrick was 0 and 10. Lidsky understood that Derrick, as a virtual unknown, needed a better brand to help develop the product. Lidsky knew Ronyld Wise with PLS, and he introduced them. Yashodeep Dehodhar jumped on the opportunity to partner with PLS because he concluded that a relationship with PLS was his best, and perhaps only, chance to have a viable product. Otherwise, Derrick was likely to never achieve success.

7.  The need for Derrick to attach itself to a North American business with name recognition was self-evident. Although it is an unfair stereotype because the Indian companies often are not deserving of the suspicion, businessmen in North America often express concern over companies based in India. Derrick knew that by having PLS be the face of the product it would work because PLS had clients all over the globe and would give Derrick instant credibility. Derrick also observed that PLS had great skills at marketing which was essential to develop the database into a commercial product.

8. In 2009, PLS and Derrick, after extensive negotiations, agreed to join their efforts to develop and market a yet-to-be developed joint M&A Database, pooling each other's data, resources and marketing efforts. The parties jointly drafted and executed a Memorandum of Understanding ("MOU") outlining their respective roles and responsibilities in late 2009.

9. The MOU was typed by Brian Lidsky but was formulated with input directly from Yashodeep Dehodhar, and later reviewed by Ronyld Wise.

**The Memorandum of Understanding**

1. PLS and Derrick referred to themselves – voluntarily – as partners. They signed the MOU expressing as much on September 30, 2009 and October 3, 2009 respectively. Ronyld Wise signed for PLS and Yashodeep Deodhar signed for Derrick. The MOU was a mutually negotiated document that formed their Joint Venture or Partnership (hereinafter alternatively referred to as the "Joint Venture" or "Partnership").

2. PLS reasonably relied upon the representations of Derrick that they were partners. PLS testified that it never would have entered into an arrangement to market an M&A Database solely owned by Derrick because PLS was taking too much risk. According to Ronyld Wise, it would not have been commercially reasonable to have simply been a reseller and the Joint Venture was an essential element.

3. If they achieved the initial hurdles – sales over $150,000 – then the parties could no longer exit the Joint Venture without penalty. Derrick and PLS agreed that "the intent for the partnership [was] for a long term relationship" and that the initial term was for five years. If the revenues of the partnership reached $2.0 million annually, however, Derrick and PLS were required to create a separate LLC to govern the business.

4. PLS and Derrick were investing so much time, money and labor in this Joint Venture that they wanted to keep it focused on their mutual success. For that reason, Derrick and PLS agreed that they would work together exclusively on the JV's M&A Database during the term of the Partnership and that they would not circumvent the other party by similar product offerings.

5. The reason for not circumventing the Joint Venture was clear; namely, Derrick and PLS both agreed "to work together in good faith as joint venture partners to develop" a database of information and analysis of oil and gas industry transactions ("JV's M&A Database"). This was not a casual use of

the phrase "partners" because the MOU describes this business venture in detail. The success of the Joint Venture meant that these partners would jointly own a commercially viable database.

6. Because they were starting from scratch – Derrick had accomplished virtually nothing to that point – the MOU was very broad and expressed that it would apply to any E&P Database products for the North American market. The use of the phrase "E&P Database product" was broader than simply the M&A Database. This explains why Derrick and PLS stated that a goal of Partnership was to have other businesses "beyond database products and beyond the North American market." Derrick and PLS agreed that additional business opportunities would be pursued on a fifty percent/fifty percent ownership basis.

7. That the new database was going to be "jointly developed" was demonstrated by the agreement that Derrick and PLS would both provide their existing and ongoing M&A data to the JV's M&A Database. It didn't matter who provided what, or how much, just that everyone made their contribution. PLS provided a lot of ideas from the customers as to how to make the JV's M&A Database more marketable and compliant with the North American market.

8. Derrick was further obligated to provide the database platforms, software and content to the Joint Venture. Derrick agreed in the MOU to provide product enhancements to the JV's M&A Database including "additional features, integration of PLS transaction data, regional segregation." Derrick had these continuing obligations to the Partnership, all of which focused upon development of the product.

9. Because the PLS brand was a critical part of Joint Venture, and PLS was unwilling to give that brand away, PLS agreed to provide "a full license to PLS's brand and corporate name for use in marketing" the JV's M&A Database. Thus, unlike the complete contribution of the database platforms, software and content by Derrick as stated in the MOU, the parties clearly knew how to express themselves when they intended to provide only a license.

