# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| DERRICK PETROLEUM SERVICES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-1520 |
| | § | |
| PLS, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION SETTING OUT FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    Introduction: The Issues

This is a business divorce and custody dispute. The divorcing parties are the plaintiff, Derrick Petroleum Services, and the defendant, PLS, Inc. The custody dispute is over which party owns the jointly branded Derrick/PLS Oil & Gas Mergers & Acquisitions Database, which contains data on the oil and gas industry compiled from thousands of sources, with transaction-by-transaction analyses for over 16,000 past deals from 1999 to the present, as well as information on over 3,000 current "Deals in Play" in the market. Derrick created a database, the "Derrick Database," which later formed the basis of the jointly branded Derrick/PLS Database, the "Derrick/PLS Database." The Derrick Database was created in 2006, in India, primarily for the European market. In a Memorandum of Understanding dated October 3, 2009, Derrick and PLS agreed to a framework for working together to develop and market the Derrick Database for the North American market using a joint Derrick/PLS brand. (Docket Entry No. 1, Ex. 1). Derrick's primary role was to develop and maintain the jointly branded Derrick/PLS Database; PLS's primary role was to market it and sell

subscriptions.

The MOU did not specify who owned the jointly branded Derrick/PLS Database. The MOU did express the parties' intent to enter a long-term relationship and to create a limited liability company once the annual subscription revenue reached $2 million. The MOU also stated that the parties' business relationship would have an initial five-year term ending in October 2014.

Although the $2 million revenue target was reached in September 2013, the parties did not succeed in negotiating an LLC. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, pp. 267–68). Instead, the parties' relationship deteriorated. Both parties claim that the other breached the MOU by offering products or services that competed with the Derrick/PLS Database, or that the other exited the MOU before the five-year term expired, triggering penalties that affect who owns this Database and who has the right to market it.

Derrick sued in June 2014, seeking a declaratory judgment that it owns the Derrick/PLS Database; that the MOU has expired and the parties have no further obligations toward each other; and that it is entitled to offer this Database in the North American market, including to previous and present customers of this Database. (Docket Entry No. 1). Derrick also seeks a declaratory judgment that PLS has exited the MOU. (Docket Entry No. 96). PLS asserts that it has a 50 percent ownership interest in the Derrick/PLS Database, that the parties formed a partnership and their obligations to each other continue, and that Derrick prematurely exited the partnership, giving PLS the unrestricted right to a copy of the Database and restricting Derrick in its ability to market that Database. (Docket Entry Nos. 8, 90).

The parties agreed to bifurcate the litigation. The first phase is the bench trial held in November 2014 on two issues: (1) who owns the Derrick/PLS Database; and (2) whether the MOU

terminated when its five-year term expired, or whether the MOU's provision stating that a separate LLC would be created after the venture reached the $2 million annual revenue target extended the term. This Memorandum and Opinion sets out the findings and conclusions resulting from that bench trial.

The court heard testimony from Yashodeep Deodhar, Derrick's founder and principal; Ronyld Wise, PLS's founder and principal; Brian Lidsky, a PLS employee who had previously worked at Derrick marketing the Derrick Database; David Harris, a consultant who has advised PLS on database marketing since December 2010; Jason Reimbold, a PLS employee since 2008 and a creator of a PLS database of historic oil and gas transactions, referred to as the "PLS Legacy Database"; Ali Rizvi, a PLS employee who has been in charge of marketing the Derrick/PLS Database since 2011; and Nancy Miracle, an expert in forensic software analysis retained by Derrick for this litigation. The parties admitted extensive exhibits and presented argument.

Based on the pleadings; the briefs and exhibits; the testimony, arguments, and exhibits presented at the four-day bench trial; the posthearing briefs and submissions; and the applicable law, the court enters findings of facts and conclusions of law, summarily listed below and explained in detail in this Memorandum and Opinion.

1. Derrick and PLS did not form a partnership.

2. Derrick did not contribute all or part of ownership in or title to its Derrick Database as it existed before 2009 or after it was marketed as the Derrick/PLS Database, to the parties' business venture or to PLS.

3. The parties' relationship ended on October 3, 2014.

4. Derrick is the sole owner of the Derrick Database and what was marketed from 2009

to 2014 as the jointly branded Derrick/PLS Database.

     5.      The present record does not show that the Exit Mechanism of the MOU has been triggered as to either party.

These findings of fact and conclusions of law are explained below. A scheduling conference is set for **January 23, 2015**, at 8:30 a.m. in Courtroom 11-B.

## II.    The Applicable Law

The parties agree that Texas law on contract interpretation and partnership formation apply.[1]

## A.    Contract Interpretation

In interpreting a contract, the court's primary concern "is to ascertain the true intentions of the parties as expressed in the instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). To achieve this objective, the court considers the contract as a whole. *See id.* ("[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."). When considered as a whole, a contract is ambiguous only if it is "reasonably susceptible to more than one meaning." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). A court will not find a contract ambiguous if it may properly be given a certain legal meaning or interpretation. *J.M. Davidson*, 128 S.W.3d at 229. "Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity." *Tex. v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006) (*citing Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 732–33 (Tex. 1982); *Gen. Accident Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd.*, 288 F.3d 651, 657

---

[1] The MOU does not contain a choice-of-law clause. The parties agree that Texas law applies to their claims and have framed their arguments in terms of Texas law.

(5th Cir. 2002)).

Under Texas law, the interpretation of a written contract is controlled by the intention of the parties to it. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333–34 (Tex. 2011). "The language in an agreement is to be given its plain grammatical meaning unless to do so would defeat the parties' intent." *DeWitt Cnty. Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999). "The objective intent as expressed in the agreement controls the construction of an unambiguous contract, not a party's after-the-fact conduct." *In re Dillard Dep't Stores, Inc.*, 186 S.W.3d 514, 515 (Tex. 2006).

## B.     Partnership Formation

Under Texas law, a partnership is "an association of two or more persons to carry on a business for profit as owners." Tex. Rev. Civ. Stat. art. 6132b-2.02(a). The Texas Revised Partnership Act lists five factors that indicate the existence of a partnership:

> (1) the receipt or right to receive a share of profits of the business;
> (2) the expression of an intent to be partners in the business;
> (3) participation or the right to participate in the control of the business;
> (4) sharing or agreeing to share:
>     (A) losses of the business; or
>     (B) liability for claims by third parties against the business; and
> (5) contributing or agreeing to contribute money or property to the business.

*Id.* at art. 6132b-2.03(a). Because the statute "contemplates a less formalistic and more practical approach to recognizing the formation of a partnership," courts consider the totality of the circumstances; no one factor is determinative. *Ingram v. Deere*, 288 S.W.3d 886, 895 (Tex. 2009). The party asserting the partnership has the burden of proving its creation. *See Valero Energy Corp. v. Teco Pipeline Co.*, 2 S.W.3d 576, 585 (Tex. App — Houston [14th Dist.] 1999, no pet.).

