**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DERRICK PETROLEUM SERVICES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-14-1520 |
| | § | |
| PLS, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

This case involves two companies, Derrick Petroleum Services and PLS, Incorporated. Both collect and distribute information about oil and gas mergers and acquisitions. Derrick and PLS had a brief business marriage selling an oil and gas merger and acquisition database that Derrick had originated and owned (referred to as the "Database").

Although the business was a financial success, the marriage was not successful. Derrick and PLS are going through a divorce—or, more precisely, an annulment—and are litigating over ownership of, and custody over, the Database. This court ruled previously that while Derrick and PLS entered into a Memorandum of Understanding to market the Database from 2009 to 2014 as a jointly branded Derrick/PLS Database, they did not form a partnership or joint venture under Texas law and did not jointly own the Database. The lawsuit is in its second phase. Each party alleges that the other prematurely exited or breached their Memorandum of Understanding. Each party raises a number of additional claims against the other. Both parties anticipate proceeding to a jury trial on at least some of their breach-of-contract claims. The parties have filed cross-motions for summary judgment on some of those claims and on some additional claims. The court has carefully considered the cross-motions. Based on the pleadings; the motions, responses, and replies;

1

the summary judgment record; and the applicable law, the court grants in part and denies in part the cross-motions for summary judgment.

The specific rulings are as follows:

- The court grants PLS's summary judgment motion dismissing the following Derrick claims:

    1. PLS breached the parties' Memorandum of Understanding by failing to act in good faith when it claimed ownership of the Database;

    2. PLS breached the MOU by marketing the Database internationally;

    3. PLS owes Derrick at least $2.5 million in Database revenue from sales occurring after the MOU's expiration; and

    4. PLS triggered the MOU's "Exit Mechanism" when it: (1) marketed the Database internationally, and (2) made a frivolous claim of Database ownership.

- The court denies PLS's summary judgment motion on the following Derrick claims, which will proceed to trial:

    1. PLS breached the MOU by failing to act in good faith by downloading the Database content;

    2. PLS breached the MOU by failing to market the Database as a co-branded product;

    3. PLS breached the MOU by offering docFinder as a standalone product;

    4. PLS breached the MOU by offering the OpFinder product;

    5. PLS breached the MOU by failing to pay Derrick a 50 percent share of the revenues from Database subscriptions during the duration of the MOU;

    6. PLS violated the Computer Fraud and Abuse Act by downloading the Database content;

    7. PLS violated the Lanham Act by its false and misleading statements in marketing materials for the Database; and

    8. PLS triggered the MOU's Exit Mechanism by its: (1) theft of Database content to build a "copycat" Database; (2) failure to co-brand the Database; (3) failure to act in good faith; (4) failure to pay Derrick a 50 percent share of revenues; (5) offering docFinder as a standalone product; and (6) offering the OpFinder product.

- The court grants Derrick's summary judgment motion dismissing the following PLS claims:

  1. Derrick committed fraud by misrepresenting the nature of the parties' business venture;

  2. PLS is entitled to recover $44,795.49 for the taxes it failed to withhold from Derrick's 50 percent share of the revenues;

  3. Derrick tortiously interfered with PLS's contracts with existing subscription customers; and

  4. PLS is entitled to 50 percent of the revenues on the Database subscription renewals "for as long as those customers remain clients of the jointly developed M&A Database." (Docket Entry No. 321 at 29).

- The court denies Derrick's summary judgment motion on the following PLS claims, which will proceed to trial:

  1. Derrick triggered the MOU's Exit Mechanism by forming 1Derrick;

  2. Derrick breached the MOU by 1Derrick's marketing of Intel Bytes;

  3. Derrick breached the MOU by giving 1Derrick the marketing materials PLS created for the business venture between Derrick and PLS;

  4. Derrick misappropriated PLS's trade secrets under Texas common law and the Texas Uniform Trade Secrets Act; and

  5. Derrick breached the MOU's non-litigation clause by filing this lawsuit.

In sum, the parties will proceed to a jury trial on some of their claims that each side breached the MOU or exited it prematurely. Derrick's related claims under the Lanham Act and Computer Fraud and Abuse Act, and PLS's claim for misappropriation of trade secrets, will also proceed. All other claims are dismissed with prejudice. A pretrial hearing is set for **August 30, 2017 at 9:30 a.m.** to schedule the trial and address other pretrial matters. Counsel and each party must appear at the hearing in person. The joint pretrial order must be filed by **August 25, 2017**.

## I.    Background

The procedural and factual background are set out in detail in this court's December 2014 Memorandum and Opinion Setting Out Findings of Facts and Conclusions of Law, issued after a four-day bench trial. *Derrick Petroleum Servs. v. PLS, Inc.*, 2014 WL 7447229, at *4–19 (S.D. Tex. 2014). A brief recap suffices here.

On October 3, 2009, PLS and Derrick entered into a Memorandum of Understanding to develop an oil and gas mergers and acquisitions database for the United States marketplace. Derrick, an Indian partnership, had created the Oil & Gas Mergers & Acquisitions Database in 2006. When the parties entered the MOU, the Database contained 5,893 records of oil and gas transactions, with data and analyses compiled from thousands of sources. The Database focused on European mergers and acquisitions, and Derrick had limited success in marketing it to North America. *Id.* at *4.

PLS, a Texas corporation, provides various information services for the oil and gas industry, including a multiple-listing service for properties for sale, marketing and advisory services, and approximately 19 industry publications. PLS had its own database that consisted of 6,796 transactions, primarily from North America, dating back to 1979.

In May 2009, Ronyld Wise, PLS's founder and principal, contacted Yashodeep Deodhar, Derrick's founder and principal, suggesting a business relationship between PLS and Derrick. The parties negotiated the MOU and signed it in October 2009.

In the MOU, the parties "agree[d] to work together in good faith as joint venture partners to develop and market E&P database products for the North American market." (Docket Entry No. 1, Ex. 1 at 1). Derrick agreed to provide "existing products and ongoing operational support." PLS

agreed to provide "market penetration, product enhancement, and ongoing client relationships." Derrick agreed to maintain and update the Database, and PLS agreed to handle marketing. (*Id.*). The MOU stated "that further business relationships beyond database products and beyond the North American market are also a goal of the relationship." (*Id.*). The MOU was not intended to be the permanent governing document for the relationship between PLS and Derrick. The MOU had a five-year term. A more permanent arrangement, if it could be reached, was to be set out in a written joint venture agreement, with a target deadline of October 31, 2009 to sign that agreement. If the revenue from the Database exceeded $2 million annually before the five-year MOU term expired and a joint venture agreement could be reached, Derrick and PLS agreed to create a separate LLC for the joint venture. (*Id.* at 3).