10. PLS had additional responsibilities in the development of the JV's M&A Database by handling some of the office functions. It was for that reason that Derrick and PLS agreed in the MOU that PLS would provide marketing for the Partnership. Derrick and PLS also agreed that PLS was responsible for client invoicing, collection and distribution of the revenue. The customer

subscription contracts for the JV's M&A Database were issued in PLS's name.

11. The face of the JV's M&A Database was PLS.

**The Partnership**

1. PLS and Derrick clearly intended to create a Joint Venture/Partnership and stated such in the MOU. Derrick repeatedly referred to PLS as a partner in various emails. These communications demonstrate that PLS and Derrick intended that the JV M&A Database be property of the Partnership/Joint Venture. PLS and Derrick cannot deny that their intentions were clear in this regard. Any claim to the contrary is frivolous.

2. PLS and Derrick agreed to "[s]hare all Revenues on PLS, Inc.'s [JV M&A Database] sales, including renewals 50/50." PLS and Derrick also agreed to share any losses of the Partnership/Joint Venture in the proportion that they were incurred by bearing their costs "100% by the respective parties as they fulfill their respective activities."

3. PLS and Derrick each contributed property, labor and money to the Partnership/Joint Venture. PLS incurred expenses on behalf of Derrick that were never reimbursed.

4. PLS and Derrick each exercised control over activities of the Partnership/Joint Venture. PLS and Derrick consulted with each other on the core parts of the Joint Venture/Partnership and how to implement the MOU. PLS had considerable input and control in the look, feel and organization of the information for the customer.

5. PLS also exercised control over the marketing activities of the Partnership/Joint Venture. PLS designed logos, brochures, other marketing materials, and marketing strategies. PLS identified potential customers, initiated contact with those potential customers, and had input and control over pricing. Ultimately, any customer who subscribed to the JV's M&A Database executed a contract for those services with PLS.

6. All of these facts evidence that PLS and Derrick formed a Partnership/Joint Venture with respect to the JV's M&A Database. PLS and Derrick each own fifty percent of the Partnership/Joint Venture, including its assets. The JV's M&A Database is an asset of the Partnership/Joint Venture, of which PLS owns fifty percent (50%) and Derrick owns fifty percent (50%).

## More Evidence Creating the JV's M&A Database

1. Derrick and PLS contributed to the creation of the JV's M&A Database with different tasks that simply cannot be compared. For example, Derrick clearly performed most of the data entry while PLS did most of the marketing. There was no requirement in any of the documents that each Joint Venture Partner's contribution had to be precisely the same. The law does not require any measurement of the relative contributions by the partners. Neither the contributions by PLS nor the contributions by Derrick can be classified as *de minimus*.

2. Here is an example of how PLS went beyond its contractual obligation in the MOU; that is, Derrick needed PLS to help train its employees. In the fall of 2009, Naveen Seetharama who was employed by Derrick in India, had no prior oil and gas experience and had never analyzed an oil and gas E&P transaction prior to working for Derrick. Yashodeep Deodhar sent Naveen Seetharama to PLS's offices in Houston, Texas to learn "the valuation methodology for US" from Brian Lidsky, PLS's Managing Director of Research.

3. Naveen Setharama was sent to PLS's offices in the United States with the following objective: "categorization of the existing US deals in the E&P database for US regions and learn any additional valuation methodology more than what we weren't already doing at that time." This meant that PLS was performing, in addition to marketing, functions that can only be described as "product development", "operations" or "quality control". PLS was not obligated to perform such functions or train Derrick's employees, but it did so happily for the benefit of the Partnership/Joint Venture.

4. Naveen Seetharama travelled halfway around the globe and worked primarily with Brian Lidsky at PLS for eight weeks, so this was no casual trip. With Brian Lidsky's help, Naveen Setharama achieved his objectives for Derrick and also performed services for PLS. Before the lawyers were involved in the case, and at the end of his time with PLS, Naveen Setharama wrote to Brian Lidsky on November 6, 2009 and stated: "After working here for the last eight weeks, PLS/Derrick collaboration looks even more exciting than what I initially thought before coming here. The prospects are really bright!"

5. Naveen Seetharama later acknowledged PLS's contributions to the JV's M&A Database, as well as Brian Lidsky's specific suggestions on how to improve the JV M&A Database and that Brian Lidsky "finalized structural and format changes in the database (sheets order and deals – full view is yet

to be finalized)". When the JV's M&A Database went live in 2010, it included new United States and Canada modules and associated protocols that did not previously exist. Later, in 2012, PLS contributed its midstream, downstream, and oilfield services content, sub-regional classifications and ideas for the new versions of the database. PLS also contributed significant listings to the JV's M&A Database's Deals in Play module.