## C.     The Transfer of an Ownership Interest in Intellectual Property

A transfer of ownership interest in intellectual property generally "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a). "Section 204(a)'s requirement, while sometimes called the copyright statute of frauds, is in fact different from a statute of frauds." *Lyrick Studios, Inc. v. Big Idea Productions, Inc.*, 420 F.3d 388, 391 (5th Cir.2005) (citing *Konigsberg Intern. Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994)). "Rather than serving an evidentiary function and making otherwise valid agreements unenforceable, under § 204(a) 'a transfer of copyright is simply 'not valid' without a writing.'" *Id.* (quoting *Konisberg*, 16 F.3d at 357). "If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Charta; a one-line pro forma statement will do." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990). State contract law governs the construction of copyright assignments, licenses, and other writings effecting transfers of intellectual property. *See P.C. Films Corp. v. Turner Entm't Co.*, 954 F. Supp. 711, 714 n. 6 (S.D.N.Y. 2007); *Key Maps, Inc. v. Pruitt*, 470 F. Supp. 33, 38 (S.D. Tex. 1978) ("Principles of contract law are generally applicable in the construction of copyright assignments, licenses, and other transfers of rights.").

The court analyzes the evidence in light of the relevant legal standards and enters the following findings of fact and conclusions of law on the questions tried to the bench in November 2014.

## II.    Findings of Fact[2]

### A.    The Parties and the Disputed Database

#### 1.    Derrick

Deodhar founded Derrick in 2006 as a partnership organized under the laws of the Republic of India with its principal place of business in Bangalore, India.  Derrick, an oil and gas research company, provides both consulting services and research products, including databases, reports, and news articles, on the oil and gas industry.  In 2006, Derrick created the "Oil & Gas Mergers & Acquisitions Database" (the "Derrick Database") of data relating to oil and gas industry transactions. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, p. 65).  The Derrick Database, compiled from thousands of sources, included reports on, and analyses of, oil and gas transactions on a transaction-by-transaction basis.  As of September 2009, the Derrick Database contained 5,893 records, of which 1,691 related to United States transactions, 989 related to Canadian transactions, and the remainder related to European transactions.  (Derrick Ex. 125, Miracle presentation, at slide 6).

Derrick launched its Database in 2007 and had some, but limited, marketing success.  In the spring of 2009, Derrick hired Lidsky, who had previously worked for John S. Herold, a leader in the oil and gas database field, to market the  Derrick Database in North America.  Lidsky issued press releases and contacted potential clients, (*see* PLS Ex. 1), but he was unable to sell subscriptions. Later that year, Lidsky left Derrick to work at PLS.

#### 2.    PLS

PLS is a Texas corporation with its principal office in Houston, founded in 1987 by Wise.

---

[2]  Any findings of fact that are more properly conclusions of law are so deemed. Any conclusions of law that are more properly findings of fact are so deemed.

PLS provides information relating to the oil and gas industry, including a multiple listing service of oil and gas properties for sale, marketing and advisory services, and approximately 19 industry publications. PLS had developed a Legacy Database of oil and gas transactions going back to 1979, primarily of North American transactions. As of 2009, the PLS Legacy Database contained 6,796 entries on transactions dating from 1979 to 2009. (Docket Entry No. 110, Bench Trial Tr., Vol. 3, p. 33). PLS had not been successful in marketing the Legacy Database.

Lidsky issued a press release on Derrick's behalf in 2009 as part of his marketing efforts. (PLS Ex. 1). Wise contacted Deodhar in May 2009 in response to that press release. (PLS Ex. 2). Wise told Deodhar that he was impressed with the Derrick Database and was interested in exploring a business relationship between PLS and Derrick. (PLS Exs. 2, 3; Derrick Ex. 8; Docket Entry No. 110, Bench Trial Tr., Vol. 3, pp. 30–39). The parties began negotiating and exchanging drafts of what became the October 3, 2009 Memorandum of Understanding. (*See* PLS Exs. 5, 6, 13). Although Lidsky, acting for PLS, wrote the initial MOU draft, both parties proposed edits and revisions. (*See* PLS Exs. 6–8, 15, 18–19). The MOU was executed by Deodhar for Derrick and Wise for PLS on October 3, 2009. (Docket Entry No. 1, Ex. 1).

## B.    The October 3, 2009 Memorandum of Understanding

The MOU stated that the parties would develop and market "E&P database products for the North American market" and expressed the parties' intent "to work together in good faith as joint venture partners." (*Id.*). In broad terms, the MOU called for the parties to sell subscriptions to the Derrick/PLS Database, which was to be marketed as a jointly branded product. Derrick's role was to continue developing and maintaining the Derrick Database it had started in 2006; PLS's role was to market it in North America as the joint Derrick/PLS Database and collect and distribute

subscription sales revenue on a 50/50 basis. (*Id.*).

The MOU stated that the parties' goals included "future business relationships beyond database products and beyond the North American market." (*Id.*). In the MOU, the parties agreed that while they intended a "long-term relationship" for the "partnership," the initial term was for five years. (*Id.*). The MOU set a target of October 31, 2009 for the parties to formalize "a written Joint Venture Agreement." (*Id.*). The parties did not formalize or sign such an agreement. The MOU also stated that if product revenues reached $2 million per year, "a separate LLC for the purpose of the JV [would] be created." (*Id.*). Although the business venture reached the revenue target in September 2013, the parties' efforts to negotiate a limited liability company proved unsuccessful. Each blames the other for their inability to agree. In short, the parties clearly intended the MOU to be temporary and to be replaced by a formal agreement on a joint venture or LLC or to expire in five years.

The October 2009 MOU gave some details as to each party's role. "Derrick provides existing products and ongoing operational support and PLS provides market penetration, product enhancement, and ongoing client relationships." (*Id.*). Derrick agreed to provide "[e]xisting M&A database platforms, software and content including ongoing data"; "Product Enhancements including . . . additional features, integration of PLS transaction data"; and "Ongoing Operations including . . . Database updates and integrity." (*Id.*). PLS agreed to provide "[a] full license to PLS' brand and corporate name for use in marketing E&P database products"; "Marketing"; "Client invoicing, collection & distribution of revenue"; and customer lists. (*Id.*). PLS was also to provide its "[e]xisting M&A data and ongoing data from its sources," and "[o]ngoing data support regarding North America private deals by other brokers and/or deals sold or being marketed by PLS

Divestment Marketing division." (*Id.*).