When the revenue from marketing the Derrick/PLS Database under the MOU hit the $2 million target in 2013, the relationship between the parties started to deteriorate. Each party claims that the other breached the MOU. Alternatively, both argue that the other triggered the MOU's Exit Mechanism, which imposes severe penalties on the exiting party. Rancor escalated. This litigation resulted.

Derrick filed this suit against PLS in June 2014. (Docket Entry No. 1). The parties agreed to bifurcate their disputes into two phases. In the first phase, the parties briefed and argued two issues: "(1) who owns the [D]atabase; and (2) whether the MOU terminated when its five-year term expired, or whether the MOU's provision stating that a separate LLC would be created after the venture reached the $2 million annual revenue target extended the term." *Derrick*, 2014 WL 7447229, at *1. In December 2014, the court issued a lengthy ruling, finding and concluding that:

1. Derrick and PLS did not form a partnership;

5

2. Derrick did not contribute all or part of ownership in or title to its Derrick Database, either as it existed before 2009 or after it was marketed as the Derrick/PLS Database, to the parties' business venture or to PLS;

3. the parties' relationship ended on October 3, 2014;

4. Derrick is the sole owner of the Derrick Database and what was marketed from 2009 to 2014 as the jointly branded Derrick/PLS Database; and

5. the record did not show that the MOU's Exit Mechanism was triggered as to either party.

*Id.* at *2.

PLS appealed the court's decision. In September 2016, the Fifth Circuit affirmed. (Docket Entry Nos. 281–82). Derrick filed a second amended complaint, PLS filed a third amended counterclaim, and the parties completed discovery on the remaining issues. (Docket Entry Nos. 278–79).

After both sides filed cross-motions for summary judgment, each party—commendably—scrutinized its own claims and decided to abandon several. In its third amended complaint, Derrick withdrew its claims for defamation, business disparagement, tortious interference, and civil conspiracy. Derrick maintained its claims for breach of contract, revenue recovery, and violations of the federal Lanham Act and the Computer Fraud and Abuse Act. (Docket Entry No. 332). Derrick seeks damages, attorneys' fees, and a permanent injunction. The injunction would prohibit PLS from using the Database or a mirror copy of it without Derrick's permission, and prohibiting PLS from marketing products similar to the Derrick/PLS Database for two years to the clients who subscribed to the Database. Derrick also asked the court to require PLS to disclose documents relating to its customer contacts and marketing activities. (*Id.*).

In its fifth amended counterclaim, PLS withdrew some of its claims for breach of contract,

indemnity for future tax liabilities, and indemnity for reimbursements to customers. PLS maintained its claims for fraud, breach of contract, indemnity for back taxes, breach of trade secrets, and tortious interference. (Docket Entry No. 321). PLS seeks damages, attorneys' fees, and a copy of the Database from Derrick. (*Id*.).

Each party has filed cross-motions for summary judgment, responses, and replies. (Docket Entry Nos. 307, 318, 328; 314, 325, 333). Each party argues that factual disputes material to deciding its own claims requires trying those claims, and each argues that the other's claims fail as a matter of law. Each claim addressed in the cross-motions is analyzed below.

## II. The Legal Standards

### A. Summary Judgment

"Summary judgment is required when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015) (quoting FED. R. CIV. P. 56(a)). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013)); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, the movant may merely point to

the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* (quotation marks omitted); *see also Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

"Once the moving party [meets its initial burden], the non-moving party must 'go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine [factual] issue for trial.'" *Nola Spice*, 783 F.3d at 536 (quoting *LHC Grp.*, 773 F.3d at 694). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008); *see also Nola Spice*, 783 F.3d at 536.

## B.     Contract Interpretation

In interpreting a contract, the court's primary concern "is to ascertain the true intentions of the parties as expressed in the instrument." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).  To achieve this objective, the court considers the contract as a whole. *See id.* ("[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.").    A contract is not ambiguous "simply because the parties advance conflicting interpretations of the contract; for an ambiguity to exist, both interpretations must be reasonable." *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 728 (Tex. 2001).  "When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue" for the jury. *Mitchell v. Mitchell*, 445 S.W.3d 790, 798–99 (Tex. App.—Hous. [1st. Dist.] 2014, no pet.) (quoting *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983)).

A court will find a contract unambiguous only if it may properly be given a certain legal meaning or interpretation.  *J.M. Davidson*, 128 S.W.3d at 229.   "If the written instrument is [unambiguous], . . . the court will construe the contract as a matter of law." *Coker*, 650 S.W.2d at 393.  "Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity." *See Texas v. Am. Tobacco Co.*, 463 F.3d 399, 407 (5th Cir. 2006).

## C.     The Computer Fraud and Abuse Act

A defendant violates the Computer and Fraud Abuse Act if the defendant (1) "intentionally accesses a computer" (2) "without authorization or exceeds authorized access," and (3) "thereby obtains . . . information from any protected computer" 18 U.S.C. § 1030(a).  "[T]he term 'exceeds

authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

### D. The Lanham Act

"A prima facie case of false advertising under [§ 1125(a)] requires the plaintiff to establish: (1) [a] false or misleading statement of fact about a product; (2) [s]uch statement either deceived, or had the capacity to deceive a substantial segment of potential consumers; (3) [t]he deception is material, in that it is likely to influence the consumer's purchasing decision; (4) [t]he product is in interstate commerce; and (5) [t]he plaintiff has been or is likely to be injured as a result of the statement at issue." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 495 (5th Cir. 2000); 15 U.S.C. § 1125(a). "The failure to prove the existence of any element of the prima facie case is fatal to the plaintiff's claim." *Pizza Hut*, 227 F.3d at 495.