6. PLS eventually spent millions of dollars to market the JV's M&A Database. There was no reason to spend that amount of money if PLS was nothing more than a reseller. No rational businessman would have incurred liabilities to the extent that PLS did without the potential upside of owning 50% of the Joint Venture property. These sales efforts meant that in 2013, the revenues of the Partnership/Joint Venture reached the $2.0 million threshold as set forth in the MOU by any reasonable calculation.

7. Because the $2MM threshold was reached PLS requested that Derrick join it in creating an LLC for the governance of the business of the Partnership/Joint Venture as set forth in the MOU, but Derrick has refused to enter into an LLC on a fifty-fifty basis.

**Derrick's Breach of the MOU and Breach of Fiduciary Duties**

1. Derrick refused to create a separate LLC to govern the Joint Venture/Partnership's business after the revenues reached the $2.0 million threshold, as set forth in the MOU. Although it is not directly relevant to the "Phase 1" portion of the trial the Court heard a number of facts that demonstrate why the Partnership/Joint Venture will need to be liquidated including, but not limited to, the following:

    - Derrick has failed to maintain data integrity of the JV's M&A Database by ensuring timely, complete, and accurate data information.

    - Derrick's refusal to correct and update the JV's M&A Database as requested by PLS has damaged the quality of the product.

    - Derrick has failed to include additional feasible and related features in the JV's M&A Database, such as the map feature, doc Search, and PLS news content. Derrick has used the map feature in a separate product to the exclusion of PLS and the partnership.

    - Derrick has disabled the docSearch feature so that it is not available to be used by existing subscribers to the JV's M&A Database.

- Derrick has removed and refused to return proper PLS news content to the JV's M&A Database, despite previously including these materials.

- 1Derrick.com, which is controlled by Derrick, provides to the public substantial volumes of M&A content at no charge, thereby damaging the partnership.

- Derrick and/or a 1Derrick salesman has pirated the co-branded marketing materials of the partnership that were developed by PLS and has passed them off as its own. Derrick removed PLS's logo from the materials and used those materials to independently sell subscriptions to the partnership's database and retain one-hundred percent (100%) of the proceeds for itself.

- PLS has referred clients with North American offices and operations to Derrick for the benefit of the partnership, only to see Derrick close those sales without notice or remuneration to PLS as required by the MOU.

- Derrick has and is currently competing against PLS and the partnership for JV's M&A Database sales, for Derrick's exclusive benefit, internationally and in North America. Derrick is competing with the partnership by marketing and selling subscriptions to the JV's M&A Database through its London and Houston sales people, 1Derrick, Rystad, and/or third party agents in Singapore and Dubai.

- Derrick is contacting and soliciting prospective clients, including those located in North America, of the JV's M&A Database in an effort to independently sell the database and retain one-hundred percent (100%) of the proceeds and is telling these clients and potential clients that PLS is merely a "reseller" of the database.

- Derrick and 1Derrick have removed PLS's contact information from their website advertising the JV's M&A Database, and instead each directs all inquiries to itself in an effort to independently sell JV's M&A Database and retain one-hundred percent (100%) of the proceeds. Derrick and 1Derrick have never shared any revenue from any sale of the JV's M&A Database with PLS, regardless of when or where sold.

- Derrick's competition and misclassification has harmed the partnership and PLS and wrongfully benefitted Derrick. Derrick's competition has also caused client confusion and harm to the partnership and PLS.

To the extent any Conclusion of Law constitutes a Finding of Fact, the Court hereby adopts it as such.

## CONCLUSIONS OF LAW

**Jurisdiction and Choice of Law**

1. This Court has jurisdiction over claims asserted between the parties under 28 U.S.C. § 1332 subject matter based on diversity of citizenship and also under 28 U.S.C. §2201 based on the parties' requests for declaratory relief. Plaintiff is a citizen of India, a foreign state, and defendant is a citizen of Texas. Moreover, the amount in controversy is well in excess of $75,000.

2. The claims asserted between the parties are governed by the substantive laws of the State of Texas.

**The Partnership and the MOU**

1. The Court must construe the MOU in accordance with ordinary contract construction principles. Those include the following:

    - If a written contract is so worded that it can be given a definite or certain legal meaning then it is not ambiguous. *See, Kelly-Coppedge, Inc v. Highlands Insurance Co.*, 980 S.W.2d 462, 464 (Tex. 1998). The MOU is not ambiguous – PLS and Derrick are partners;

    - An ambiguity does not arise because counsel cites only chosen portions of sentences in a paragraph. *See, Grain Dealers Mutual Insurance Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997). Thus, Derrick cannot misquote the MOU in order to leave out the fact that the database was contributed to the Joint Venture;

    - When construing provisions in a contract, we must give terms their plain, ordinary and generally accepted meaning. *See, Heritage Resources, Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). The parties clearly agreed that the MOU would evidence a Joint Venture, that the database

would be owned by the Joint Venture and that the revenues would be split 50/50.