PLS characterized Derrick's obligation as including the contribution of the Derrick/PLS Database either entirely to the business venture or 50 percent to PLS, with Derrick retaining 50 percent. At trial, both Wise and Lidsky admitted that the MOU does not explicitly address ownership of the jointly branded Derrick/PLS Database. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 10–11, 92, 186, 211). Internal PLS emails also show that Lidsky and Wise believed that the MOU did not expressly transfer ownership. (*See* Derrick Ex. 69) (July 31, 2013 email from Wise to Lidsky, stating that Deodhar "should have known to put ownership in the 3 pg document but he didn't.").

The court finds that, as objectively expressed in the MOU, the parties did not intend to have Derrick contribute or otherwise to transfer an ownership interest in the Derrick Database that was expanded, maintained, and marketed during the business venture as the jointly branded Derrick/PLS Database to either PLS or to the parties' business venture. As the conclusions of law set out below make clear, the MOU expresses Derrick's obligation to use its Database for the parties' business relationship but not to contribute or convey an ownership interest in the Database to either PLS or the parties' business.

Under the MOU, each party was to receive one-half of the revenue generated from PLS's North American subscription sales to the Derrick/PLS Database, but each party would bear its own costs of the work within its assigned sphere. Derrick would bear the costs incurred in developing and maintaining the Database, and PLS would bear the costs it incurred in marketing the Database, administering subscriptions, and distributing 50 percent of the total North American subscription revenue to Derrick. (*Id.*) ("Costs will be borne 100% by respective parties as they fulfill the

10

respective activities. In other words Derrick will bear 100% of costs for product development and operations, quality control and PLS will bear 100% of costs of marketing.").

If either party chose to end the relationship before the five-year term expired, the MOU provided for penalties, as follows:

> In the event of exit by Derrick for whatever reason, Derrick shall provide PLS, Inc. a full copy of the Database and associated software and other such required items deemed necessary for PLS, Inc. to continue to provide M&A or other Joint Venture products. In the event of exit by PLS for whatever reason, PLS shall forfeit revenues from existing and targeted clients of the service. . . . The party that exists [*sic*] will not sell similar products to the same clients that were subscribers for the JV products for a minimum of two years.

(*Id.*)

## C. The Parties' Conduct Under the MOU: The Indicia of a Partnership

### 1. The Parties' Characterization of their Relationship During the MOU: The Expression of an Intent to be Partners

The evidence shows that Derrick and PLS used the vocabulary of partnership and partners to describe their relationship in the early days of the MOU. The MOU describes the parties' intent to develop a relationship as "joint venture partners" to market the Derrick Database as a jointly branded Derrick/PLS Database to North American clients. (*Id.*). Emails between Derrick and PLS before and after they signed the MOU referred to their relationship as a partnership. (PLS Exs. 11, 13, 32; Derrick Exs. 13, 35, 36, 38; Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 240–41; Docket Entry No. 110, Bench Trial Tr., Vol. 3, pp. 65–66). Emails to potential and existing customers referred to Derrick and PLS as partners in providing the jointly branded Database to the North American market. (*See, e.g.*, PLS Exs. 17, 22, 39, 85, 86; Derrick Exs. 19, 20, 22). Derrick was copied on many of these emails. Rizvi testified that Deodhar referred to PLS as Derrick's

"North American partner" in front of clients. (Docket Entry No. 110, Bench Trial Tr., Vol. 3, p. 66).

Derrick and PLS issued joint press releases in which they described themselves as "partners in providing U.S., Canadian and International clients leading M&A and E&P databases and services." (*See* PLS Ex. 17).

Although Deodhar testified that when he used the term "partner" to refer to PLS, he meant it in the sense of a "business associate," (Docket Entry No. 108, Bench Trial Tr., Vol. 1, p. 223), his testimony on this point is not credible. The court finds that there is evidence in the record that when the parties drafted and signed the MOU, and in its early stages, they intended to form a long-term partnership or joint venture relationship. There is clearly some evidence of an intent to form a partnership.

### 2. The Parties' Improvements to, Maintenance of, and the Right to Control the Database

After Deodhar and Wise signed the MOU, Derrick and PLS exchanged information on their respective databases. (PLS Exs. 14, 21, 23). Derrick employee Naveen Seetharama spent six weeks at PLS's Houston offices and was given access to the PLS Legacy Database. (PLS Exs. 14, 73; Docket Entry No. 108, Bench Trial Tr. Vol. 1, p. 193). Seetharama accessed 99 records in the PLS Legacy Database relating to transactions from the 1980s, 1990s, and 2000s. (PLS Ex. 73, 79, Derrick Ex. 98, pp. 54–55).

Lidsky prepared a spreadsheet comparing the parties' respective databases. (PLS Exs. 21, 23). PLS offered Derrick information on 439 deals in its Legacy Database. (*Id.*). Derrick added only four of those deals to the Derrick/PLS Database. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 126–27). Deodhar testified that much of the information PLS provided from its Legacy Database Derrick had obtained from other sources and already included it in the Derrick Database

12

that was expanded and marketed as the jointly branded Derrick/PLS Database. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, pp. 192–93). Wise testified that Derrick did not view PLS's older deals as commercially valuable. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 252–54). Miracle testified that many of the deals in PLS Legacy Database were either already in the Derrick/PLS Database or lacked information necessary to add them. (Docket Entry No. 110, Bench Trial Tr., Vol. 3, pp. 128–29).

The jointly branded Derrick/PLS Database contains the same software identifiers as the Derrick Database. Miracle testified that the software identifiers show that no new database was created when or after the parties signed the MOU. Miracle's testimony, and other evidence in the record, shows that the Derrick Database, supplemented with four records from PLS's Legacy Database, and otherwise expanded and maintained by Derrick, was the jointly branded Derrick/PLS Database developed and marketed under the MOU. (Derrick Ex. 125, Miracle presentation, at slide 3; Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 119–22).

Derrick's work on the Derrick Database during the MOU added new 10,000 entries between October 2009 and October 2014. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, p. 35). As of 2014, the Derrick Database included data and analysis on over 16,000 historical transactions from 1999 through the present, as well as information on over 3,000 current "Deals in Play" in the market. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 35, 129). Some of the additions derived from suggestions PLS sent to Derrick, usually by email. (*See* Derrick Ex. 72; PLS Ex. 5). Deodhar testified that Derrick performed an independent analysis before including suggested additions in the Database, and many of the PLS suggestions did not satisfy Derrick's quality or other relevant requirements. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, pp. 123–30; *see also* Docket Entry

No. 109, Bench Trial Tr., Vol. 2, p. 152). Miracle testified that 1,434 of PLS's suggestions contained information that was incorporated into the Database, representing 1.7 percent of the jointly branded Derrick/PLS Database's current content. (Derrick Ex. 125, Miracle presentation, at slide 8; Docket Entry No. 109, Bench Trial Tr., Vol. 2, p. 138). Deodhar also testified that Derrick added content to the Database in response to suggestions from users. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, pp. 131–32). Wise's testimony confirmed that "thousands" of other companies provided Derrick with content suggestions that it incorporated into the Database. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 94–95).