"With respect to materiality, when the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers. In such a circumstance, the court will assume that the statements actually misled consumers." *Id.* at 497 (citations omitted). For a statement to be literally false, rather than misleading, the statement must be "false on its face." *Greater Hous. Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 699 (S.D. Tex. 2015) (quoting *Oreck Direct, LLC v. Dyson, Inc.*, 544 F. Supp. 2d. 502, 512 (E.D. La. 2008)). When determining whether a statement is literally false, the court's "initial inquiry requires a determination of what the statements at issue actually say." *Id.* at 700. "Only an unambiguous message can be literally false; if the language at issue is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." *Id.*

If the plaintiff can show only that the statement is misleading or ambiguous, the plaintiff must prove actual deception "through direct evidence of consumer reaction to the advertising or evidence of consumer surveys or consumer reaction tests." *IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002). "The plaintiff may not rely on the judge or the jury to determine, 'based solely on his or her intuitive reaction, whether the advertisement is deceptive.'" *Pizza Hut*, 227 F.3d at 497 (quoting *Johnson & Johnson v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992)).

### E.      Texas Common-Law Fraud

Under Texas law, a plaintiff alleging fraud is required to show "(1) that a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury." *Massey v. EMC Mortg. Corp.*, 546 F. App'x 477, 481 (5th Cir. 2013) (per curiam) (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam)).

### F.      Trade Secret Misappropriation

#### 1.      Texas Common Law

To state a claim for trade secret misappropriation under Texas common law, a plaintiff must show: "(1) the trade secret existed; (2) the trade secret was acquired through breach of a confidential relationship or was discovered by improper means; (3) the defendant used the trade secret without authorization; and (4) [the plaintiff] suffered damages as a result." *Lamont v. Vaquillas Energy Lopeno Ltd., LLP*, 421 S.W.3d 198, 209 (Tex. App.—San Antonio, 2013, no pet.); *accord Tex.*

*Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366–67 (Tex. App.—Dallas 2009, pet. denied); *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.—Austin 2004, pet. denied). Texas common law defines a trade secret as a "formula, pattern, device or compilation of information used in a business, which gives the owner an opportunity to obtain an advantage over his competitors who do not know or use it." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (quoting *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir. 1991)).

"[T]o determine whether there is a trade secret protected from disclosure or use, a court must examine six relevant but nonexclusive criteria: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 150 (5th Cir. 2004) (citing *In re Bass*, 113 S.W.3d 735, 739–40 (Tex. 2003)). All six factors need not be satisfied "because trade secrets do not fit neatly into each factor every time." *Id.* (quoting *Bass*, 113 S.W.3d at 740).

### 2.       The Texas Uniform Trade Secret Act

In 2013, the TUTSA displaced the Texas common-law trade-secret doctrine. Tex. Civ. Prac. & Rem. Code Ann. § 134A.007(a). The Act applies "to the misappropriation of a trade secret made on or after [September 1, 2013]." *In re Mandel*, 578 F. App'x 376, 383 n.8 (5th Cir. 2014) (per curiam) (quoting Uniform Trade Secret Act, 83rd Leg., R.S., ch. 10, § 3, 2013 Tex. Gen. Laws 12,

14.).  The TUTSA defines a trade secret as

> information, including a formula, pattern, compilation, program, device, method, technique, process, financial data, or list of actual or potential customers or suppliers, that: (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6).

### G.    Tortious Interference

To establish a claim for tortious interference with an existing contract under Texas law, the complaining party must show "(1) the existence of a contract subject to interference, (2) willful and intentional interference (3) that proximately causes damage, and (4) actual damage or loss." *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 531 (Tex. App.—Fort Worth 2009, pet. denied).

## III.    Derrick's Claims Against PLS

### A.    Breach of Contract

#### 1.    The Claim that PLS Breached the Duty of Good Faith

Derrick alleges that PLS breached the MOU by failing to act in good faith.  While the Texas Supreme Court has "declined to impose an implied covenant of good faith and fair dealing in every contract," the contracting parties can agree to act in good faith.  *Arnold v. Nat'l Cty. Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987) ("[A] duty of good faith and fair dealing may arise as a result of a special relationship between the parties governed or created by a contract.").  The MOU stated that the parties "agree to work together in *good faith* as joint venture partners to develop and market E&P database products for the North American market."  (Docket Entry No. 1, Ex. 1 at 1) (emphasis added).

Derrick alleges that PLS failed to act in good faith when it downloaded content from the

Database to build a "copycat" Database. (Docket Entry No. 332 at 14, 23). PLS does not deny that it downloaded the content from the Database to make a copy, but PLS argues that the MOU did not prohibit it from doing so. The parties agree that PLS did not sell or distribute the copy of the Database from the downloaded content. The parties also agree that PLS destroyed its copy of the downloaded content sometime in early 2015. (Docket Entry No. 314, Ex. 19).

Derrick's technical expert, Nancy Miracle, testified that to download the Database content, "PLS did not use the ordinary access methods." Instead, PLS used a "QuNect" product to "spoof" a login to the Database to download the content. (Docket Entry No. 325, Ex. 15 at 20). Because the downloaded data was not further copied, transferred, or sold—indeed, PLS destroyed it shortly after downloading it—any damage to Derrick from the downloading may be nominal. But whether PLS's downloading of the Database content rose to the level of bad faith is factually disputed and turns on determinations of witness credibility. PLS's summary judgment motion on this ground is denied.

Derrick also alleges that PLS failed to act in good faith by making a frivolous claim that it owned the Database. "A claim is frivolous if it has no basis in law or fact." *Yazdchi v. Jones*, 499 S.W.3d 564, 568 (Tex. App.—Hous. [1st Dist.] 2016, pet. denied). The MOU was silent on the issue of Database ownership. Both parties made reasonable arguments and produced or identified corroborating record evidence on ownership at the Phase I trial. Those arguments and the record required this court's careful and considered analysis to resolve the ownership issue. PLS's claim of ownership, while ultimately unsuccessful at trial, was not frivolous. PLS's summary judgment motion on this ground is granted. Derrick's claim that PLS acted in bad faith in making a frivolous claim that it had an ownership interest in the Database is dismissed.

### 2. Co-Branding

Derrick alleges that PLS breached the MOU by failing to market the Database as a co-branded product. Two MOU provisions are at issue. First, the parties agreed to "[p]rovide E&P Database Services via a co-branded website." Second, the parties agreed to "issue all Press Releases, Market Updates and Research Announcements related to the . . . Database[] under a joint Derrick and PLS brand." (Docket Entry No. 1, Ex. 1 at 2). In its summary judgment evidence, Derrick produced dozens of PLS-created brochures, advertising the Database without the Derrick/PLS co-branding. (Docket Entry No. 326, Ex. 22). PLS responded that "press releases," "market updates," and "research announcements" are unambiguous terms and that the brochures in evidence were neither press releases, market updates, nor research announcements. (Docket Entry No. 314 at 5).