- The construction of any written contract must be interpreted so that no contract term – like the parties are partners – will be rendered meaningless. *See, Universal CIT Credit Corp. v. Daniel*, 243 S.W.2d 154, 158 (Tex. 1951). This Court cannot conclude that PLS and Derrick are not partners or that the JV M&A Database is owned by Derrick solely; to the contrary, the only reasonable construction is that the JV M&A Database is jointly owned; and

- Only after applying these rule of construction and finding a term susceptible of two or more reasonable interpretations will the term be ambiguous. *See, Glover v. National Insurance Underwriters*, 545 S.W.2d 755, 761 (Tex. 1977). The Court cannot find any portion of the MOU to be ambiguous.

2. "The existence of a partnership under Texas law is a question of fact. No single fact is determinative, and each case turns on its own particularities, considering the presence or absence of the usual attributes of a partnership relation." *In re Saunders*, 155 B.R. 405, 410 (Bankr. W.D. Tex. 1993) (citing *Arnold v. Caprielian,* 437 S.W.2d 620, 625 (Tex. Civ. App.—Tyler 1969, writ ref'd n.r.e.; *Jenkins v. Brodnax White Truck Co.,* 437 S.W.2d 922, 925 (Tex. Civ. App.—Tyler 1969, no writ)). Texas law also provides that "an association of 2 or more persons to carry on a business for profit as owners creates a partnership, regardless of whether: (1) the persons intend to create a partnership; or (2) the association is called a 'partnership,' 'joint venture,' or other name." *Advanced Nano Coatings, Inc. v. Hanafin*, 478 F. App'x 838, 844 (5th Cir. 2012) (citing Tex. Bus. Org. Code Ann. § 152.051(b)).

3. Derrick repeatedly stated that PLS was its partner. PLS could reasonably rely upon such statements to support its belief that they were partners. Derrick is estopped to deny that a Partnership/Joint Venture exists.

4. In Texas, a partnership is formed "regardless of the persons' intent to create a partnership." Tex. Bus. Orgs. Code Ann. § 152.051(b). However, expressions of intent are still relevant to the rules for determining if a partnership is created per § 152.052(a)(2). However, a statement in an agreement that the parties do not intend to creation a partnership is of limited value in considering the existence of a partnership under Texas law. *In re Cavu/Rock Properties Project I, LLC*, 516 B.R. 414, 420 (Bankr. W.D. Tex. 2014) (disregarding statement in a written agreement that "nothing in this

Agreement shall be construed, deemed or interpreted by the parties or by any third person to create the relationship of principal and agent or of partnership, joint venture or any other association other than that of debtor-creditor between the parties").

5. Thus, the five factors to consider to determine the existence of a partnership or joint venture are (i) receipt or right to receive a share of profits of the business, (ii) expression of intent to be partners in a business, (iii) participation or right to participate in control of the business, (iv) agreement to share or sharing losses of the business or liability for claims by third parties against the business, and (iv) agreement to contribute or contributing money or property to the business. Tex. Bus. Orgs. Code §152.052(a). PLS has proven each of these factors as follows:

   a. The parties agreed to share, and did share, the revenues on a 50/50 basis. The revenues distributed were no different than profits in this scenario because PLS distributed the funds after it deducted its expenses.

   b. The parties expressed their intent to be partners by stating such in the MOU and by various email communications that were sent to each other as well as third parties.

   c. The parties both participated in the control of the business by making, among other things, decisions about the JV's M&A Database, how it would look, how it was organized and how it was marketed. The partners discussed the business operations in a series of emails.

   d. Although the parties did not purport to share the losses of the business, they did share in the liability for claims by third parties against the business. There are also circumstances where PLS incurred expenses for Derrick and was not reimbursed by Derrick.

   e. Both parties agreed to contribute money and property to the business. The contributions are outlined in the MOU, but the most important item contributed was the database, the software, the platform and the associated data. Those contributions ultimately became the JV's M&A Database.