Derrick also made changes to the presentation and format of the Database after signing the MOU. In 2010, Derrick moved the Database to a different software platform. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, pp. 132–33). Derrick also changed how the data is organized and sorted and changed the appearance to make it more appealing to a North American audience. Derrick made some of these presentation and format changes based on PLS's suggestions. (*Id.* at pp. 121–24). Derrick, however, made the final decisions on whether to make presentation or format changes and what they would be. As Wise wrote in a June 2013 email, Derrick was the "boss of" the MOU Database's content and format, the "back end," and Deodhar and other Derrick personnel had "veto power" over any changes Wise and other PLS personnel suggested. (Derrick Ex. 66).

The court finds that the jointly branded Derrick/PLS Database was not a new database, but a continuation and expansion of the Derrick Database. The court also finds that Derrick retained and maintained control over the content, structure, and presentation of the Database.

### 3. The Parties' Division of Profits, Revenues, Costs, and Losses

PLS began marketing the Derrick/PLS Database in North America in October 2009. PLS

drafted promotional materials and consumer subscription contracts that described the Database as "jointly created" by Derrick and PLS. (PLS Exs. 17, 75, 76). PLS handled the North American marketing and the subscriptions. PLS, not Derrick, entered into subscription contracts with customers in North America. Derrick had no involvement in the negotiation of those contracts and no liability to customers under them. (PLS Exs. 75, 76; Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 280–82). Wise testified that PLS unilaterally controlled pricing on those subscriptions, although Derrick provided input. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, p. 241).

PLS collected the subscription revenue, calculated Derrick's 50 percent share of the total received, and sent Derrick that share by wire transfer every month. (Docket Entry No. 110, Bench Trial Tr., Vol. 3, p. 73). The parties did not regularly exchange information on their respective expenses with each other. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, p. 103; Docket Entry No. 109, Bench Trial Tr., Vol. 2, p. 191). PLS and Derrick did not calculate or provide each other with information on their costs or profits.

The evidence shows that on some occasions, PLS deducted certain expenses from Derrick's share of the revenue before sending Derrick a check. On those occasions, Derrick protested on the basis that the MOU required each party to bear the costs each incurred in its "respective activities" — Derrick in "product development and operations, quality control," and PLS in "marketing." (Docket Entry No. 1, Ex. 1; *see* Derrick Ex. 119; 120; Docket Entry No. 108, Bench Trial Tr., Vol. 1, pp. 214, 218; Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 265–70). Aside from those exceptions, the parties followed the MOU provision that total or gross revenues were equally shared and each party bore its own costs for the work it did under the MOU. PLS did not deduct Derrick's expenses and its own expenses before dividing the revenues and distributing them. Instead, the

evidence shows, and the court finds, that Derrick paid the expenses it incurred in improving and maintaining the Database, and PLS paid the expenses it incurred in marketing the Database, after PLS divided and distributed the gross revenues.

Although Wise testified that he considered the financial arrangement as calling for the parties to share losses, his testimony on this point is not credible. The parties did not exchange information about expenses or calculate whether the business experienced a net loss or profit in any month. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, p. 103; Docket Entry No. 109, Bench Trial Tr., Vol. 2, p. 191). If Derrick's share of the total revenues fell short of its costs in developing and maintaining the Database, only Derrick would suffer the loss. If PLS's share of the total revenues fell short of its marketing costs, only PLS would suffer the loss.

The record contains no evidence of third-party claims against the business venture or of any losses that had to be addressed. Wise testified that if a customer had a claim under its subscription contract, PLS, not Derrick, was "on the hook" under that contract. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, p. 281–82).

The court finds that the parties did not agree to, and did not, share losses of the business venture or share liability for claims by third parties.

PLS asserts that it controlled marketing, revenue distribution, subscription sales, and "money." The court finds that PLS did control marketing and subscription sales and that it exerted significant, but not total, control over revenue distribution and "money." PLS was required to account to Derrick for the receipt, division, and distribution of the revenues received. When PLS deducted costs from the revenues it distributed to Derrick, the deduction was met with protests from Deodhar. (Derrick Exs. 119, 120; Docket Entry No. 108, Bench Trial Tr., Vol. 1, pp. 214, 218;

Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 265–70). At least once, PLS reversed part of the deduction in response to those protests. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 276–77).

### 4. The Parties' Contributions to the Business Venture: Contributing Money or Property, Including the Disputed Database

The evidence shows that both parties made significant contributions to the business venture. PLS contributed time and services beyond such marketing and related administrative services as handling the subscriptions and collecting, accounting for, and distributing the revenues. PLS also trained Seetharama, who traveled from India to spend six weeks at PLS's Houston offices in 2009. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, p. 193). Derrick contributed time and services by developing and maintaining the Database, and contributed access to and use of the Derrick Database for the limited purpose of marketing the jointly branded Derrick/PLS Database in North America.

Wise testified that PLS contributed money to the parties' business by incurring $1 million of expenses on work relating to the "back end," which the MOU made Derrick's responsibility. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 239–40). Wise testified that PLS employee Lidsky worked on the Database's appearance and format to make it more appealing to the North American market. (*Id.* at pp. 238–39). Wise testified that Derrick should have paid PLS for Lidsky's work, but did not. (*Id.*). As a result, according to Wise, PLS contributed this sum to the venture. (*Id.*). The court does not find Wise's testimony on this point credible. There is little specific evidence of the costs PLS incurred in Lidsky's work suggesting how Derrick might change the Database. Nor is there evidence that PLS billed Derrick for Lidsky's work on the Database during the MOU's five-year term. Instead, the evidence shows that PLS contributed services and expertise, including Lidsky's familiarity with the relevant North American market, in suggesting

ways to make the Derrick/PLS Database more appealing to that market. To the extent the services and expertise related to marketing, the MOU allocated the costs to PLS. To the extent the services and expertise related to the Database, as the conclusions of law set out below make clear, their contribution is not a contribution of money or property that indicates a partnership.

In addition, Wise testified that he retained Harris, a former John S. Herold employee, to review the Database for potential improvements and suggest them to Derrick. Harris testified that PLS paid him between $15,000 and $35,000 and that Derrick did not reimburse PLS for this expense. (Docket Entry No. 110, Bench Trial Tr., Vol. 3, p. 13). The record evidence does not show that PLS billed Derrick for Harris's consulting fees. To the extent that Harris's consulting services were part of marketing efforts to make the Database more appealing to potential customers in North America, the cost was properly allocated to PLS under the MOU, not to Derrick.