Some of the brochures include statements conveying what could be described as press releases, market updates, or research announcements related to the Database itself. For example, some of the brochures state that "[t]his [Database] has been on the international market for three years and went live in the U.S. in January 2010," and "[a]s a direct result of feedback received to date, PLS recently launched version 4 of the database in August 2010, which has a multitude of improvements over version 3. PLS expects to launch version 5 in early 2011." (Docket Entry No. 326, Ex. 22 at 30). All of the brochures contain PLS's brand—a black box with "PLS" in serif white typeface. No brochure contains or refers to Derrick's brand. Only a few brochures note in faint small type at the bottom of the page that PLS is offering the Database "[i]n conjunction with Derrick Petroleum Services." (*See, e.g., id.* at 20). Whether the brochures are press releases, market updates, or research announcements within the meaning of the MOU is disputed. The parties also

dispute whether PLS's faint and inconspicuous reference to Derrick, in contrast to the starkly colored and prominent PLS brand, counts as "co-branding." PLS's motion for summary judgment on this ground is denied. Derrick's claim for failure to co-brand as the MOU requires may proceed.

### 3.      Similar Products

The MOU's similar-products provision states: "The parties agree to work together exclusively on these efforts during the term of this JV [joint venture] and will not circumvent the other party for similar product offerings, unless agreed to in writing." (Docket Entry No. 1, Ex. 1 at 3). Derrick's claims that PLS breached the MOU by offering products similar to the Database are analyzed below.

### a.      docFinder

Derrick alleges that PLS breached the MOU by offering docFinder as a standalone product. Derrick asserts that the Database's docSearch function is similar to PLS's docFinder product. PLS supports its summary judgment motion by arguing that docFinder preceded the MOU and is not covered by the MOU.

Both parties have previously taken the position that docSearch and docFinder are similar products subject to the MOU. But the MOU does not address whether the similar-products provision applies to products that the parties offered before the MOU. (Docket Entry No. 1, Ex. 1 at 3). The similar-products provision is ambiguous because it is "reasonably susceptible to more than one meaning." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). Derrick's interpretation that the similar-products provision applies to products that existed before the MOU, and PLS's interpretation that it does not apply to prior products, are both reasonable. The interpretation of the provision is a factual dispute, making summary judgment improper. *Mitchell*,

445 S.W.3d at 798–99.  PLS's summary judgment motion on this claim is denied.

### b.      OpFinder

Derrick alleges that PLS breached the MOU by offering OpFinder as a product allegedly similar to the Database's "Deals in Play" module.  PLS argues that OpFinder is not a product similar to any Database function and is therefore not covered by this MOU provision.  PLS argues that OpFinder is a listing service, and not similar to a mergers-and-acquisitions database.  PLS produced an email from Deodhar at Derrick to Wise at PLS acknowledging that OpFinder "technically falls outside the scope of the JV."  (Docket Entry No. 314, Ex. 25 at 7).

Derrick, on the other hand, points to an email from Wise to Deodhar acknowledging that OpFinder competes with "Deals in Play."  (Docket Entry No. 314, Ex. 24 at 1).  Derrick also produced an expert report that concluded that OpFinder is similar to "Deals in Play." (Docket Entry No. 325, Ex. 37 at 3).

Derrick has "designate[d] specific facts showing that there is a genuine [factual] issue for trial," *Nola Spice*, 783 F.3d at 536, by identifying specific evidence in the record supporting its claim that PLS breached the MOU's similar-products provision.  *Baranowski*, 486 F.3d at 119.  PLS's summary judgment motion on this claim is denied.

### 4.      International Marketing

Derrick alleges that PLS breached the MOU by marketing the Database internationally.  In its summary judgment motion, PLS argues that the MOU did not prohibit it from marketing internationally.  The MOU states that the parties "agree to work together in good faith as joint venture partners to develop and market E&P database products *for the North American market*.  The parties understand that further business relationships beyond database products and *beyond the*

17

*North American market* are also a goal of the relationship." (Docket Entry No. 1, Ex. 1 at 1) (emphases added).

This court's Phase I ruling made it clear that the MOU applied only to North American sales. The court found that "[t]he MOU describes the parties' intent to develop a relationship as 'joint venture partners' to market the Derrick Database as a jointly branded Derrick/PLS Database to North American clients." *Derrick Petroleum Servs.*, 2014 WL 7447229, at *6. Under the MOU, "PLS's role was to market [the Database] in North America as the joint Derrick/PLS Database and collect and distribute subscription sales revenue on a 50/50 basis." *Id.* at *5. The court further noted that "[e]mails to potential and existing customers referred to Derrick and PLS as partners in providing the jointly branded Database to the North American market. . . . Derrick was copied on many of these emails. [Ali] Rizvi[,] [a PLS employee,] testified that Deodhar referred to PLS as Derrick's 'North American partner' in front of clients." *Id.* at *6.

The MOU clearly applies only to marketing the Database in North America. Because the contract language is not ambiguous, it is not necessary or appropriate to consider extrinsic evidence about the parties' intent. *See Am. Tobacco Co.*, 463 F.3d at 407 ("Courts interpreting unambiguous contracts are confined to the four corners of the document, and cannot look to extrinsic evidence to create an ambiguity."); *see also Coker*, 650 S.W.2d at 393 ("If the written instrument is [unambiguous], . . . the court will construe the contract as a matter of law.").

PLS did not breach the MOU by marketing internationally because the MOU did not cover international marketing. PLS's summary judgment motion on this claim is granted.