6. The existence of a formal partnership agreement is not one of the five factors. Tex. Bus.Org. Code Ann. § 152.002(a); *Garcia v. Lucero*, 366 S.W.3d 275, 278 (Tex. App.—El Paso 2012, no pet.); *Cavazos v. Cavazos*, 339 S.W.2d

224, 226 (Tex. Civ. App.—San Antonio 1960, writ ref'd) (partnership may be determined by review of surrounding facts and circumstances).

7. An agreement to share losses is not necessary to create a partnership and simply showing the right to share or sharing in gross returns or revenue, standing alone, is not enough to show a partnership. Tex. Bus. Orgs. Code §§152.052(b)(3), (c).

8. A contribution sufficient to form a partnership can be of personal property. The creation of formulas and product constitute a contribution of property to a business and thus weigh in favor of finding a partnership. *Advanced Nano Coatings, Inc. v. Hanafin*, 478 F.App'x 838, 845 (5th Cir. 2012). The contribution of the database to the Joint Venture was a sufficient contribution by Derrick to support its interest in the Joint Venture. The contribution by PLS of its marketing services was a sufficient contribution by PLS to support its interest in the Joint Venture.

9. Property is presumed to be partnership property if acquired with partnership property. Tex. Bus. Orgs. Code Ann. § 152.102(b). This presumption cannot be overcome by the allegation that PLS is a reseller because a reseller agreement would be subject to the Statute of Frauds. V.T.C.A. Bus & Commerce Code § 26.01. In addition, Derrick is estopped to assert that PLS is only a reseller because Derrick implied that PLS was not a reseller in correspondence to PLS.

10. The intention of the parties has long been the basic test for determining ownership of property used by the partnership. *Biggs v. First Nat. Bank of Lubbock*, 808 S.W.2d 232, 237 (Tex. App. 1991), writ denied (Oct. 23, 1991). Under well-established partnership principles, ownership of property intended to be a partnership asset is not determined by legal title. The intention of the parties, as found by the jury and supported by the evidence, is controlling. *Logan v. Logan*, 156 S.W.2d 507, 512 (Tex. 1941); *King v. Evans*, 791 S.W.2d 531, 533 (Tex. App.—San Antonio 1990, writ denied); *Littleton*, 341 S.W.2d at 489.

11. The statutory rules set forth in the Texas Business Organization Code are guidelines for ascertaining intention of partners to a partnership. Tex. Prac. Business Organizations § 9:1 (3d ed.) (citing *Foust v. Old American County Mutual Fire Insurance Co.*, 977 S.W.2d 783 (Tex. App.—Fort Worth 1998, no pet.) (the court followed its citation to the Texas Revised Partnership Act with citation to case law predating the Act that stressed the intention of the parties rather than legal title in determining the ownership of the property in question).

12. The calendar term provision in the MOU indicating that the initial term of the Partnership/Joint Venture is through October 3, 2014 is of no practical significance because even if the Partnership/Joint Venture terminated it would only mean that the assets of the Partnership/Joint Venture would either be sold and distributed in cash or in kind. It would not mean that the assets of the Joint Venture/Partnership suddenly revert to the partners individually – that is not how a partnership works. In addition, the calendar term provision cannot be applied in a manner that ends this Partnership/Joint Venture because the parties achieved the goal of selling more than $2MM in subscriptions in one year.

13. Finally, and in any event, if the parties are not Joint Venture partners then they are tenants-in-common in the JV M&A Database. Thus, whether it is a Joint Venture, a partnership or a tenancy in common the JV M&A Database is owned 50/50 by PLS and Derrick

To the extent any Finding of Fact constitutes a Conclusion of Law, the Court hereby adopts it as such.

Respectfully submitted,

HIRSCH & WESTHEIMER, P.C.

By: _/s/Eric Lipper_
    Eric Lipper
    State Bar No. 12399000
    Melissa N. Sternfels
    State Bar No. 24037181
    1415 Louisiana, 36th Floor
    Houston, Texas 77002
    713.220.9181 (Telephone)
    713.223.9319 (Facsimile)
    Email: elipper@hirschwest.com
    Email: msternfels@hirschwest.com

**ATTORNEYS FOR DEFENDANT PLS, INC.**

OF COUNSEL:

Clifford H. Walston
PLS, Inc.
One Riverway, Suite 2500
Houston, Texas 77056

## CERTIFICATE OF SERVICE

I do hereby certify that on this November 7, 2014, I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of such filing to the following:

Brendan D. Cook
Baker & McKenzie, LLP
700 Louisiana, Suite 3000
Houston, Texas 77002
*Via Facsimile No. 713-427-5099*

By: _____/s/Eric Lipper_____
         Eric Lipper