PLS did contribute to the parties' business venture "a full license to PLS's brand and corporate name for use in marketing" the jointly branded Derrick/PLS Database. (Docket Entry No. 1, Ex. 1). PLS explains that this contribution of the limited right of a license solely for the purpose of marketing the jointly branded Derrick/PLS Database contrasts with the "complete contribution of the Database platforms, software and content by Derrick. . . ." (Docket Entry No. 107, p. 6). Wise testified that had Derrick not contributed title to and ownership of the Database to the parties' business venture, in a way that survived the parties' relationship and allowed PLS to retain a 50 percent ownership interest after the relationship ended, PLS would not have expended the money, time, and resources it committed to marketing the jointly branded Derrick/PLS Database in North America. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, p. 77). Deodhar, by contrast, testified that while he intended to provide the parties' business use of the Derrick Database, expanded and

marketed as the jointly branded Derrick/PLS Database, he did not intend to contribute unfettered ownership rights to the Database that would survive the parties' business relationship. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, pp. 96, 230, 238).

The court has found that the language the parties agreed to in the MOU shows they did not contribute unfettered rights to their intellectual property, but rather limited rights. The MOU does not state that Derrick transferred its intellectual property — the Derrick Database, expanded and marketed as the Derrick/PLS Database — to the parties' business venture or to PLS. The MOU did state that PLS contributed a license to use its brand. Derrick provided the parties' business use of its Database, but maintained sole possession and control over the Database during the MOU, which, as set out in the conclusions of law below, is consistent with its continued sole ownership of the Database.

Deodhar's testimony that the parties did not intend to convey ownership is consistent with the objective intent expressed in the MOU, which is silent on ownership rights to the jointly branded Database except in the "Exit Mechanism" clause. That clause stated that if Derrick prematurely exited the MOU, it would have to give PLS a copy of the Database for use in continuing the business. Had Derrick already contributed ownership of the Database to the business, the clause would be surplusage; the right to the Database would already be part of the parties' jointly owned business property. And there is an obvious answer to PLS's argument that it would not have expended so much time and effort on marketing the jointly branded Derrick/PLS Database had it not received a 50 percent ownership interest in that Database. PLS expected to, and apparently did, make a profit from the subscription revenues. PLS also expected to attract new customers and to retain the loyalty of existing customers by providing them a new resource.

The court finds that Derrick did not contribute ownership of, or title to, the Derrick Database as it existed in 2009, before the MOU, or to the expanded Derrick Database that was marketed as the jointly branded Derrick/PLS Database during the MOU. There are no other records showing transfer of the Derrick Database. The evidence shows, and the court finds, that Derrick retained full and sole ownership of the Database unless it exited the MOU prematurely so as to trigger its obligation to provide PLS a copy for use in continuing to market subscriptions and serve existing subscribers after the MOU ended.

PLS did not significantly contribute to the content of the Database from 2009 to 2014. Wise testified that Derrick frustrated PLS's contributions, particularly of the Legacy Database information, by refusing to include them in the Derrick/PLS Database. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, p. 213). The MOU stated that "Derrick shall provide . . . Product Enhancements, including but not exclusive of . . . PLS transaction data." PLS contended, and Wise testified, that Derrick's refusal to include all of PLS's Legacy Database and other data in the jointly branded Derrick/PLS Database breached this MOU obligation. (Docket Entry No. 107; Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 212–13). The court finds Wise's testimony in this respect not credible. Derrick had the right to control the content of the Derrick/PLS Database. The evidence does not show that Derrick refused to consider including entries from the Legacy Database, or other information PLS submitted, in the Derrick/PLS Database. Instead, the evidence shows that Derrick exercised its contractual prerogative of controlling the Database's content and format. Deodhar credibly testified as to the reasons it decided not to include many of the suggestions PLS submitted, including entries from its Legacy Database. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, pp. 123–24, 192–93). The court finds that Derrick did not breach the MOU in deciding what to include, and what not to

include, from PLS's Legacy Database and other suggestions.

### 5. The End of the MOU

The MOU expired of its own terms on October 3, 2014. While the MOU stated that the parties intended a "long-term relationship" and targeted the creation of a joint venture or an LLC if the business reached a certain revenue level, the MOU also provided an initial five-year term. The parties were unable to agree on a joint venture, an LLC, or another means of continuing their business relationship. As the conclusions of law stated below make clear, neither the aspirational reference to a long-term relationship or the provisions on creating a joint venture agreement or an LLC operate to extend the MOU's five-year term.

PLS argued at the bench trial that the MOU's Exit Mechanism provisions apply because Derrick breached the MOU and prematurely exited the business by making clear its intent to part with PLS once the five-year term ended. Derrick argued that PLS had exited by sending emails stating that it intended to compete with Derrick starting in October 2014. (Docket Entry No. 96). The Exit Mechanism provision states that if Derrick prematurely exited the MOU, it would have to "provide PLS a full copy of the Database and associated software and other such required items deemed necessary for PLS, Inc. to continue to provide M&A or other Joint Venture products." (Docket Entry No. 1, Ex. 1). If PLS prematurely exited the MOU, it would "forfeit revenues from existing and targeted clients of the service and provide Derrick Petroleum with all documentation regarding marketing activities." (*Id.*). The MOU also stated that the "party that exi[]ts will not sell similar products to the same clients that were subscribers for the JV products for a minimum of two years." (*Id.*).

Each party accuses the other of announcing during the MOU an intent to compete after the

MOU ended. In its bench trial brief, PLS emphasized that Derrick announced in its pleadings and briefs filed in this lawsuit, before the MOU's five-year term expired, its decision "to part ways with its North American marketing agent Defendant PLS, Inc., . . . and begin its own North American marketing effort." (Docket Entry Nos. 87, 90). Derrick sought a declaratory judgment that the parties had not entered into a partnership, that they owed no residual duties to each other after the MOU expired and the business arrangement ended in October 2014, and that Derrick was the sole owner of the Database and had the legal right after the MOU expired to offer the Database in the North American market, including to previous and existing Database customers. (Docket Entry Nos. 1, 87).

In its arguments to the court, Derrick emphasized emails from Wise making clear by September 2012 PLS's intent to "go its own way" after the MOU expired in 2014, by "selling the heck out of" the jointly branded Database before then, taking "our copy of the data base" after that date, and continuing to aggressively market it; or, alternatively, launching its own product to compete with Derrick's Database after the MOU ended. (Derrick Exs. 44, 69). But the record evidence presented at the bench trial does not show that either Derrick's or PLS's statements indicated more than the deterioration of the relationship and a subjective recognition that the MOU would expire after five years because the parties could not reach a longer-term agreement.