### 5. Failing to Pay Derrick Its Revenue Share

Derrick alleges that PLS breached the MOU by failing to pay Derrick its 50 percent share

of the revenues generated from the Database. The parties do not dispute that, under the MOU, the revenues from marketing the Database were to be split evenly between the parties. PLS argues that Derrick has no evidence to support this claim. This court's Phase I ruling, however, forecloses PLS's argument. The court stated that "[t]he evidence show[ed] that on some occasions, PLS deducted certain expenses from Derrick's share of the revenue before sending Derrick a check. On those occasions, Derrick protested on the basis that the MOU required each party to bear the costs each incurred in its 'respective activities'—Derrick in 'product development and operations, quality control,' and PLS in 'marketing.'" *Derrick Petroleum Servs.*, 2014 WL 744229, at *8. PLS did not adjust any of the payments in response to Derrick's protests. Derrick cashed the checks despite protesting the amounts. PLS's summary judgment motion on this claim is denied; there are factual disputes material to determining whether PLS's adjustments were in circumstances and amounts consistent with the MOU.

Derrick also alleges that PLS owes at least $2.5 million in Database revenues from subscription sales that took place after the MOU's October 3, 2014 expiration. After the bench trial and ruling on the Phase I issues, the parties entered into an Agreement Pending Appeal that outlined their obligations and responsibilities during PLS's appeal of the Phase I issues. That Agreement stated in relevant part:

> For those customers identified on Exhibit A with an Automatic Renewal Provision, PLS will invoice and service the renewal of that subscription at the time of its renewal and pursuant to the terms of the existing subscription agreement during the term of this Agreement. . . . Derrick and PLS will continue to share all revenues from that customer 50/50 until the termination or modification of this Agreement.

(Docket Entry No. 170 at 2).

PLS argues that under this provision, it was entitled to 50 percent of the revenues on the

automatically renewed subscription accounts.  The court agrees.

The Agreement Pending Appeal clearly states who gets what percent of the revenues while PLS's appeal was pending.  Each party would receive 50 percent of the revenues for customer accounts that automatically renewed during this period.  *See Wal–Mart Stores*, 52 S.W.3d at 728 (a contract is not ambiguous "simply because the parties advance conflicting interpretations of the contract; for an ambiguity to exist, both interpretations must be reasonable.").  As a matter of law, PLS is entitled to keep 50 percent of the revenues for the automatically renewed subscription accounts for the duration of the Agreement.  *Coker*, 650 S.W.2d at 393 ("If the written instrument is [unambiguous], . . . the court will construe the contract as a matter of law.").  PLS's summary judgment motion on this claim is granted.

### B.  The Computer and Fraud Abuse Act

Derrick alleges that PLS violated the Computer Fraud and Abuse Act by secretly downloading Database content.  A defendant violates the Computer and Fraud Abuse Act if the defendant (1) "intentionally accesses a computer" (2) "without authorization or exceeds authorized access" and (3) "thereby obtains . . . information from any protected computer." 18 U.S.C. § 1030(a).  "[T]he term 'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." *Id.* § 1030(e)(6).

Derrick's technical expert, Nancy Miracle, submitted a report stating that the M&A QuickBase database system allows users to download only a limited amount of information at one time.  The system automatically rejects attempts to download a large quantity of information.  Miracle, a software patent and intellectual property analyst, reported that to evade this limit, PLS

used a product called "QuNect" to "spoof" a login to the Database. PLS allegedly entered its Database credentials into QuNect, allowing QuNect to copy a mirror of the Database's tables onto a separate database on PLS's server. Miracle opined that this access to the Database to allow PLS to download and copy information that PLS could not otherwise obtain "is not a normal user function," but rather a function that "exceeds access authorized in the Derrick Terms of Use." (Docket Entry No. 325, Ex. 15 at 21). Miracle concluded, and PLS acknowledges, that it accessed the Database 37 times to download and copy content. PLS argues that those logins occurred over a six-month period, lasted mere seconds, and were for the purpose of servicing existing Database clients, not for copying content. (Docket Entry No. 326, Ex. 15 at 19–22).

On the current record, the evidence could support an inference that PLS exceeded its authorized access by using the QuNect software to obtain protected information from the Database. PLS's summary judgment motion on this claim is denied.

### C.    The Lanham Act

Derrick alleges that PLS violated the Lanham Act, 15 U.S.C. § 1125(a), by making false and misleading statements in Database marketing materials. Specifically, Derrick alleges that PLS's advertising and marketing brochures were false and misleading in that they omitted any mention of Derrick or included only a faint reference to Derrick.

"With respect to [the] materiality [requirement for a Lanham Act claim], when the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers. . . . In such a circumstance, the court will assume that the statements actually misled consumers." *Pizza Hut*, 227 F.3d at 497. But "if the statements at issue are either ambiguous or true but misleading, the plaintiff must present evidence of actual

21

deception." *Id.* For an statement to be literally false rather than misleading, the statement must be "false on its face." *Uber Techs.*, 155 F. Supp. 3d at 699. The court's "initial inquiry requires a determination of what the statements at issue actually say." *Id.* at 700. "Only an unambiguous message can be literally false; if the language at issue is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." *Id.*

PLS argues that no evidence shows that it made false statements in a commercial advertisement, and that Derrick has not identified evidence showing any damages resulting from allegedly false advertisements. In response to the first issue, Derrick points to PLS's advertising brochures that either do not mention Derrick at all or only faintly refer to Derrick at the bottom of the page. (Docket Entry No. 326, Ex. 22). Derrick's point is similar to its breach-of-contract claim for PLS's failure to adequately co-brand marketing materials. As noted in the discussion of that claim, the PLS brochures refer to the Database as a PLS product and feature PLS's logo. No brochure clearly identifies Derrick's ownership of or role in creating the Database. Some of the brochures do not mention Derrick at all. (Docket Entry No. 326, Ex. 22 at 20). The current record supports a factual dispute material to determining whether the PLS brochures are false, making summary judgment inappropriate.

In response to the damages issue, Derrick retained FTI Consulting to "assist the [jury] with opinions of the estimates of [Derrick's] financial damages." David B. Lerman, an FTI Consulting employee designated as an expert, produced a report stating that "[t]he financial damage associated with the lost cross-sales is for a total claim of $11,556,732." (Docket Entry No. 325, Ex. 30). There is sufficient evidence of damages to have this claim proceed. PLS's summary judgment motion on this claim is denied.

## D.     The Exit Mechanism

Derrick largely repeats the grounds asserted in its breach-of-contract allegations as the grounds for alleging that PLS triggered the MOU's Exit Mechanism.  Derrick alleges that PLS exited the MOU by its: (1) theft of Database content to build a "copycat" Database; (2) international marketing of the Database; (3) failure to co-brand the Database; (4) failure to act in good faith; (5) failure to pay Derrick its 50 percent share of revenues; (6) offering DocFinder as a standalone product; (7) offering the OpFinder product; and (8) making a frivolous claim of Database ownership.