The court finds that based on the record evidence and the parties' arguments presented at the bench trial, neither party has triggered the Exit Mechanism. But this case has been bifurcated under the parties' September 2014 agreement to try the limited issues of ownership of the Database and the expiration of the MOU at the bench trial and to try other issues, including claims of breach, at a later trial. (*See also* Docket Entry No. 46, Joint Discovery and Case Management Plan). PLS

responded to interrogatories regarding a potential Derrick exit from the MOU by claiming that the topic was "outside the scope of Phase 1 of the litigation in that it relates to damages." (Docket Entry No. 96, Ex. C).

To the extent the parties have already submitted some evidence on whether the Exit Mechanism was triggered by the parties' statements indicating an intent to end their business relationship, the court has found that the evidence does not show that the Exit Mechanism has been triggered. The parties may, however, reurge these arguments during the second phase of the litigation if additional evidence supports them.

### 6. Summary of the Court's Findings of Fact

The court finds that:

1.     there is some evidence that the parties intended to form a partnership;

2.     the parties did not share profits, losses, or liability to third parties;

3.     Derrick's Database was the database developed and marketed under the MOU;

4.     Derrick retained control of the Database throughout the term of the MOU;

5.     Derrick did not intend to convey the Database in whole or in part to the business venture or to PLS;

6.     PLS did not significantly contribute to the content of the jointly branded Derrick/PLS Database, and its contributions represent 1.7 percent of the Database's current content;

7.     Derrick's failure to incorporate all of PLS's suggestions and data from the PLS Legacy Database did not breach the MOU;

8.     the MOU expired on October 3, 2014 and was not extended by the references to a "long term relationship," a future "Joint Venture Agreement," or the possible creation of an

LLC; and

9.    neither party has triggered the MOU's Exit Mechanism.

## II.    Conclusions of Law

### A.    The Parties Did Not Form a Partnership

Derrick seeks a declaratory judgment that it did not create a partnership with PLS. The court concludes that the MOU did not form a partnership, and that the parties' relationship ended in October 2014.

#### 1.    The Parties Did Not Agree to, and Did Not, Share Profits

Derrick and PLS agreed to "[s]hare all revenues on PLS, Inc.'s joint E&P database sales, including renewals, 50/50." (Docket Entry No. 1, Ex. 1). The parties also agreed that each one would bear its own costs. PLS argues that because each party deducted its own expenses after receiving half of revenue, they shared in the profits of the business.

The evidence presented at trial showed that under the MOU, PLS collected all revenue from North American subscription sales and distributed the revenue equally between itself and PLS. PLS sent half of the revenue to Derrick and kept the remainder for itself. On occasion, PLS deducted costs related to developing and maintaining the Database that it, rather than Derrick, incurred, from Derrick's half of the gross revenues and sent Derrick a reduced payment. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 274–80). But this was the exception. When it occurred, it was often met by protests from Derrick. (Derrick Exs. 119, 120; Docket Entry No. 108, Bench Trial Tr., Vol. 1, pp. 214, 218; Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 265–70).

"[T]he receipt of gross revenue is not profit sharing." *Ingram*, 288 S.W.3d at 899. Profits are "the excess of revenues over expenditures in a business transaction." *Id.* (internal citations

omitted). In *Ingram*, the defendant claimed that the parties shared profits because they set aside one-third of revenue for the business's expenses before splitting the remaining revenue between themselves. The Texas Supreme Court stated that there was no profit sharing because "[t]here is no evidence that the allocation for expenses was sufficient to satisfy all the [business's] expenses, leaving only profits to be split." *Id.*

Derrick's and PLS's allocation for expenses did not constitute profit sharing. Each party's receipts were tied to the amount of revenue PLS brought in, rather than to the business's profits. PLS did not deduct all the expenses of the business venture from revenue before sending Derrick its share; it only made deductions to set off occasional expenses that it had paid on Derrick's behalf. Wise testified that Derrick and PLS did not regularly share information about their respective expenses with each other and had exchanged such information only three or four times from 2009 to 2014. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, p. 103; Docket Entry No. 109, Bench Trial Tr., Vol. 2, p. 191). Instead, each party incurred its own expenses and kept its own books. The record evidence does not show that the parties ever calculated the profits of the business, much less shared them. The court has found, and now concludes, that PLS and Derrick did not share profits.

### 2.    The Intent to Create a Partnership

Derrick and PLS referred to each other as partners in the MOU, in their communications with each other, and in representations to third parties. (PLS Exs. 11, 22, 32, 39, 85, 86; Derrick Exs. 19, 20, 22, 26, 35, 36, 38; Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 240–41; Docket Entry No. 110, Bench Trial Tr., Vol. 3, pp. 65–66). "[B]ecause the term 'partner' is regularly used in common vernacular and may be used in a variety of ways," "[c]ourts have consistently held that 'merely referring to another person as partner in a situation where the recipient of the message would not

expect the declarant to make a statement of legal significance is not enough." *Westside Wrecker Servs., Inc. v. Skafi*, 361 S.W.3d 153, 170 (Tex. App. — Houston [1st Dist.] 2011, pet. denied) (quoting *Ingram*, 288 S.W.3d at 900). To determine if a statement expressed the intent to become partners, courts look to the words used, the context in which they were spoken, and the identity of the speaker. *See id.*

PLS and Derrick expressed their intent to be "joint venture partners" in the MOU, a document which they intended to have legal significance. Based on this context, the specific choice of words, and the business expertise of the PLS and Derrick representatives who signed the MOU, the court has found that there is some evidence of this factor.

Statements that the parties are partners are less indicative of intent to form a partnership when the parties have declined to take concrete actions. In *Ingram*, 288 S.W.3d at 901, the court found no expression of intent despite the fact that the parties called each other partners. The court emphasized that the business did not change its name, the party claiming the existence of a partnership did not sign legal documents on behalf of the business, neither party filed taxes as a partner, and the parties maintained separate insurance. *Id.* In *Westside Wrecker*, 361 S.W.3d at 170, there was no legally significant expression of intent to be partners because none of the four businesses changed their names to reference each other or registered an assumed name. They did not open a bank account for the partnership or give each other signatory authority on their individual bank accounts. *Id.* They also did not obtain partnership insurance or file partnership tax returns. *Id.* Derrick and PLS took the concrete actions needed to jointly brand and market the Derrick/PLS Database, but no more. There is limited evidence of this factor.

PLS contends that Derrick is estopped from arguing that it did not enter into a partnership

because Derrick represented to PLS that the parties were partners, and PLS relied on such representations to its detriment. Under Texas law, the intent of the parties and the words they use to describe their relationship do not determine whether a partnership exists. *See* Tex. Bus. Orgs. Code § 152.051 (stating that a partnership may exist "regardless of whether . . . the association is called a 'partnership,' 'joint venture,' or other name"); *Ingram*, 288 S.W.3d at 299; *Advanced Nano Coating, Inc. v. Hanafin*, 478 F. App'x 838, 844 (5th Cir. 2012). PLS and its representatives were experienced in business and presumed to know Texas law. Their reliance on a representation that the parties were partners was not reasonable given PLS's participation in negotiating and signing the MOU. The court concludes that Derrick's representations that the parties were partners does not establish a partnership or estop Derrick from arguing that no partnership was formed.