The MOU's Exit Mechanism provision states:

> In the event of exit by Derrick for whatever reason, Derrick shall provide PLS, Inc. a full copy of the Database and associated software and other such required items deemed necessary for PLS, Inc. to continue to provide M&A or other Joint Venture products. In the event of exit by PLS for whatever reason, PLS shall forfeit revenues from existing and targeted clients of the service and provide Derrick Petroleum with all documentation regarding marketing activities. The Party that exists [sic] will not sell similar products to the same clients that were subscribers for the JV products for a minimum of two years.

(Docket Entry No. 1, Ex. 1 at 2).

The MOU does not define or describe what events trigger the Exit Mechanism.  But the record gives rise to factual disputes material to determining whether PLS misappropriated Database content, failed to co-brand the Database in its marketing materials, or offered competing products. This court has granted PLS's summary judgment motion as to the second and eighth assertions—that PLS conducted international marketing efforts and made frivolous claims of Database ownership, in violation of the MOU.  PLS's summary judgment motion is denied as to the other six grounds Derrick alleges as grounds for finding that PLS exited the MOU.  Factual disputes material to deciding those claims preclude summary judgment.

## IV.	PLS's Counterclaims Against Derrick

### A.	Fraud

PLS alleges that Derrick fraudulently misrepresented the nature of the parties' business venture.  PLS claims that Derrick, knowing that the statements were false, misrepresented that: (1) the parties would "jointly develop" the Database; (2) Derrick was transferring its ownership of the Database to the partnership; and (3) the parties would each own a 50 percent interest in the Database.[1]  Derrick argues that PLS's fraud claim is foreclosed by this court's Phase I ruling.  The court agrees.

Under Texas law, a plaintiff alleging fraud is required to show: "(1) that a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury." *Massey v. EMC Mortg. Corp.*, 546 F. App'x 477, 481 (5th Cir. 2013) (per curiam) (quoting *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam)).

The Phase I ruling forecloses PLS's argument that on Derrick misrepresented that the parties would jointly develop the Database, or that PLS justifiably relied on what role it contends Derrick promised to have PLS play.  The court found that PLS's "contributions represent 1.7 percent of the Database's current content."  *Derrick Petroleum Servs.*, 2014 WL 7447229, at *13.  The court

---

[1]  In its response, PLS also argues that it relied on Derrick's misrepresentations that PLS would be entitled to make international sales and that the parties' business relationship would last longer than the five-year term stated in the MOU.  PLS did not allege these misrepresentations in its fifth amended counterclaim. "A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court." *Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005).

further found that:

> Derrick had the right to control the content of the Derrick/PLS Database. The evidence d[id] not show that Derrick refused to consider including entries from the Legacy Database, or other information PLS submitted, in the Derrick/PLS Database. Instead, the evidence show[ed] that Derrick exercised its contractual prerogative of controlling the Database's content and format. Deodhar credibly testified as to the reasons it decided not to include many of the suggestions PLS submitted, including entries from its Legacy Database.

*Id.* at *11. The MOU and undisputed facts in the record show that, as a matter of law, Derrick did not falsely describe PLS's role in expanding the Database and PLS did not justifiably rely on what it claims Derrick promised. PLS did contribute to the Database, and PLS could not have reasonably believed that, under the MOU, Derrick had no discretion to determine what materials to include in the Database. Nor could PLS have reasonably believed that Derrick promised to include all, most, or many of PLS's suggestions in the Database. PLS's claim that Derrick fraudulent described the joint development of the Database fails.

This court's Phase I ruling and Wise's deposition testimony also foreclose PLS's argument that it reasonably relied on Derrick's alleged representations that it was transferring ownership of the Database to a PLS/Derrick partnership or joint venture. The court found that "[i]nternal PLS emails also show that [Brian] Lidsky [a PLS employee] and [Ronyld] Wise [PLS's founder and principal] believed that the MOU did not expressly transfer ownership." *Id.* at *5. Wise testified in his deposition: "honestly, I wasn't worried about ownership. You know, we were entering a joint venture and you know it's like when you get married, you don't worry about who owns the house and the red wagon . . . ." (Docket Entry No. 307, Ex. 8). Undisputed record evidence shows that neither the MOU nor a Derrick agent represented that Derrick was transferring the Database from Derrick's sole ownership to joint ownership by Derrick and PLS. This court's Phase I findings and the record, including Wise's testimony, foreclose the possibility that PLS relied on a joint-ownership

representation—a required element for PLS to show fraud.  Derrick's summary judgment motion on PLS's fraud claim is granted.

**B.      The Exit Mechanism**

PLS alleges that Derrick triggered the MOU's Exit Mechanism by forming an entity called 1Derrick, in order to circumvent the MOU and to compete with the parties' business venture. Derrick argues that it could not have exited the MOU by creating 1Derrick because Deodhar—not Derrick—created 1Derrick.  In response, PLS points to Deodhar's deposition testimony that he formed 1Derrick "for marketing Derrick Petroleum Services Products."  (Docket Entry No. 318 at 5).  PLS also points to evidence that Deodhar, Derrick's principal, owns 90 percent of 1Derrick. Both Deodhar and Wise signed the MOU.  The parties dispute whether they intended the MOU's non-circumvention clause to apply to Deodhar and Wise, the principals of Derrick and PLS, or only to the corporate entities these individuals founded and owned.  The MOU is silent on the issue. Derrick's summary judgment motion on this claim is denied.

**C.      Breach of Contract**

**1.      Intel Bytes**

PLS alleges that Derrick breached the MOU's similar-products provision when 1Derrick marketed a product, Intel Bytes, that competed with the Database.  Deodhar, not Derrick, created 1Derrick.  There are factual disputes material to determining whether the MOU's similar-products provision applies.  There is also a factual dispute as to whether Intel Bytes is so similar to the Database as to fall within the similar-products provision.  The MOU states that: "[t]he parties . . . will not circumvent the other party for similar product offerings, unless agreed to in writing." (Docket Entry No. 1, Ex. 1 at 3).  The MOU does not define "similar product offerings."  It is

unclear whether the similar-products provision applies to products similar to any Derrick or PLS business activities, or only to those entities connected to the Database, and whether Intel Bytes is similar to either. These disputes preclude summary judgment on this claim. Derrick's motion is denied.