### 3. No Right to Participate in the Control of a Shared Business

The right to participate in control of a business means "the right to make executive decisions." *Ingram*, 288 S.W.3d at 901. Factors relevant to the right to control a business include: the right to write checks on behalf of the business; control over and access to the business's books; and the receipt and management of the business's assets and money. *See id.* at 901–02 (citing *Brown v. Cole*, 291 S.W.2d 704, 710 (Tex. 1956)); *Guerrero v. Salinas*, No. 13-05-323-CV, 2006 WL 2294578, at *11 (Tex. App. — Corpus Christi Aug. 10, 2006, no pet.); *Tierra Sol Joint Venture v. City of El Paso*, 155 S.W.3d 503, 508 (Tex. App. — El Paso 2004, pet. denied); *Rojas v. Duarte*, 393 S.W.3d 837, 843 (Tex. App. — El Paso 2012, pet. denied).

The Derrick/PLS business relationship did not form an entity that maintained its own assets, accounts, or books. Although PLS collected and distributed revenues, it did not manage assets belonging to the business venture and had to account to Derrick for the receipt, division, and

distribution of revenue, as well as for any deductions that it made to Derrick's revenue share. Each party exercised control only in its assigned sphere. *Cf. Westside Wrecker*, 361 S.W.3d at 171 (finding no right to participate in control because the parties kept their assets and activities separate). Derrick controlled the development and maintenance of the jointly branded Database, and PLS controlled marketing. The evidence at trial showed that PLS made suggestions to Derrick about the content and presentation of the Database, but Derrick made the final decisions on whether to accept PLS's suggestions. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, pp. 123–30; Docket Entry No. 109, Bench Trial Tr., Vol. 2, p. 152). PLS had executive discretion to decide which companies to contact for subscriptions, what publicity materials to use, and how to price subscriptions. (Derrick Ex. 66; Docket Entry No. 110, Bench Trial Tr., Vol. 3, pp. 68–69). Each party was able to give input and suggestions about the other's business, but "input" is not control. *See Sewing v. Bowman*, 371 S.W.3d 321, 334–35 (Tex. App. — Houston [1st Dist.] 2012, pet. dismissed); *Knowles v. Wright*, 288 S.W.3d 136, 147 (Tex. App. — Houston [1st Dist] 2009, pet. denied).

In *Westside Wrecker*, 361 S.W.3d at 171, the court found that none of the parties had a right to participate in control of the business because there were no shared responsibilities. Each of the parties "ran its own business," operating as four different companies rather than one unified partnership. *Id.* "[N]one of the four parties had any ability to act on behalf of or bind the others." *Id.* The companies shared some employees and sometimes performed tasks for each others' benefit, but they did not have "any right to make executive decisions that extended beyond the operation of their own individual compan[ies]." *Id.* Because they worked as "separate business entities seeking to share in a particular, mutually-beneficial business opportunity but did not work together to exercise shared control over a single, united partnership entity or over each others' individual

business entities," the court found that there was no right to participate in control. *Id.* at 172.

PLS and Derrick each ran its own business. They made few shared decisions, even under the MOU. Each made independent decisions on hiring employees, allocating expenses, and fulfilling its obligations under the MOU. The evidence showed that neither party was authorized to make decisions binding the other. Deodhar and Wise testified that when PLS made decisions changing the revenue share Derrick was to receive, Deodhar objected. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, pp. 214, 218; Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 265–70; *see also* Derrick Exs. 119, 120). The court has found, and now concludes, that neither Derrick nor PLS exercised shared control over a united business entity. This factor is not present.

### 4.     The Parties Did Not Share Losses

PLS and Derrick did not agree to share business losses or liability to third parties. The MOU stated that "[c]osts will be borne 100% by respective parties as they fulfill the respective activities." (Docket Entry No. 1, Ex. 1). PLS argues that the parties shared losses by assigning PLS responsibility for all of the marketing expenses and Derrick responsibility for expenses related to the development and maintenance of the Database. An agreement to share the costs or expenses of a business is not an agreement to share losses. *See Ingram*, 288 S.W.3d at 902; *Brown v. Keel*, No. 01:10-936-CV, 2012 WL 760933, at *7 (Tex. App. — Houston [1st Dist] Mar. 8, 2012, no pet.); *Malone v. Patel*, 397 S.W.3d 658, 675 (Tex. App. — Houston [1st Dist.] 2012, pet. denied); *Hoss v. Alardin*, 338 S.W.3d 635, 642 (Tex. App. — Dallas 2011, no pet.).

Wise testified that only PLS was liable under the subscription contracts PLS signed with third parties. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 280–82). Wise also testified that PLS and Derrick shared the cost of an origination fee for Lidsky, and that PLS paid for costs that it

believed should have been paid by Derrick — including Harris's consulting fee and hotel stays for Derrick employees in Houston — without receiving reimbursement. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 86, 237–40).

The court has found, and now concludes, that although PLS shared some costs with Derrick and advanced certain expenses on Derrick's behalf, the parties did not agree to share net losses of the business venture or liability for third-party claims against the business. The court has found, and now concludes, that this factor is not present.

### 5. Contribution of Money or Property

Finally, courts ask whether the parties contributed or agreed to contribute money or property to the business as a partner. *See* Tex. Rev. Civ. Stat. art. 6132b-2.03(a)(5). PLS argues this factor is present because Derrick contributed its E&P Transactions Database and PLS contributed a license to its brand, its Legacy Database, and its marketing expertise, as well as unreimbursed costs and expenses not related to marketing. As a preliminary matter, "[e]mployees may contribute to business endeavors by lending their time and reputation, but that is not a contribution to the venture indicative of a partnership interest." *Ingram*, 288 S.W.3d at 903. "[S]haring in expenses does not necessarily constitute contributing money or property to a partnership." *Westside Wrecker*, 361 S.W.3d at 172.