### 2.      The Marketing Materials

PLS alleges that Derrick breached the MOU by giving 1Derrick the marketing materials PLS created for the parties' business venture. PLS submitted the allegedly copied marketing materials. These materials contain Derrick's name. The materials look similar to the marketing materials used for the Database. Derrick mentions this claim in its summary judgment motion but does not present a basis for granting summary judgment dismissing the claim. Derrick's motion to dismiss this claim on summary judgment is denied.

### 3.      The Non-Litigation Clause

PLS alleges that Derrick breached the MOU's non-litigation clause. That clause states: "The parties agree to execute a non-litigation clause subject to a minimum requirement that the parties fulfill their Agreement obligations in good faith. Litigation can only be pursued in the event of gross negligence." (Docket Entry No. 1, Ex. 1 at 3). Derrick could sue PLS only if it failed to act in good faith or acted with gross negligence. Derrick has alleged PLS's failure to act in good faith, and the record shows factual disputes material to determining whether PLS failed to act in good faith. Derrick's summary judgment motion on this issue is denied.

### D.      The Tax Recovery Claim

PLS claims that it is entitled to recover for the taxes it failed to withhold and later paid on Derrick's behalf. PLS states that it did not realize it had an obligation to withhold taxes until 2013,

when it paid the IRS $44,795.49 PLS should have withheld. (Docket Entry No. 318 at 7–8).

Because Derrick is a foreign partnership formed under Indian law, 26 U.S.C. § 1441(a) applies. It requires "all persons . . . having the control, receipt, custody, disposal, or payment of any . . . gross income from sources within the United States . . . of any foreign partnership [to] . . . deduct and withhold from such items a tax equal to 30 percent thereof." PLS had control over, and custody of, the revenue from the Database and was responsible for withholding 30 percent of Derrick's share. "Every person required to deduct and withhold any tax under this chapter is hereby made liable for such tax . . . ." 26 U.S.C. § 1461.

The obligation to withhold is separate from the foreign entity's tax liability. "An American taxpayer who makes such . . . payments [to a foreign corporation] is required to deduct and withhold the tax owed by the foreign corporation. If the American taxpayer fails to deduct and withhold the tax, he is personally liable for the tax due." *Del Commercial Props., Inc. v. Comm'r of Internal Revenue Serv.*, 251 F.3d 210, 213 (D.C. Cir. 2001) (citations omitted). A PLS tax expert stated in an email to PLS: "I have probably said this a thousand times, but this is a PLS oversight. PLS has 100% of the liability." (Docket Entry No. 307, Ex. 21). PLS's undisputed failure to comply with the withholding requirements under United States tax law created the tax liability. Under the MOU, Derrick is not obligated to reimburse or otherwise indemnify PLS for this amount. Derrick's summary judgment motion on this claim is granted.

### E.     The Trade Secrets Claim

PLS alleges that Derrick is liable under Texas common law and the Texas Uniform Trade Secret Act (TUTSA) for misappropriating PLS's trade secrets. PLS alleges that Derrick improperly provided the 1Derrick companies with PLS's customer and pricing information, and that the

1Derrick companies used that information to PLS's detriment.  (Docket Entry No. 321 at 33).

Derrick argues that PLS's customer and pricing information is not a trade secret because Derrick is an entity outside of PLS and it obtained the information.  Derrick argues that it properly had access to the customer and pricing information through the subscription contracts and customer invoices.  Although Derrick argues that it "didn't have a list, per se," it argues that the customer information that would be contained in a list was readily ascertainable from the subscription contracts and customer invoices.  (Docket Entry No. 307 at 39).  Second, Derrick argues that Exhibit A to the Agreement Pending Appeal, which provides a list of PLS's current customers, was jointly authored by PLS and Derrick and their attorneys.  Derrick asserts that because this list was jointly created, it is not a PLS-owned document, much less a PLS trade secret.

"A trade secret owner may disclose trade secret information to a third party without risk of losing trade secret protection if the owner takes steps to insure the secrecy of the information." *INEOS Grp. Ltd. v. Chevron Phillips Chem. Co., LP*, 312 S.W.3d 843, 853 (Tex. App.—Hous. [1st Dist.] 2009, no pet.).  Trade secret "[p]rotection is available even in the absence of an express agreement not to disclose materials; when a confidential relationship exists, the law will imply an agreement not to disclose trade secrets."  *In re Cayman Is. Firm of Deloitte & Touche*, No. 04–01–00491–CV, 2001 WL 1042233, at *2 (quoting *Gonzales v. Zamora*, 791 S.W.2d 258, 265 (Tex.App.—Corpus Christi 1990, no writ)).

The MOU does not address confidentiality or trade secrets.  (Docket Entry 1, Ex. 1).  The parties agree that 1Derrick was not a party to the MOU.  The record suggests that PLS took steps to protect the information from broad dissemination.  It is undisputed that Derrick and PLS kept their Agreement Pending Appeal, including its attached customer information, confidential.  The parties

filed it in court under seal.  (Docket Entry Nos. 70–71).  Derrick's summary judgment motion on this claim is denied.

### F.    Tortious Interference

PLS alleges that Derrick tortiously interfered with PLS's business relationships with existing customers who had subscription agreements with PLS, causing damage.  Derrick argues that PLS cannot prove that Derrick tortiously interfered with any subscription agreements or that PLS suffered damages.  Derrick further argues that its actions were both justified and privileged.

Under Texas law, a plaintiff is required to prove actual damages for a tortious-interference claim.  *All Am. Tel.*, 291 S.W.3d at 531.  Derrick argues that PLS cannot identify evidence supporting an inference that PLS sustained any damages resulting from Derrick's alleged tortious interference with PLS's existing customers.

In response, PLS failed to identify evidence of actual damages, such as lost business or profits.  *See Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 805 (5th Cir. 2011).  PLS's only identification of damages from Derrick's alleged interference is that it caused "customer confusion."  (Docket Entry No. 318 at 15).  But a general reference to "customer confusion," without evidence of what it was and how it damaged PLS, is insufficient.  *See Santander Consumer USA, Inc. v. Zeigler Chrysler Dodge Jeep-Downers Grove LLC*, No 3:16–CV–3310–B, 2017 WL 2729998, at *11 (N.D. Tex. June 26, 2017) (a plaintiff's allegation of "customer confusion" was insufficient to demonstrate proximate cause or actual damages).  PLS has not pointed to evidence in the record showing customer confusion or resulting damages.  *Baranowski*, 486 F.3d at 119.