The parties' intent is the most important factor in determining whether property is contributed to, and owned by, a partnership. *See Biggs v. First Nat. Bank of Lubbock*, 808 S.W.2d 232, 237 (Tex. App. — El Paso 1991, writ denied). When the property at issue is intellectual property, the parties must express that intent in writing. 17 U.S.C. § 204(b). Property owned by one member of a business relationship before the business was created is presumed to remain the property of that individual member. *See* Tex. Bus. Orgs. Code § 152.102(c); *Chapman Custom Homes, Inc. v.*

*Dallas Plumbing Co.*, 446 S.W.3d 29, 34 (Tex. App. — Dallas Aug. 20, 2013), overturned on other grounds, 445 S.W.3d 716 (Tex. 2014) ("The mere fact property is used for partnership purposes is not evidence it is partnership property. . . . To the contrary, such property is presumed to be the property of the partner that purchased the property with its own funds."). Derrick owned the Database before the MOU and is presumed to remain the owner. A person possessing property is also presumed to own it under Texas law. *See In re Rollings*, 451 Fed. App'x 340 (5th Cir. 2011). Derrick was the only party with control over the jointly branded Derrick/PLS Database's content, software, and platform, and Derrick alone had the ability to modify the Database. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, p. 84; Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 198, 214, 246).

PLS argues that in the MOU, Derrick conveyed the Database title and ownership to the parties' business venture. The MOU did not explicitly address ownership. It stated that Derrick will "provide" its "existing M&A database platforms, software and content including ongoing data from its sources," and that PLS will "provide" "[a] full license to PLS' brand and corporate name for use in marketing E&P database products," "[e]xisting M&A data and ongoing data from its sources," and "[m]arketing." (Docket Entry No. 1, Ex. 1).

Derrick's obligation to provide its existing Database was described in an MOU clause setting out each party's obligation to furnish various services for the business. The word "provide" was also used to refer to marketing services, client invoicing, ongoing operations, and client services and training, with no suggestion that the parties intended to convey an ownership interest. This context suggests that "provide" means "furnish" rather than "convey ownership of."

The MOU language is consistent with Deodhar's credible testimony that the parties did not

intend in the MOU to transfer any ownership interest in the Database. The MOU language is also consistent with the parties' conduct under the MOU. After signing the MOU, the parties did not take actions indicating that ownership of the Database had changed. Derrick retained possession and control of the Database and continued to market it outside North America without PLS's involvement or permission. (Docket Entry No. 109, Bench Trial Tr., Vol. 2, pp. 264–65). These circumstances, combined with the brief and vague language in the MOU, do not overcome the presumptions that Derrick has remained the sole owner of the Database. Similarly, although PLS gave Derrick access to the PLS Legacy Database in 2009 and four records from the Legacy Database were added to Derrick's Database, PLS retained possession and control of its Legacy Database and is presumed to have remained its owner.

The court has found, and now concludes, that both parties contributed primarily time and expenses to the business venture. Both parties contributed some property — PLS's license to its brand and Derrick's agreement to allow access to and use of its Database for the jointly branded and marketed Derrick/PLS Database — but did not make more expansive contributions. The court has found, and now concludes, that Derrick did not convey ownership of the Database to the business venture. This factor is present to a limited extent.

### 6. Summary

Of the five factors indicating a partnership under Texas law, two are present — the intent to form a partnership and the parties' contribution of property — and both are present only to a limited extent. Although no one factor is controlling, "[e]ven conclusive evidence of only one factor normally will be insufficient to establish the existence of a partnership." *Ingram*, 288 S.W.3d at 898. The limited extent to which the two factors are present, and the absence of the other factors, result

in the court's finding and conclusion that Derrick and PLS did not enter into a partnership.

### B.    Conveyance of the Database to PLS

PLS alternatively argues that even if there is no partnership, Derrick and PLS are tenants-in-common in the jointly branded Derrick/PLS Database. The plain language of the MOU does not address copyright ownership in a way that satisfies the requirements of 17 U.S.C. § 204(a). Deodhar's credible testimony and the parties' conduct after signing the MOU also support finding that Derrick did not convey any ownership interest in its Database to PLS. The court has found, and now concludes, that the MOU did not contain a transfer of any ownership or copyright interest from Derrick to PLS and that Derrick retained exclusive ownership of the Derrick Database, expanded and marketed as the jointly branded Derrick/PLS Database.

### C.    The Term of the MOU

The MOU provided a five-year term. (Docket Entry No. 1, Ex. 1). This term ended on October 3, 2014. The MOU also provided that "a separate LLC for the purpose of the JV [would] be created once product revenues reach a minimum of $2 million annually." (Id.). This threshold was passed in September 2013. (Docket Entry No. 108, Bench Trial Tr., Vol. 1, pp. 267–68). Derrick and PLS exchanged proposals but did not create an LLC. PLS argues that its relationship with Derrick has not ended because the parties were required to form an LLC and continue working together.

The MOU provided no details about the LLC to be formed. Essential terms were missing, including how it would be organized and administered; how the finances would be arranged and handled; how long it would last; or what law would control. There was no binding, enforceable agreement to form an LLC. *See T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221

(Tex. 1992) ("Where an essential term is open for future negotiation, there is no binding contract.").
The MOU also expressed the parties' desire for a "long-term relationship" and provided that a "Joint
Venture Agreement" would be negotiated by October 31, 2009. (Docket Entry No. 1, Ex. 1). This
language does not contain essential terms and does not bind the parties to extend their relationship.
The court has found, and now concludes, that the parties' legal relationship ended when the MOU
expired on October 3, 2014.

### D.      The Application and Effect of the Exit Mechanism

In briefs and proposed findings and conclusions submitted in connection with the bench trial,
both parties argued that the other had prematurely exited the MOU and triggered the penalty
provisions of the Exit Mechanism. (Docket Entry Nos. 90, 96, 105, 107). This case has been
bifurcated under the parties' September 2014 agreement to try the limited issues of ownership of the
Database and the expiration of the MOU at the bench trial and to try other issues, including claims
of breach, at a later trial. (*See* Docket Entry No. 46, Joint Discovery and Case Management Plan).

To the extent the parties have already submitted some evidence on whether the Exit
Mechanism was triggered by the other party's breach or statements indicating an intent to leave the
business relationship, the court has found, and now concludes, that the evidence does not show that
the Exit Mechanism has been triggered. The parties may, however, reurge these arguments if
additional evidence supports them during the second phase of the litigation.

## III.  Conclusion

For the reasons stated above, the court finds and concludes that:

1.      Derrick and PLS did not form a partnership.

2.      Derrick did not contribute all or part of ownership in or title to its Derrick Database

as it existed before 2009 or after it was marketed as the Derrick/PLS Database, to the parties' business venture or to PLS.

3.      The parties' MOU and business relationship ended on October 3, 2014.

4.      Derrick is the sole owner of the Derrick Database and what was marketed from 2009 to 2014 as the jointly branded Derrick/PLS Database.

5.      The present record does not show that the Exit Mechanism of the MOU has been triggered as to either party.

A status conference is scheduled for **January 23, 2015**, at 8:30 a.m. in Courtroom 11-B.

SIGNED on December 31, 2014, at Houston, Texas.

Lee H. Rosenthal
United States District Judge