Derrick's summary judgment motion on this claim is granted.[2]

### G.     The Claim for Revenue from Renewals

PLS seeks a declaratory judgment that it is entitled to 50 percent of the revenue from subscription renewals on Database sales "for as long as those customers remain clients of the jointly developed M&A Database." (Docket Entry No. 321 at 29). Derrick seeks summary judgment dismissing this claim on the basis that PLS has no legal basis to receive revenue other than as provided in the MOU, which is now expired, or under the Agreement Pending Appeal, which is also expired. (Docket Entry No. 307 at 26).

PLS has failed to establish that, as a matter of law, it is entitled to revenues from subscription renewals on Database sales indefinitely "for as long as those customers remain clients of the jointly developed M&A Database." (Docket Entry No. 321 at 29). The MOU formally expired on October 3, 2014. *Derrick Petroleum Servs.*, 2014 WL 7447229, at *11. On August 29, 2014 before the MOU's formal expiration, PLS and Derrick entered into an Agreement in Lieu of Preliminary Injunction that extended the MOU's terms "through the trial and ruling of final judgment." (Docket Entry No. 43 at 1). On May 8, 2015, after the bench trial and ruling on the Phase I issues, the parties terminated the Agreement in Lieu of Preliminary Injunction by entering into an Agreement Pending Appeal.

The Agreement Pending Appeal states: "The parties' August 29, 2014 Agreement in Lieu of Preliminary Injunction is terminated and replaced by this Agreement." (Docket Entry No. 170

---

[2] Derrick moved to exclude evidence of damages PLS did not sufficiently disclose during the discovery process. (Docket Entry No. 312). Most of the damages relate to claims that the court has dismissed, including claims for fraud and indemnity for back taxes. The motion to exclude is denied as moot. Any remaining dispute about the precise calculation of damages remaining in the case may be reurged at the pretrial hearing on August 30, 2017. Limited discovery may be ordered if needed.

at 1).  It further states:

> This Agreement shall remain in place until either: (1) the determination of any appeal of the Judgment by the United States Court of Appeals for the Fifth Circuit; (2) the expiration of thirty days from the entry of the Judgment, should Defendant fail to file a Notice of Appeal within that thirty-day period in accordance with Federal Rule of Appellate Procedure 4(a)(1)(A); or (3) the issuance of any further order by the Court that may terminate, modify, or supersede this Agreement.

(*Id.* at 5–6).  The Fifth Circuit issued its opinion on PLS's appeal on August 4, 2016, *Derrick Petroleum Servs. v. PLS, Inc.*, 659 F. App'x 748 (5th Cir. 2016) (per curiam), terminating the Agreement Pending Appeal and the parties' contractual obligations to each other.

Derrick owns the Database.  *Derrick Petroleum Servs.*, 2014 WL 7447229, at *2.  PLS does not identify another contract or agreement with Derrick under which PLS would receive 50 percent of the revenues from subscription renewals "for as long as those customers remain clients of the jointly developed M&A Database."  (Docket Entry No. 321 at 29).  Derrick's summary judgment motion on this claim is granted.

## V.    Conclusion

The court grants in part and denies in part the parties' motions for summary judgment. The court grants PLS's summary judgment motion dismissing the following Derrick claims:

1. PLS breached the parties' Memorandum of Understanding by failing to act in good faith when it claimed ownership of the Database;

2. PLS breached the MOU by marketing the Database internationally;

3. PLS owes Derrick at least $2.5 million in Database revenue from sales occurring after the MOU's expiration; and

4. PLS triggered the MOU's "Exit Mechanism" when it: (1) marketed the Database internationally, and (2) made a frivolous claim of Database ownership.

The court denies PLS's summary judgment motion on the following Derrick claims, which will

proceed to trial:

1. PLS breached the MOU by failing to act in good faith by downloading the Database content;

2. PLS breached the MOU by failing to market the Database as a co-branded product;

3. PLS breached the MOU by offering docFinder as a standalone product;

4. PLS breached the MOU by offering the OpFinder product;

5. PLS breached the MOU by failing to pay Derrick a 50 percent share of the revenues from Database subscriptions during the duration of the MOU;

6. PLS violated the Computer Fraud and Abuse Act by downloading the Database content;

7. PLS violated the Lanham Act by its false and misleading statements in marketing materials for the Database; and

8. PLS triggered the MOU's Exit Mechanism by its: (1) theft of Database content to build a "copycat" Database; (2) failure to co-brand the Database; (3) failure to act in good faith; (4) failure to pay Derrick a 50 percent share of revenues; (5) offering docFinder as a standalone product; and (6) offering the OpFinder product.

The court grants Derrick's summary judgment motion dismissing the following PLS claims:

1. Derrick committed fraud by misrepresenting the nature of the parties' business venture;

2. PLS is entitled to recover $44,795.49 for the taxes it failed to withhold from Derrick's 50 percent share of the revenues;

3. Derrick tortiously interfered with PLS's contracts with existing subscription customers; and

4. PLS is entitled to 50 percent of the revenues on the Database subscription renewals "for as long as those customers remain clients of the jointly developed M&A Database." (Docket Entry No. 321 at 29).

The court denies Derrick's summary judgment motion on the following PLS claims, which will

proceed to trial:

1.	Derrick triggered the MOU's Exit Mechanism by forming 1Derrick;

2.	Derrick breached the MOU by 1Derrick's marketing of Intel Bytes;

3.	Derrick breached the MOU by giving 1Derrick the marketing materials PLS created for the business venture between Derrick and PLS;

4.	Derrick misappropriated PLS's trade secrets under Texas common law and the Texas Uniform Trade Secrets Act; and

5.	Derrick breached the MOU's non-litigation clause by filing this lawsuit.

A pretrial hearing is set for **August 30, 2017 at 9:30 a.m.** to set a schedule to resolve the remaining claims. The parties must file their joint pretrial order by **August 25, 2017**. All counsel and party principals must attend the hearing.

SIGNED on August 11, 2017, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge